**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

**WTS PARADIGM, LLC,**

     Plaintiff,

     v.

**EDGEAQ, LLC,**

     Defendant.

Case No. 15–cv–330

**JURY TRIAL DEMANDED**

---

### COMPLAINT FOR DECLARATORY JUDGMENT

---

Plaintiff, WTS Paradigm, LLC ("WTS"), by its attorneys, Quarles & Brady LLP, as and for its complaint, alleges as follows:

### NATURE OF THE LAWSUIT

1. This is an action under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against EdgeAQ, LLC ("EdgeAQ") for a declaration that WTS does not infringe U.S. Patent No. 6,810,401 ("the '401 Patent") or U.S. Patent No. 7,461,049 ("the '049 Patent") (collectively, the "Patents in Suit").

2. This is also an action under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against EdgeAQ for a declaration that WTS has not misappropriated EdgeAQ's trade secrets, has not tortiously interfered with EdgeAQ's contractual or business relationships, and has not procured a breach of an EdgeAQ contract.

### PARTIES

3. WTS is a Wisconsin limited liability company with its principal place of business at 1850 Deming Way, Suite 120, Middleton, WI 53562.

4. On information and belief, EdgeAQ is a Delaware limited liability company having a principal place of business at 6 Cadillac Drive, Suite 405, Brentwood, TN 37027.

5. On information and belief, EdgeAQ has an office at N14W24200 Tower Place, Suite 100, Waukesha, WI 53188.

1

**JURISDICTION & VENUE**

6.     This Court has jurisdiction to declare the rights and other legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202, because this action presents a case of actual controversy within this Court's jurisdiction.

7.     On November 17, 2014, EdgeAQ filed suit against WTS in *EdgeAQ, LLC v. WTS Paradigm, LLC*, No. 3:14-cv-02264, Dkt. No. 1 (M.D. Tenn.) (the "Tennessee Litigation").

8.     On January 28, 2015, EdgeAQ filed a First Amended Complaint in the Tennessee Litigation (the "First Amended Tennessee Complaint"). The First Amended Tennessee Complaint is attached as Exhibit A.

9.     In the First Amended Tennessee Complaint, EdgeAQ sued WTS for patent infringement of the '401 patent and the '049 patent, trade secret misappropriation, tortious interference with contractual and business relationships, and procurement of breach of contract.

10.     The Middle District of Tennessee dismissed the case for lack of personal jurisdiction on May 29, 2015. *EdgeAQ, LLC v. WTS Paradigm, LLC*, No. 14-cv-2264, Dkt. 102, Order Granting Motion to Dismiss (M.D. Tenn.).

11.     Upon information and belief, EdgeAQ continues to assert that WTS is liable for patent infringement of the '401 patent and the '049 patent, trade secret misappropriation, tortious interference with contractual and business relationships, and procurement of breach of contract.

12.     This Court has subject matter jurisdiction over Counts 1–2 of this action under 28 U.S.C. §§ 1331 and 1338(a), as they arise under the United States Patent Laws, Title 35 of the United States Code.

13.     In addition, the Court has pendant subject matter jurisdiction over Counts 3–5 of this action under 28 U.S.C. § 1367, as they arise out of the same facts and thus the same controversy. For example, in the First Amended Tennessee Complaint, EdgeAQ alleged that WTS's alleged infringement began only after WTS allegedly misappropriated EdgeAQ's trade secrets:

> Upon information and belief, after [WTS] received Edgenet's confidential information from Mr. Cork described in this First Amended Complaint, [WTS]

> modified the manner in which [WTS]'s product configuration software worked to mirror EdgeAQ's m2o product and be able to truncate the question process. Upon information and belief, [WTS]'s product configuration software began to infringe the claims of the '049 and '401 products after [WTS]'s modifications.

While WTS denies the substance of this allegation as it relates to the exchange of confidential information and patent infringement, WTS contends that this allegation shows relatedness between the threatened patent infringement and trade secret claims for the purposes of pendant subject matter jurisdiction.

14.    Alternatively, this Court has subject matter jurisdiction over this entire action under 28 U.S.C. §§ 1332, as the parties are diverse.  As stated supra, EdgeAQ is a Delaware limited liability company with its principal place of business in Brentwood, Tennessee.  WTS is a Wisconsin limited liability company with its principal place of business in Middleton, WI. Further, upon information and belief, EdgeAQ is seeking over $75,000 in damages for their threatened claims.

15.    This Court has personal jurisdiction over EdgeAQ.

16.    On information and belief, one member of EdgeAQ is a resident of California and the remaining members are residents of Tennessee.

17.    EdgeAQ is engaged in substantial and not isolated business activities in the State of Wisconsin and in this judicial district.

18.    For example, EdgeAQ is registered as a Foreign Limited Liability Company in the State of Wisconsin with a registered agent office located at 8040 Excelsior Drive, Suite 200, Madison, WI 53717.  Further, upon information and belief, EdgeAQ has a physical facility and employees  located at N14W24200 Tower Place, Suite 100, Waukesha, WI 53188.

19.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391.

## COUNT 1:
## DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 6,810,401

20.    WTS re-alleges and incorporates the allegations of the foregoing paragraphs as though fully set forth herein.

21.     WTS has not and is not now infringing, directly or indirectly, or contributed to infringement by another, or actively induced others to infringe any claim of the '401 patent. WTS is not liable for any infringement of the '401 patent.

22.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

23.     As a result, WTS is entitled to a judgment finding that the '401 patent is not infringed by WTS, and that WTS has not contributed to or induced any infringement by another.

**COUNT 2:**
**DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 7,461,049**

24.     WTS re-alleges and incorporates the allegations of the foregoing paragraphs as though fully set forth herein.

25.     WTS has not and is not now infringing, directly or indirectly, or contributed to infringement by another, or actively induced others to infringe any claim of the '049 patent. WTS is not liable for any infringement of the '049 patent.

26.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

27.     As a result, WTS is entitled to a judgment finding that the '049 patent is not infringed by WTS, and that WTS has not contributed to or induced any infringement by another.

**COUNT 3:**
**DECLARATION OF NO MISAPPROPRIATION OF TRADE SECRETS**

28.     WTS re-alleges and incorporates the allegations of the foregoing paragraphs as though fully set forth herein.

29.     WTS has not misappropriated any EdgeAQ trade secrets.

4

30.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

31.     As a result, WTS is entitled to a judgment finding that WTS has not misappropriated any EdgeAQ trade secrets.

### COUNT 4:
### DECLARATION OF NO TORTIOUS INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONSHIPS

32.     WTS re-alleges and incorporates the allegations of the foregoing paragraphs as though fully set forth herein.

33.     WTS has not tortiously interfered with EdgeAQ's contractual or business relationships.

34.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

35.     As a result, WTS is entitled to a judgment finding that WTS has not tortiously interfered with EdgeAQ's contractual or business relationships.

### COUNT 5:
### DECLARATION OF NO PROCUREMENT OF BREACH OF CONTRACT

36.     WTS re-alleges and incorporates the allegations of the foregoing paragraphs as though fully set forth herein.

37.     WTS has not procured a breach of an EdgeAQ contract.

38.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

39.     As a result, WTS is entitled to a judgment finding that WTS has not procured a breach of an EdgeAQ contract.

## PRAYER FOR RELIEF

WHEREFORE, WTS prays for relief against EdgeAQ and respectfully requests judgment as follows:

(a)    For a declaration that WTS does not infringe, under any theory, any claim of the Patents in Suit;

(b)    For a declaration that WTS has not misappropriated EdgeAQ's trade secrets, has not tortiously interfered with EdgeAQ's contractual or business relationships, and has not procured a breach of an EdgeAQ contract.

(c)    For a declaration that this is an exceptional case under 35 U.S.C. § 285 and an award to WTS of its attorneys' fees and expenses in this action; and

(d)    For such other relief as the Court may deem just and proper.

Dated this 29th day of May, 2015.

/s/ Anthony A. Tomaselli
Anthony A. Tomaselli
aat@quarles.com
Kristin Graham Noel
kgn@quarles.com
Anita M. Boor
anita.boor@quarles.com
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI  53703
Tel.: 608.251.5000
Fax: 608.251.9166

Louis A. Klapp (of counsel)
louis.klapp@quarles.com
QUARLES & BRADY LLP
300 North LaSalle Street, Suite 4000
Chicago, IL 60654
Tel: 312-715-2712
Fax: 312-632-194

Counsel for WTS Paradigm, LLC

6

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), WTS Paradigm, LLC hereby demands a trial by jury of all issues so triable in this action.

Dated this 29th day of May, 2015.

*/s/ Anthony A. Tomaselli*
Anthony A. Tomaselli
aat@quarles.com
Kristin Graham Noel
kgn@quarles.com
Anita M. Boor
anita.boor@quarles.com
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI  53703
Tel.: 608.251.5000
Fax: 608.251.9166

Louis A. Klapp (*of counsel*)
louis.klapp@quarles.com
QUARLES & BRADY LLP
300 North LaSalle Street, Suite 4000
Chicago, IL 60654
Tel: 312-715-2712
Fax: 312-632-194

*Counsel for WTS Paradigm, LLC*

QB\35297601.2

7

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EDGEAQ, LLC<br><br>                    Plaintiff,<br><br>vs.<br><br>WTS PARADIGM, LLC,<br><br>                    Defendant. | Civil Action No.: 3:14-cv-2264<br><br>Judge Campbell<br><br>Magistrate Judge Knowles<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Plaintiff EdgeAQ, LLC files this First Amended Complaint against Defendant WTS Paradigm, LLC ("Defendant"), alleging, based on its own knowledge with respect to itself and its own actions and based on information and belief as to all other matters, as follows:

**INTRODUCTION**

1.      This is an action for patent infringement arising under the patent laws of the United States, Title 35, United States Code to enjoin infringement and obtain damages from Defendant's unauthorized manufacture, use, sale, offer to sell, and/or importation into the United States for the subsequent use or sale of products or methods that infringe one or more claims of U.S. Patent No. 6,810,401, entitled Automated Configuration System and Method (hereinafter "the '401 Patent") and U.S. Patent No. 7,461,049, entitled Automated Configuration System and Method (hereinafter "the '049 Patent") which are owned by EdgeAQ, LLC.  In addition, this is also an action for state law claims of trade secret misappropriation, tortious interference with contractual and business relationships, and procurement of breach of contract based on

1

Defendant's wrongful actions in soliciting trade secret information from a former employee of EdgeAQ, LLC.

## THE PARTIES

2.      EdgeAQ, LLC is a Delaware limited liability company having its principal place of business in Brentwood, Tennessee.

3.      EdgeAQ, LLC is the owner, by assignment, of all right, title, and interest in and to the '401 Patent, including the right to bring suit for patent infringement.

4.      EdgeAQ, LLC is the owner, by assignment, of all right, title, and interest in and to the '049 Patent, including the right to bring suit for patent infringement.

5.      Upon information and belief, Defendant is a Wisconsin limited liability company with its principal place of business located at 1600 Aspen Commons, Suite 500, Middleton, WI 53562.

6.      Upon information and belief, Defendant may be served this First Amended Complaint via its registered agent: Amanda L. Thomas, 1600 Aspen Commons, Suite 500, Middleton, WI 53562.

## JURISDICTION AND VENUE

7.      This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject matter jurisdiction over all causes of action set forth herein pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.* In addition, this Court has pendant jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

2

8.    Venue is proper in this judicial district and division pursuant to 28 U.S.C. §§1391(b) and (c) and 1400(b) in that, upon information and belief, Defendant has done business in this District, has committed acts of infringement in this District, and continues to commit acts of infringement in this District, thus entitling EdgeAQ, LLC to relief. Venue is further proper in this judicial district in that Defendant has committed tortious actions through its actions in misappropriating EdgeAQ's trade secrets, interfering with EdgeAQ's contractual and business relations and inducing a resident of this District to breach his contract with EdgeAQ, which are further set forth in Counts III-V of this First Amended Complaint.

9.    Upon information and belief, Defendant is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Tennessee Long Arm Statute, due at least to Defendant's substantial business in this State and judicial district, including: (i) at least a portion of the infringements alleged herein; and/or (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Tennessee and in this district. Defendant has sold and offered to sell infringing goods and/or services in this District and in the State of Tennessee.  Defendant's website includes a map which plots users of its goods and services, including many in the State of Tennessee. Defendant is further subject to jurisdiction in this State and this judicial District through its actions in misappropriating EdgeAQ's trade secrets, interfering with EdgeAQ's contractual and business relations and inducing a resident of this District to breach his contract with EdgeAQ, which are further set forth in Counts III-V of this First Amended Complaint.

3

**COUNT I**
**(INFRINGEMENT OF U.S. PATENT NO. 6,810,401)**

10.    EdgeAQ, LLC re-alleges and incorporates herein the allegations of the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

11.    EdgeAQ, LLC is the owner, by assignment, of all right, title, and interest in and to U.S. Patent No. 6,810,401 ("the '401 Patent"), which issued from the United States Patent and Trademark Office on October 26, 2004, including the right to exclude others and to enforce, sue and record damages for past and future infringement. A true and correct copy of the '401 Patent is attached hereto as Exhibit A.

12.    The '401 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

## DIRECT INFRINGEMENT OF THE '401 PATENT

13.    Defendant has directly infringed and continues to directly infringe one or more claims of the '401 Patent in this judicial district and elsewhere in Tennessee and the United States, including at least claims 6 and 7, by among other things making, using, offering for sale and/or selling the infringing Centerpoint product configuration software system alone or in combination with its the "One Catalog. Everywhere."  System (hereinafter the "Centerpoint System").

## INDIRECT INFRINGEMENT OF THE '401 PATENT
**(INDUCEMENT – 35 U.S.C. § 271(b))**

14.    Based on the information presently available to EdgeAQ, LLC, absent discovery, and in the alternative to direct infringement, EdgeAQ, LLC contends that Defendant has, and continues to, indirectly infringe one or more claims of the '401 Patent by inducing direct infringement by users of its Centerpoint System.

15. Defendant has had knowledge of the '401 Patent for at least a period of time during the period whereby Defendant has infringed the '401 Patent, including at least since service, or notice, of this action. On information and belief, despite having knowledge of the '401 Patent, Defendant has specifically intended for persons who acquire and use its Centerpoint System, including Defendant's customers, to acquire and/or use such devices in a way that infringes the '401 Patent, including at least claim 1, and Defendant knew or should have known that its actions were inducing infringement.

16. Defendant instructs and encourages users to use its Centerpoint System in a manner that infringes the '401 Patent. For examples, see:

http://www.wtsparadigm.com/centerpoint/;

http://www.wtsparadigm.com/windows/;

http://www.wtsparadigm.com/doors/;

http://www.wtsparadigm.com/garage-doors/; and

http://www.wtsparadigm.com/window-fashions/.

In accordance with Fed. R. Civ. P. 11(b)(3), EdgeAQ, LLC will likely have additional evidentiary support after a reasonable opportunity for discovery on this issue.

## INDIRECT INFRINGEMENT
### (CONTRIBUTORY – 35 U.S.C. § 271(c))

17. Based on the information presently available to EdgeAQ, LLC, absent discovery, and in the alternative to direct infringement, EdgeAQ, LLC contends that Defendant has, and continues to, indirectly infringe one or more claims of the '401 Patent by contributing to the direct infringement of users of its Centerpoint System.

18. Defendant has had knowledge of the '401 Patent since at least service, or notice, of this action. Despite this knowledge, Defendant has knowingly sold, and continues to sell, its

Centerpoint System even though such devices are not staple articles or commodities of commerce suitable for substantial non-infringing use.

19.     The only use demonstrated for Defendant's Centerpoint System on Defendant's website is an infringing use.  For examples, see:

http://www.wtsparadigm.com/centerpoint/;

http://www.wtsparadigm.com/windows/;

http://www.wtsparadigm.com/doors/;

http://www.wtsparadigm.com/garage-doors/; and

http://www.wtsparadigm.com/window-fashions/.

Defendant's Centerpoint System is especially made and/or adapted for use in infringing the '401 Patent.

20.     Upon information and belief, EdgeAQ, LLC has been irreparably harmed by Defendant's infringements of EdgeAQ, LLC's patent rights.

21.     EdgeAQ, LLC has complied with the statutory requirement of placing a notice of the '401 Patent on its product configuration products it manufactures and sells.

22.     Defendant's unauthorized and infringing uses of EdgeAQ, LLC's '401 Patent have threatened the value of this intellectual property because Defendant's conduct results in loss of EdgeAQ, LLC's lawful patent rights to exclude others from making, using, selling, offering to sell and/or importing the patented invention.

23.     The acts of infringement of the '401 Patent by Defendant have caused damage to EdgeAQ, LLC, and EdgeAQ, LLC is entitled to recover from Defendant the damages sustained by EdgeAQ, LLC as a result of Defendant's wrongful acts in an amount subject to proof at trial.

6

24. The infringement of EdgeAQ, LLC's exclusive rights under the '401 Patent by Defendant will continue to damage EdgeAQ, LLC, causing irreparable harm, for which there is no adequate remedy at law, unless enjoined by this Court.

## COUNT II
### (INFRINGEMENT OF U.S. PATENT NO. 7,461,049)

25. EdgeAQ, LLC re-alleges and incorporates herein the allegations of the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

26. EdgeAQ, LLC is the owner, by assignment, of all right, title, and interest in and to U.S. Patent No. 7,461,049 ("the '049 Patent"), which issued from the United States Patent and Trademark Office on December 2, 2008, including the right to exclude others and to enforce, sue and record damages for past and future infringement. A true and correct copy of the '049 Patent is attached hereto as Exhibit B.

27. The '049 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

### DIRECT INFRINGEMENT OF THE '049 PATENT

28. Defendant has directly infringed and continues to directly infringe one or more claims of the '049 Patent in this judicial district and elsewhere in Tennessee and the United States, including at least claims 1, 2, 3, 4, and 5 by among other things making, using, offering for sale and/or selling the infringing Centerpoint product configuration software system alone or in combination with its the "One Catalog. Everywhere." System (hereinafter the "Centerpoint System").

7

## INDIRECT INFRINGEMENT
### (INDUCEMENT – 35 U.S.C. § 271(b))

29.     Based on the information presently available to EdgeAQ, LLC, absent discovery, and in the alternative to direct infringement, EdgeAQ, LLC contends that Defendant has, and continues to, indirectly infringe one or more claims of the '049 Patent by inducing direct infringement by users of its Centerpoint System.

30.     Defendant has had knowledge of the '049 Patent for at least a period of time during the period whereby Defendant has infringed the '049 Patent, including at least since service, or notice, of this action. On information and belief, despite having knowledge of the '049 Patent, Defendant has specifically intended for persons who acquire and use its Centerpoint System, including Defendant's customers, to acquire and/or use such devices in a way that infringes the '049 Patent, including at least claim 11, and Defendant knew or should have known that its actions were inducing infringement.

31.     Defendant instructs and encourages users to use its Centerpoint System in a manner that infringes the '049 Patent. For examples, see:

> http://www.wtsparadigm.com/centerpoint/;
>
> http://www.wtsparadigm.com/windows/;
>
> http://www.wtsparadigm.com/doors/;
>
> http://www.wtsparadigm.com/garage-doors/;
>
> http://www.wtsparadigm.com/window-fashions/

In accordance with Fed. R. Civ. P. 11(b)(3), EdgeAQ, LLC will likely have additional evidentiary support after a reasonable opportunity for discovery on this issue.

8

## INDIRECT INFRINGEMENT
### (CONTRIBUTORY – 35 U.S.C. § 271(c))

32.     Based on the information presently available to EdgeAQ, LLC, absent discovery, and in the alternative to direct infringement, EdgeAQ, LLC contends that Defendant has, and continues to, indirectly infringe one or more claims of the '049 Patent by contributing to the direct infringement of users of its Centerpoint System.

33.     Defendant has had knowledge of the '049 Patent since at least service, or notice, of this action. Despite this knowledge, Defendant has knowingly sold, and continues to sell, its Centerpoint System even though such devices are not staple articles or commodities of commerce suitable for substantial non-infringing use.

34.     The only use demonstrated for Defendant's Centerpoint System on Defendant's website is an infringing use. For examples, see:

> http://www.wtsparadigm.com/centerpoint/;
>
> http://www.wtsparadigm.com/windows/;
>
> http://www.wtsparadigm.com/doors/;
>
> http://www.wtsparadigm.com/garage-doors/;
>
> http://www.wtsparadigm.com/window-fashions/;

Defendant's Centerpoint System is especially made and/or adapted for use in infringing the '049 Patent.

35.     Upon information and belief, EdgeAQ, LLC has been irreparably harmed by Defendant's infringements of EdgeAQ, LLC's patent rights.

36.     Defendant's unauthorized and infringing uses of EdgeAQ, LLC's '049 Patent have threatened the value of this intellectual property because Defendant's conduct results in loss

9

of EdgeAQ, LLC's lawful patent rights to exclude others from making, using, selling, offering to sell and/or importing the patented invention.

37.     The acts of infringement of the '049 Patent by Defendant have caused damage to EdgeAQ, LLC, and EdgeAQ, LLC is entitled to recover from Defendant the damages sustained by EdgeAQ, LLC as a result of Defendant's wrongful acts in an amount subject to proof at trial.

38.     The infringement of EdgeAQ, LLC's exclusive rights under the '049 Patent by Defendant will continue to damage EdgeAQ, LLC, causing irreparable harm, for which there is no adequate remedy at law, unless enjoined by this Court.

**COUNT III**
**(VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT AND MISAPPROPRIATION OF TRADE SECRETS)**
**(T.C.A. §§ 47-25-1701** *et seq.***)**

39.     EdgeAQ, LLC re-alleges and incorporates herein the allegations of the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

40.     Stephen Cork (hereinafter "Cork") is a former Vice President of Building Products for Edgenet, Inc. (hereinafter "Edgenet"), the predecessor to EdgeAQ, LLC. (*See* Exhibit F – Declaration of Stephen Cork).

41.     For all relevant time periods set forth herein, including while employed as Vice President of Building Products and while working with Defendant, Mr. Cork was a resident of this judicial District.

42.     When he was hired by Edgenet, Cork signed a Nondisclosure, Noncompetition, and Intellectual Protection Agreement dated May 10, 2005 with Edgenet, a true and correct copy of which is attached as Exhibit C to this First Amended Complaint (hereinafter the "Cork Nondisclosure Agreement").

10

43.    EdgeAQ is the transferee of the Cork Nondisclosure Agreement with all right, title and interest in the Cork Nondisclosure Agreement including the ability to enforce the Cork Nondisclosure Agreement.

44.    Paragraph 1 of the Cork Nondisclosure Agreement provides:

"Confidential Information" means any and all tangible and intangible information (whether written or otherwise recorded or oral) of Edgenet that (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; or (b) that Edgenet designates as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential.  Confidential Information includes, without limitation (i) nonpublic information relating to Edgenet's technology, customers, business plans, promotional and marketing activities, finances and other business affairs, and (ii) third-party information that Edgenet is obligated to keep confidential.  Confidential Information also includes any of the above mentioned items that are developed or created by Employee during his/her employment with Edgenet.

45.    Paragraph 3 of the Cork Nondisclosure Agreement provides:

All Confidential Information furnished to Employee will be used solely in connection with performing Employee's duties to Edgenet, will not be discussed with other persons without Edgenet's express written authorization, will not be used in any way directly or indirectly except in furtherance of Edgenet's business, and will be kept confidential by Employee.

46.    Paragraph 5 of the Cork Nondisclosure Agreement provides:

If Edgenet so requests at any time, Employee will return promptly to Edgenet all copies, extracts, or other reproductions in whole or in part of the Confidential Information in the possession of Employee.  All Documents (defined to include not only paper documents but also data stored in computer memory, or on microfilm, microfiche, magnetic tape, disk or other medium, e-mails and any soft documents) that Employee

11

prepares in connection with his/her duties as an Employee of Edgenet, and all Confidential Information that may be given to him/her in the course of his/her employment are and shall remain the sole property of Edgenet. Except as necessary in the performance of Employee's duties, all Documents (including copies of Documents) containing Confidential Information shall be and remain in Edgenet's sole possession on Edgenet's premises and shall not be copied or removed from Edgenet's premises. Upon termination of his/her employment with Edgenet, Employee shall return to Edgenet all Documents, including all copies thereof in Employee's possession or control.

47.     Paragraph 7 of the Cork Nondisclosure Agreement provides:

Employee shall notify Edgenet immediately upon discovery of any unauthorized disclosure of Confidenial Information, use of Confidential Information other than as permitted hereunder, or any other breach of this Agreement.  Employee will cooperate with Edgenet in every reasonable way to help Edgenet regain possession of its Confidential Information and prevent further unauthorized use.

48.     Paragraph 8 of the Cork Nondisclosure Agreement provides:

All Confidential Information shall remain the exclusive property of Edgenet.  Edgenet retains all rights and remedies afford it under patent, copyright, trade secret, trademark, and any othe applicable laws of the United States and the states thereof, or any applicable foreign countries, including, without limitation, any laws designed to protect proprietary or confidential information.  This Agreement does not grant to Employee any express or implied right to any of Edgenet's Intellectual Proprety.

49.     Paragraph 9 of the Cork Nondisclosure Agreement provides:

Intellectual Property.

(a)     "Intellectual Property" means any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, design, technique, know-how, trade secret, idea or other intellectual property right whatsoever or any interest therein, whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection.
        …

12

(d)    Employee agrees to perform during and after his/her employment, all acts deemed necessary or desirable by Edgenet to permit and assist it, at its expense, in perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in Edgenet Intellectual Property.  Such acts may include, but are not limited to, execution of documents and assistance or cooperation in the registration and enforcement of applicable patents, copyrights or other legal proceedings.

50.    Paragraph 11 of the Cork Nondisclosure Agreement provides:

Employee shall not make, use or permit to be used any Edgenet Property otherwise than for the benefit of Edgenet.  The term "Edgenet Property" shall include all notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular phones, pages, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of Edgenet's business or concerning any of its dealings or affairs and any other Edgenet property in his/her possession, custody or control.  Employee acknowledges and agrees that all Edgenet Property shall be and remain the sole and exclusive property of Edgenet.  Immediately upon termination of Employee's employment with Edgenet, or at such early time as Edgenet may request, Employee shall deliver all Edgenet Property in Employee's possession or control, and all copies thereof, to Edgenet.

51.    Paragraph 18 of the Cork Nondisclosure Agreement provides:

All obligations created by this Agreement shall survive any change or termination of the Parties employment relationship, if one exists or arises.

52.    During his employment with Edgenet, Cork was responsible for sales of Edgenet's m2o product configuration software product (hereinafter "m2o") to dealers and window manufacturers.

53.    The m2o software is an EdgeAQ software product that practices one or more inventions claimed in the '049 and '401 Patents.

13

54.    In the course of his employment, Cork became familiar with the m2o product in connection with his sales efforts.  He was also provided technical, non-technical and financial data to assist him in his efforts to sell the m2o product to customers. Much of this data was non-public information that was not generally known or readily ascertainable outside of Edgenet. Much of this data was marked confidential by Edgenet and Edgenet took steps to ensure that the data remained confidential and non-accessible by parties outside of Edgenet.

55.    After Mr. Cork left his employment with Edgenet, Nate Herbst, President of Defendant solicited Mr. Cork to provide consulting services to Defendant. Mr. Herbst advised Mr. Cork that Defendant was interested in aggressively pursuing the business of The Home Depot, Lowe's (which were Edgenet customers) and the dealer market, among others.

56.    Mr. Herbst was aware that Mr. Cork was a former Edgenet employee and was aware that Mr. Cork had signed an agreement with post-employment restrictions.  Despite that knowledge, Mr. Herbst remained interested in engaging Mr. Cork because Mr. Cork had knowledge of information that was confidential to Edgenet.

57.    In December 2009, Mr. Herbst emailed Mr. Cork and asked for information concerning Edgenet's licensing fees for "big box" retailers, specifically, what license fees Edgenet charged its big box customers for Edgenet's m2o software.  While Mr. Cork did not immediately provide Mr. Herbst with that information, after being engaged by Defendant as a "consultant" Mr. Cork did provide Mr. Herbst with specific information concerning Edgenet's m2o software license fees that it charged its customers, among other trade secret information proprietary to Edgenet.

58.    The license fees EdgeAQ charges customers for its m2o software is a trade secret of EdgeAQ under Tennessee law.

14

59.    On February 18, 2010, Defendant and Mr. Cork's company VMH Software entered into a Non-Disclosure Agreement.  The Non-Disclosure Agreement between Defendant and VMH Software is attached as Exhibit D to this First Amended Complaint.

60.    On February 23, 2010, Defendant and VMH Software entered into a consulting agreement.  The Consulting Agreement between Defendant and VMH Software is attached as Exhibit E to this First Amended Complaint.

61.    The purpose of the consulting agreement was for Mr. Cork to provide assistance in structuring Defendant's sales strategy for future sales targets for Defendant's product configuration software product.  The Defendant's sales targets for which Mr. Cork provided assistance and advice included The Home Depot, Lowe's, 84, ProBuild (UBC) and Bradco.

62.    In performing his consulting duties pursuant to the Consulting Agreement with Defendant, Mr. Cork assisted and advised Defendant regarding (i) defining the future functionality of Defendant's product configuration software, (ii) developing Defendant's pricing model for The Home Depot and other customers, (iii) setting out a product strategy review for Defendant's product configuration software, (iv) developing a marketing strategy review for Defendant's product configuration software, and (v) developing a sales strategy review for Defendant's product configuration software, among other things.  In connection with each of these efforts, Mr. Cork provided Defendant with information relating to EdgeAQ's m2o software that constitutes EdgeAQ trade secrets under Tennessee law.

63.    As one example, Mr. Cork provided Defendant with access to Edgenet's sales power point presentation to UBC (now called ProBuild) that Edgenet used during the sales process in successfully winning UBC's business in 2006-2007.

15

64.    Upon information and belief, Defendant made use of this document to subsequently win the UBC business from Edgenet.

65.    In assisting Defendant with defining the future functionality of their product configuration software, Defendant solicited from Mr. Cork, and Mr. Cork provided to Defendant, information relating to the functionality of Edgenet's m2o software and provided Defendant with suggested functionality and additions to their product's current functionality that was based on Edgenet's m2o software.  In doing so, Mr. Cork provided Defendant with Edgenet's trade secrets and other Edgenet property.  As one example, Mr. Cork provided Defendant with images of Edgenet's graphical user interface used by The Home Depot and other customers. Mr. Cork also strongly suggested that Defendant use the Edgenet graphical user interface images.

66.    At all times, Mr. Herbst was aware that the information Mr. Cork was providing to Defendant on product functionality was Edgenet trade secret of information under Tennessee law and that the graphical user interface images Mr. Cork provided was Edgenet's property.

67.    On behalf of Defendant, Mr. Herbst also specifically solicited Edgenet trade secret information relating to Edgenet pricing to customers.

68.    In assisting Defendant in developing a pricing model for The Home Depot and other customers which Defendant was targeting as potential sales, Mr. Cork made recommendations and provided advice on pricing strategies, pricing options and pricing alternatives and provided specific pricing values and ranges based on Edgenet's pricing strategies, options and actual prices using Edgenet's pricing model for its m2o software as a model for his recommendations.

69.    Mr. Cork also showed Nate Herbst and Defendant Edgenet's iCat (a catalog management solution) pricing which is confidential to Edgenet and provided Mr. Herbst and

16

Defendant with information on Edgenet's m2o annual license fees and how Edgenet calculated such fees for vendors of The Home Depot. Mr. Herbst was aware that the information Mr. Cork was providing to Defendant on pricing strategies, options, values and ranges was Edgenet trade secret information under Tennessee law.

70.    In developing a marketing and sales strategy review for Defendant, Mr. Cork advised Defendant on the potential overall value from retailers and dealer channels and made partnership suggestions and strategies for aiding in market penetration.  The information Mr. Cork provided to Defendant with respect to retailer and dealer channels was obtained during Cork's employment at Edgenet and much of it was confidential to Edgenet.  Mr. Herbst and Defendant were well aware that the source of this information was Edgenet.

71.    On April 13-14, 2010 Mr. Cork traveled to Defendant's office in Madison, Wisconsin and attended meetings with Nate Herbst, President of Defendant, Joel Fields, VP of Operations for Defendant, and Jess Williamson, Product Lead for Defendant.  The main subjects of the meetings were defining Defendant's sales strategy for future targets including The Home Depot, Lowe's, 84, Bradco.

72.    Mr. Cork viewed a demonstration of Defendant's product configuration software in the spring or summer of 2010. After the demonstration, Mr. Cork advised Defendant that Defendant's system as currently designed was not likely to get Defendant The Home Depot's business.  Mr. Cork recommended to Defendant that in order to win The Home Depot business Defendant should copy certain parts of Edgenet's m2o software.  As one example, Mr. Cork recommended that Defendant copy Edgenet's graphical user interface and the question and answer trees employed by Edgenet's m2o software.

17

73.    Defendant questioned Mr. Cork about Edgenet's system architecture and system logic and requested Mr. Cork's recommendations as to how Defendant could be more competitive with their product configuration product.  Mr. Cork explained to Defendant about how Edgenet used frames and slots architecture in their m2o product and how the frames and slots architecture permitted the Edgenet m2o product to be very fast.

74.    The frames and slots architecture and the manner in which the question and answer trees work in the m2o software are elements of the claims of the '049 and '401 Patents which Defendant is accused of infringing in this First Amended Complaint.

75.    Upon information and belief, prior to Mr. Cork's consulting services Defendant's product configuration software worked by asking the user a transcending series of questions in order. If the user answered all the questions and wanted to change an answer to an earlier question, the user could not simply change the earlier answer without re-answering all the questions again.  The Defendant's system had a prescribed path, rather than an optional path as to how to choose the product the user wanted.  The Defendant's product configuration software was unable to truncate the process and thereby remove or eliminate products by answering a question out of turn.

76.    Upon information and belief, after Defendant received Edgenet's confidential information from Mr. Cork described in this First Amended Complaint, Defendant modified the manner in which Defendant's product configuration software worked to mirror EdgeAQ's m2o product and be able to truncate the question process.  Upon information and belief, Defendant's product configuration software began to infringe the claims of the '049 and '401 products after Defendant's modifications.

18

77.    At Defendant's request, Mr. Cork provided Defendant with Edgenet confidential information on price models for retails and dealers, including real world Edgenet industry samples.  Mr. Cork also provided recommendations with respect to pricing for window products, door products, and other product categories based on Edgenet price models.

78.    The Edgenet industry samples and price models were trade secrets under Tennessee law.  Mr. Herbst and Defendant were aware that the information Mr. Cork was providing to Defendant relating to price models constituted Edgenet's trade secrets.

79.    At Defendant's request, Mr. Cork provided Defendant with available retailer and dealer opportunities for Defendant based on Mr. Cork's knowledge of Edgenet's business and Mr. Cork provided Defendant with Edgenet historical maintenance costs for its m2o software product and Edgenet's methods and timing for providing new releases and new versions of its m2o software product. Mr. Herbst and Defendant were aware that the information Mr. Cork was providing to Defendant with respect to Edgenet's maintenance costs and versioning was Edgenet trade secret information under Tennessee law.

80.    Upon Defendant's solicitation, Mr. Cork also provided Defendant with Edgenet's sales approach to prospective customers.  Mr. Herbst and Defendant were aware that the information Mr. Cork was providing Defendant with respect to Edgenet's sales approach was Edgenet trade secret information under Tennessee law.

81.    Upon Defendant's solicitation, Mr. Cork provided Defendant with Edgenet's Service Level Agreement ("SLA") metrics that Edgenet offered its customers.  Mr. Herbst and Defendant were aware that the information Mr. Cork was providing Defendant with respect to Edgenet's SLAs was Edgenet trade secret information under Tennessee law.

82.     Upon Defendant's solicitation, Mr. Cork recommended that Defendant standardize their catalog in the same manner that Edgenet used a standardized catalog and advised Defendant as to how Lowe's and The Home Depot's process of creating catalogs differed based on Mr. Cork's experience selling the m2o software.

83.     Upon Defendant's solicitation, Mr. Cork provided Defendant with a copy of Edgenet's return on investment ("ROI") model for Edgenet's m2o product that Edgenet had prepared for a customer, which was an Edgenet confidential document.   Mr. Herbst and Defendant were aware that the document Mr. Cork gave Defendant was a trade secret under Tennessee law.

84.     Upon information and belief, Defendant used the misappropriated trade secrets to successfully win contracts from EdgeAQ's customers, including but not limited to The Home Depot and Probuild.

85.     EdgeAQ learned of the facts set forth in paragraphs 55-83 in late December, 2014.  The Declaration of Stephen Cork, dated January 20, 2015 is attached hereto as Exhibit F.

86.     The business records, including pricing-related documents and financial information, used, possessed, and misappropriated by Defendant constitute EdgeAQ's trade secrets within the purview of the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. §§ 47-25-1701 *et seq*.  EdgeAQ made reasonable efforts to maintain the secrecy of those records, and those records derive actual and potential independent economic value from not being generally known to other persons who can obtain economic value from their disclosure or use.  Those records also derive actual and potential independent economic value from not being readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

20

87.    Based on information and belief, Defendant has misappropriated EdgeAQ's trade secrets, as defined in Tenn. Code Ann. §47-25-1702, in violation of the Tennessee Uniform Trade Secrets Act.  Defendant used improper means to acquire knowledge of EdgeAQ's trade secret information from Cork; and, at the time of use by WTS, WTS knew or had reason to know that WTS's knowledge of EdgeAQ's trade secret information was derived, *inter alia*, from or through Cork, a person who owed a duty to EdgeAQ to maintain the secrecy of and to limit the use of EdgeAQ's trade secrets.

88.    The Defendant's acts in misappropriating EdgeAQ's trade secrets has been and continue to be undertaken without the express or implied consent of EdgeAQ.

89.    EdgeAQ is suffering and will continue to suffer irreparable injury if Defendant is permitted to continue their ongoing violations of the Tennessee Uniform Trade Secrets Act and continue to profit, to EdgeAQ's detriment, from Defendant's violation of the Tennessee Uniform Trade Secrets Act.

## COUNT IV
### (TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS)
#### (Common Law)

90.    EdgeAQ, LLC re-alleges and incorporates herein the allegations of the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

91.    As shown by the facts set forth herein, Defendant has intentionally interfered with EdgeAQ's contractual and business relationships.  At the time of Defendant's intentional interference, EdgeAQ had an existing business relationship and prospective contractual relationship with one or more identifiable third parties, including but not limited to a contract

21

with Mr. Cork.  At that time, WTS had actual knowledge of the specific relationship between the identifiable third party and EdgeAQ.

92.    With full awareness of Mr. Cork's contractual obligations under the Cork Nondisclosure Agreement, Defendant has induced and encouraged Cork to disclose EdgeAQ information to WTS in violation of an existing business relationship.  WTS had intent to cause breach and termination of EdgeAQ's relationship with identified third parties.  Defendant acted with an improper motive in interfering with EdgeAQ's business relationships, including a predominant purpose to injure EdgeAQ.  Defendant also acted with improper motive and malice, including inducing another to violate a statute and misappropriate trade secrets belonging to EdgeAQ to the detriment of EdgeAQ.

93.    EdgeAQ has suffered, is suffering and will continue to suffer both damages and irreparable injury if Defendant is permitted to continue its tortious interference with EdgeAQ's contractual and business relationships.

### COUNT V
### (PROCUREMENT OF BREACH OF CONTRACT)
### (T.C.A. § 47-50-109)

94.    EdgeAQ, LLC re-alleges and incorporates herein the allegations of the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

95.    As shown by the facts set forth herein, Defendant has, by inducement, persuasion, misrepresentation, or other means, induced or procured the breach or violation of the Cork Nondisclosure Agreement in violation of T.C.A. § 47-50-109. At the time of the wrongdoing, a legal contract existed between EdgeAQ and an identifiable third party, and WTS had knowledge of the existence of the contract.  WTS had an intention to induce the third party to breach its contract with EdgeAQ, and WTS acted with malice in inducing the third party to breach its

22

contract with EdgeAQ. WTS's wrongdoing is a proximate cause of the breach of a contract, which resulted in damages to EdgeAQ. EdgeAQ is entitled to treble damages based on the Defendant's procurement of the breach of a contract.

## COUNT VI
### (AWARD OF ATTORNEY'S FEES)

96.    EdgeAQ, LLC re-alleges and incorporates herein the allegations of the foregoing paragraphs of this First Amended Complaint as if fully set forth herein.

97.    Defendant has misappropriated trade secrets in violation of the Tennessee Uniform Trade Secrets Act § 47-25-1701 *et seq*.

98.    EdgeAQ is entitled to an award of litigation expenses, including reasonable attorney's fees, against Defendant as provided under Tennessee Uniform Trade Secrets Act § 47-25-1705 based on Defendant's willful and malicious misappropriation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff EdgeAQ, LLC prays that the Court enter judgment in its favor and against Defendant, granting the following relief:

A.    That the Court enter judgment that one or more claims of the '401 Patent have been infringed either literally and/or under the doctrine of equivalents, by Defendant or by others to whose infringement Defendant has contributed and/or by others whose infringement has been induced by Defendant;

B.    That the Court enter judgment that one or more claims of the '049 Patent have been infringed either literally and/or under the doctrine of equivalents, by Defendant or by others to whose infringement Defendant has contributed and/or by others whose infringement has been induced by Defendant;

23

C. That Defendant be ordered to pay damages adequate to compensate EdgeAQ, LLC for its acts of infringement, pursuant to 35 U.S.C. § 284;

D. That EdgeAQ, LLC be awarded increased damages under 35 U.S.C. § 284 due to Defendant's willful infringement of the '401 and '049 patents;

E. That the Court find that this case is exceptional and award EdgeAQ, LLC its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

F. That Defendant, its officers, agents, employees, and those acting in privity with it, be permanently enjoined from further infringement, contributory infringement, and/or inducing infringement of the patent-in-suit, pursuant to 35 U.S.C. § 283;

G. That Defendant be ordered to pay EdgeAQ, LLC its attorneys' fees and expenses of litigation for violation of the Tennessee Uniform Trade Secrets Act;

H. That Defendant be ordered to pay treble damages for violations of T.C.A. § 47-50-109;

I. That Defendant be ordered to pay prejudgment and post-judgment interest;

J. That Defendant be ordered to pay all costs associated with this action; and

K. That EdgeAQ, LLC be granted such other and additional relief as the Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff EdgeAQ, LLC demands a trial by jury of all issues triable of right by a jury.

24

Dated:  Jan. 28, 2015                          Respectfully submitted,


                                               /s/ Matthew C. Cox
                                               Matthew C. Cox (Tenn. Bar No. 028212)
                                               Nathan J. Bailey (Tenn. Bar No. 026183)
                                               Laura P. Merritt (Tenn. Bar No. 026482)
                                               Robb S. Harvey (Tenn. Bar No. 011519)
                                               WALLER LANSDEN DORTCH & DAVIS, LLP
                                               Nashville City Center
                                               511 Union Street, Suite 2700
                                               Nashville, TN  37219
                                               Telephone: (615) 244-6380
                                               Facsimile: (615) 244-6804
                                               Matt.Cox@wallerlaw.com
                                               Nate.Bailey@wallerlaw.com
                                               Laura.Merritt@wallerlaw.com
                                               Robb.Harvey@wallerlaw.com


                                               Peter F. Schoenthaler (admitted *pro hac vice*)
                                               Bryan Baysinger (admitted *pro hac vice*)
                                               Peter F. Schoenthaler, P.C.
                                               3350 Riverwood Parkway, Suite 1900
                                               Atlanta, GA 30339
                                               Telephone:  (404) 592-5397
                                               Facsimile:    (404) 891-6120
                                               pfs@pfslawgroup.com
                                               blb@pfslawgroup.com


                                               Andrew Crain (admitted *pro hac vice*)
                                               Thomas Horstemeyer
                                               400 Interstate North Parkway SE, Suite 1500
                                               Atlanta, GA 30339-5029
                                               Telephone:  (770) 933-9500
                                               Facsimile:    (770) 951-0933
                                               Andrew.Crain@thomashorstemeyer.com


                                               *Attorneys for Plaintiff EdgeAQ, LLC*


                                          25

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2015, the foregoing was filed electronically using the court's CM/ECF system, which will serve notification of such filing upon the party listed below.

William L. Campbell , Jr.
FROST BROWN TODD LLC
150 3rd Avenue South
Suite 1900
Nashville, TN 37201

Anthony A. Tomaselli
Kristin Graham Noel
Martha Jahn Snyder
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703

*Attorneys for Defendant WTS Paradigm, LLC*

/s/ Matthew C. Cox

26

# EXHIBIT A
## TO FIRST AMENDED COMPLAINT

US006810401B1

## (12) United States Patent
### Thompson et al.

(10) Patent No.:     US 6,810,401 B1
(45) Date of Patent:        Oct. 26, 2004

(54) **AUTOMATED CONFIGURATION SYSTEM AND METHOD**

(75) Inventors: **Joseph H. Thompson**, Nashville, TN (US); **Randy J. Weems**, Lavergne, TN (US); **Edward A. Lessman**, Nashville, TN (US)

(73) Assignee: **Edgenet Inc.**, Brentwood, TN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 324 days.

(21) Appl. No.: **09/684,907**

(22) Filed: **Oct. 10, 2000**

### Related U.S. Application Data

(60) Provisional application No. 60/158,250, filed on Oct. 8, 1999, and provisional application No. 60/158,316, filed on Oct. 8, 1999.

(51) **Int. Cl.**[7] ................................................ **G06F 17/00**
(52) **U.S. Cl.** ................... **707/101**; 707/102; 707/103 R; 707/104.1; 715/517; 700/96; 700/97
(58) **Field of Search** ................................. 707/101, 102, 707/103 R, 104.1, 1, 2, 3, 6, 4, 5; 715/517; 700/96, 97; 709/203, 204, 205, 206, 208, 209; 705/26, 27, 28, 29

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,293,479 A | * | 3/1994 | Quintero et al. ............ 345/841 |
| 5,311,424 A | * | 5/1994 | Mukherjee et al. ........... 705/29 |
| 5,745,765 A | | 4/1998 | Paseman |
| 5,784,286 A | * | 7/1998 | Hirose et al. .................. 707/1 |
| 5,822,206 A | * | 10/1998 | Sebastian et al. ............. 700/97 |

| | | | |
|---|---|---|---|
| 5,877,966 A | | 3/1999 | Morris et al. |
| 5,963,953 A | | 10/1999 | Cram et al. |
| 5,966,310 A | * | 10/1999 | Maeda et al. ............ 707/104.1 |
| 6,064,982 A | | 5/2000 | Puri |
| 6,076,091 A | * | 6/2000 | Fohn et al. .................. 707/102 |
| 6,351,734 B1 | * | 2/2002 | Lautzenheiser et al. ........ 705/8 |
| 6,412,012 B1 | * | 6/2002 | Bieganski et al. .......... 709/232 |
| 6,546,419 B1 | * | 4/2003 | Humpleman et al. ....... 709/223 |

#### OTHER PUBLICATIONS

EPIC Electronic Product Information Corp, Product Brochures, Apr. 1997.
EPIC Product Information Corp., Technology; Software Brochure, May 1992.
EPIC Electronic Product Information Corp., Quick Reference Technology Demo, Mar. 1995.
Edgenet Media, Made 2 Order, Brochure, Rev. Jul. 28, 1998.

* cited by examiner

*Primary Examiner*—Shahid Alam
*Assistant Examiner*—Isaac M. Woo
(74) *Attorney, Agent, or Firm*—Dickstein Shapiro Morin & Oshinsky LLP

(57)            **ABSTRACT**

An automated configuration system (and method) is provided for facilitating the configuration of desired products, services, or other assemblages that require users to gather and assimilate disparate knowledge of makes, models, types, features, codes, and prices of the desired product/service to be configured. In accordance with a preferred embodiment, configuration is facilitated through interaction of a user with a frame engine that performs frame-based inferences to discern stored knowledge of a product (or the like), as supplemented by a rules-based inference system.

**8 Claims, 36 Drawing Sheets**



**U.S. Patent**    Oct. 26, 2004    Sheet 1 of 36    **US 6,810,401 B1**



*FIG. 1*

U.S. Patent

Oct. 26, 2004    Sheet 2 of 36    US 6,810,401 B1



FIG. 2

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 4 of 49 PageID #: 756



FIG. 3

U.S. Patent    Oct. 26, 2004    Sheet 4 of 36    US 6,810,401 B1



FIG. 4

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 6 of 49 PageID #: 758

U.S. Patent    Oct. 26, 2004    Sheet 5 of 36    US 6,810,401 B1



FIG. 5

**U.S. Patent**     Oct. 26, 2004     **Sheet 6 of 36**     **US 6,810,401 B1**



FIG. 6

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 43 of 166



FIG. 7

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 9 of 49 PageID #: 761

**U.S. Patent**    Oct. 26, 2004    Sheet 8 of 36    US 6,810,401 B1



*FIG. 8*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 45 of 166



FIG. 9

Case 3:14-cv-02264    Document 50-1    Filed 01/28/15    Page 11 of 49 PageID #: 763

FIG. 10

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 12 of 49 PageID #: 764

[Quick Spec]

File  Edit  Option  Window  Tutor  Help

| Exit | Quick Spec | Projects | Product Line Review | Tutor | | |

| Close | Save | Prefs | Back | Forward | Clear | Guide Form Spec's | Appl & Perf Spec's | |

SELECT MODEL/CAT NUM          Custom: ▽ ——10

| | Cat Number | Freq. | Ballast Type | Lamp Starting | Lamp Config. | Family |
|---|---|---|---|---|---|---|
| Lamp J1364 | CJ60MPT | 60 Hz | Magnetic | Preheat | N/A | UNIVERSAL |
| Lamp Qty. 1 | | | | | | |
| Voltage 120V | CJ40MPT | 40 Hz | Magnetic | Preheat | N/A | UNIVERSAL |
| Cat. Number | | | | | | |
| All Attributes | CJ45MPT | 40 Hz | Magnetic | Preheat | N/A | UNIVERSAL |

——46

◁ □ ▷

Qualify  1

Prefs: On

Hint:

## FIG. 11



*FIG. 12*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 49 of 166



FIG. 13

Case 3:14-cv-02264    Document 50-1    Filed 01/28/15    Page 15 of 49 PageID #: 767

U.S. Patent

Oct. 26, 2004

Sheet 14 of 36

US 6,810,401 B1



*FIG. 14*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 51 of 166



*FIG. 15*

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 17 of 49 PageID #: 769

U.S. Patent    Oct. 26, 2004    Sheet 16 of 36    US 6,810,401 B1

☐ Order Form Viewer ☐☐☒

EdgeNet, Inc          Customer   Roy Hill          Purchaser   Roy Hill          Page ____ of ____
Unit Order Form       Location   461 Ocean Blvd    Job Name                      Ship Date _____
                                 Integrity GA 30556             Pillsbury Residence   S# _____
Quote # _____    P.O # _____            Date   Wed Oct 04 2000           ____ %Discount

| QTY. | Product Code RO Width X Height (1) | Ext. Finish (2) | Hinge (3) | Glass (4) | PAS/RDG (5) | Grille/Divided Light(6) Type | Style | Pattern | Bar | LS | IN | Jamb Width(7) | Int. Prime (8) | Screen(9) Color | Type | Mesh | Hard-Ware (10) | Balance/Track (11) W | TP | Style | Ext. Trim(12) | Arched Casing (13) Type | Size | Style | ELEV Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | STANDARD UNITS | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | C2–CAS–1–8x3–0W | WH | LR | OPD | | | | | 1 3/8" | | | 4 9/16" | | WH | AM | | | | | | | | | | |
| 1 | C12–AWN–2–4x1–8W | WH | S/V | OPD | | | | | | | | 4 9/16" | | WH | AM | | | | | | | | | | |
| 1 | C2–DH–2–0x3–2W | WH | | OPD | | | | | 1 3/8" | | | 4 9/16" | | WH | AM | | K | PWR | | | | | | |
| | Prep For Stool | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | C2–CAS–1–8x3–0W | WH | LR | OPD | | | | | 1 3/8" | | | 4 9/16" | | WH | AM | | | | | | | | | | |

26

[Previous Page]

[Next Page]

[Print]

[Close]

FIG. 16



FIG. 17

U.S. Patent          Oct. 26, 2004          Sheet 18 of 36          US 6,810,401 B1



FIG. 18



FIG. 19



## FIG. 20a

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 22 of 49 PageID #: 774

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 57 of 166



*FIG. 20b*

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 23 of 49 PageID #: 775



FIG. 20c

U.S. Patent    Oct. 26, 2004    Sheet 23 of 36    US 6,810,401 B1

FIG. 21a

U.S. Patent    Oct. 26, 2004    Sheet 24 of 36    US 6,810,401 B1

**Edit Project**   [?] [X]

Quote # `000006`    Sales Rep `Jack Spradigan` ▽

Name `Pillsbury Reside`    Price Mult `1.0`

Status    Date `Wed Oct 04 16:44:04 2000`

**Project Information**    [ Copy from Customer ]

| Shipping Address | Billing Address |

Name `Ray Hill`

Phone `(770) 876-3425`

Fax `(770) 876-3420`

Address1 `461 Ocean Blvd`

Address2 `          `

City `Integrity`

State/Province `GA`    Zip Code `30556`

Country `          `

[ Copy from Billing Address ]

**Customer Information**

Customer `Ray Hill` ▽

Tax `6.0000`

PO # `          `

Terms `Net 30 Days` ▽

Comments

`|          ` — 72

⊙ Delivery      ○ Pickup

[ Line Item Adjust ]    [ Ok ]   [ Cancel ]

*FIG. 21b*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 61 of 166



*FIG. 22a*

Case 3:14-cv-02264    Document 50-1    Filed 01/28/15    Page 27 of 49 PageID #: 779

U.S. Patent

Oct. 26, 2004

Sheet 26 of 36

US 6,810,401 B1



FIG. 22b

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 63 of 166



*FIG. 23a*

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 29 of 49 PageID #: 781

U.S. Patent

Oct. 26, 2004

Sheet 28 of 36

US 6,810,401 B1



*FIG. 23b*

U.S. Patent   Oct. 26, 2004   Sheet 29 of 36   US 6,810,401 B1



FIG. 24

U.S. Patent

Oct. 26, 2004

Sheet 30 of 36

US 6,810,401 B1



FIG. 25

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 67 of 166



*FIG. 26*

Case 3:14-cv-02264    Document 50-1    Filed 01/28/15    Page 33 of 49 PageID #: 785



FIG. 27

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 69 of 166



*FIG. 28*

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 35 of 49 PageID #: 787



*FIG. 29*



*FIG. 30*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 72 of 166



FIG. 31



FIG. 32

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 38 of 49 PageID #: 790

US 6,810,401 B1

## AUTOMATED CONFIGURATION SYSTEM AND METHOD

This application claims priority to U.S. Provisional Patent Application No. 60/158,250, filed Oct. 8, 1999, and U.S. Provisional Patent Application No. 60/158,316, filed Oct. 8, 1999, which are both hereby incorporated by reference in their entirety.

### BACKGROUND

In the building and construction industry, job estimation is a time-consuming and costly process. In order to appropriately estimate the cost of any job an individual must assemble both the correct product to satisfy the engineering criteria of a given project and then assemble prices from a variety of data sources. Complex estimates compound the work and cost of this process. In a complex project, estimates are often assembled from a combination of pricing sources. These estimates require both a structured and intimate understanding of the product, its technical specifications, and costs.

### SUMMARY

An automated configuration system (and method) is provided for facilitating the configuration of desired products, services, or other assemblages that require users to gather and assimilate disparate knowledge of makes, models, types, features, options, limitations, codes, and prices of the desired product/service (or group of the same) to be configured. In accordance with a preferred embodiment, configuration is facilitated through interaction of a user with a frame engine that performs frame-based inferences to discern stored knowledge of a product (or the like), as supplemented by a rules-based inference system.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating a configuration device in accordance with a preferred embodiment of the invention;

FIG. **2** is a block diagram illustrating a configuration system in accordance with a preferred embodiment of the invention;

FIG. **3** is an exemplary illustration of a product Selection and Configuration display in accordance with a preferred embodiment of the invention;

FIG. **4** is an exemplary illustration of a Preferred Answer display in accordance with a preferred embodiment of the invention;

FIG. **5** is an exemplary illustration of a Standard Answer display in accordance with a preferred embodiment of the invention;

FIG. **6** is an exemplary illustration of a Graphic Selection display in accordance with a preferred embodiment of the invention;

FIG. **7** is an exemplary illustration of multiple Product Code displays in accordance with a preferred embodiment of the invention;

FIG. **8** is an exemplary illustration of a Standard Parametric Drawings display in accordance with a preferred embodiment of the invention;

FIG. **9** is an exemplary illustration of a Composite Unit Design display in accordance with a preferred embodiment of the invention;

FIG. **10** is an exemplary illustration of a Catalog Page display in accordance with a preferred embodiment of the invention;

FIG. **11** is an exemplary illustration of a DataGrid display in accordance with a preferred embodiment of the invention;

FIG. **12** is an exemplary illustration of a Custom Shapes Editor display in accordance with a preferred embodiment of the invention;

FIG. **13** is an exemplary illustration of a Pricing display in accordance with a preferred embodiment of the invention;

FIG. **14** is an exemplary illustration of an Accessories Module in accordance with a preferred embodiment of the invention;

FIG. **15** is an exemplary illustration of a Line Item Adjust Module in accordance with a preferred embodiment of the invention;

FIG. **16** is an exemplary illustration of an Order Form display in accordance with a preferred embodiment of the invention;

FIG. **17** is an exemplary illustration of a Quotes display in accordance with a preferred embodiment of the invention;

FIG. **18** is an exemplary illustration of a Schedule Generator display in accordance with a preferred embodiment of the invention;

FIG. **19** is an exemplary illustration of a Product Specifications display in accordance with a preferred embodiment of the invention;

FIG. **20** is an exemplary illustration of an AutoCAD display in accordance with a preferred embodiment of the invention;

FIGS. **21**a and **21**b are exemplary illustrations of a Project Information Management display in accordance with a Preferred embodiment of the invention;

FIGS. **22**a and **22**b are exemplary illustrations of a Sales-Representative Information Management display in accordance with a preferred embodiment of the invention;

FIGS. **23**a and **23**b are exemplary illustrations of a Client/Customer Information Management display in accordance with a preferred embodiment of the invention;

FIG. **24** is an exemplary illustration of a Product Line Review display in accordance with a preferred embodiment of the invention;

FIG. **25** is an exemplary illustration of an Interactive Tutor display in accordance with a preferred embodiment of the invention;

FIG. **26** is a flow diagram illustrating the sales/personnel process flow steps in accordance with a preferred embodiment of the invention;

FIG. **27** is a flow diagram illustrating the dealer/distributor use steps in accordance with a preferred embodiment of the invention;

FIG. **28** is a flow diagram showing the architectural process for a millwork system in accordance with a preferred embodiment of the invention;

FIG. **29** is flow diagram illustrating the manufacturer use process in accordance with a preferred embodiment of the invention;

FIG. **30** is a diagram illustrating a configuration network, in accordance with a preferred embodiment of the invention; and

FIGS. **31** and **32** are illustrations of the hierarchical structures used in accordance with a preferred embodiment of the invention.

### DETAILED DESCRIPTION

Preferred embodiments and applications of the invention will be described herein. Other embodiments may be real-

US 6,810,401 B1

**3**

ized and structural or logical changes may be made to the embodiments without departing from the spirit or scope of the invention. Although the preferred embodiments disclosed herein have been particularly described as applied to a configuration system and method for configuration of specific exemplary products (e.g., windows and doors), it should be readily apparent that the invention may be embodied to provide configuration and estimation functionality for any number of products, services or the like where configured, customized or assembled-to-order products/services are is evaluated, selected, purchased, sold, supported, or otherwise considered.

In accordance with a preferred embodiment of the invention, a configuration system (and corresponding method) is embodied in a single (or multiple) processor-based system that may be supported in a stand-alone, networked, mainframe, or client-server architecture. A single (or multiple) program memory module is provided for storing one or more computer programs used to perform the functionality described herein.

In accordance with a preferred embodiment, one or more user interfaces are provided as part of (or in conjunction with) the configuration system to permit users to interact with the system. Individual ones of a plurality of client devices (e.g., network/stand-alone computers, personal digital assistants (PDAs), WebTV (or other Internet-only) terminals, set-top boxes, cellular/PCS phones, screenphones, pagers, kiosks, or other known (wired or wireless) communication devices, etc.) may similarly be used to execute one or more computer programs (e.g., universal Internet browser programs, dedicated interface programs, etc.) to allow users to interface with the configuration system.

In accordance with a preferred embodiment, a user (e.g., consumer, sales-representative, buyer, seller, contractor, builder, architect, consultant, organizer, project coordinator, etc.) of the configuration system interacts with the system to configure and/or estimate the cost of a desired product, component, or project. The interaction with the system is preferably through a series of questions provided by the system with input answers provided by the user. The interactive nature of the system aides the user in arriving at the desired product, component, or project selection and the production of any corresponding information (e.g., layouts, pricing, schematics, specifications, etc.).

FIG. 1 illustrates in block diagram form a configuration device in accordance with a preferred embodiment of the invention containing the Core **102**, the Frame Engine **104**, and the Rules Engine **106** subsystems or modules (described in detail below).

Core **102** is a processing module that can contain a variety of miscellaneous functions for the system. Core **102**, for example, may be used to take a user's input and standardize that input. For example, if the user inputs "2 feet, 3 inches," Core **102** can include functionality that converts that input solely to inches (or another unitized number, e.g., metric units). Another function that may be incorporated in Core **102** is a messaging system that contains all the codes for dynamically loading the other modules. Generally, any functions that may facilitate the processing of input/output data in the system may be incorporated in Core **102**.

Preferably, Frame Engine **104** is a frame-based inference engine used to process product knowledge, which may be supplemented by an interpreted rules system, based on input data from Core **102** (or other modules) and from users of the system. In accordance with a preferred embodiment, user

**4**

data is input through user input of answers to a series of questions regarding configuration of a desired product or project posed by the system (as will be discussed in detail below). In accordance with a preferred embodiment, Frame Engine **104** computes available configuration answers for any configuration questions posed to a user at any time (e.g., in any order), and processes the user's answer to such question. When given the value of one or more answers, Frame Engine **104** infers the values of answers to other questions automatically, and thus, eliminates the need for excessive rule constructs, as typically required in a rules-based engine. Through inference, Frame Engine **104** may also remove or insert questions (and their associated answers) based on the user's previous response(s).

In accordance with a preferred embodiment of the invention, Frame Engine **104** is primarily constructed using a frame-based design concept of knowledge organization, representation, and product classification. Frame-based and rule-based expert systems encode knowledge using fundamentally different models.

In the context of product configuration, the problem an expert system is supposed to solve is as follows: given a set of options ("questions" to be presented to the user), each of which has a set of legal attributes ("values" with which the user may answer the questions), how are the options/attributes themselves related to each other (which options/attributes remove [or 'constrain away'] other options/attributes, which options/attributes are 'interdependent', etc.).

As an example, if the user has answered options A, B, and C with attributes x, y, and z, the expert system must then determine what are now the legal attributes for some other option D. In order to do this, an expert system first has to encode the relationship between the options in some manner (i.e., represent the knowledge). Then, as the expert system is provided current choices as inputs in real time (i.e., "the user has answered options A, B, and C with attributes x, y, and z"), the system must now apply its encoded knowledge to the problem "what are the legal attributes for D" in order to supply the solution(s).

A rule-based expert system generally represents knowledge using a large collection of If-Then-Else constructs (i.e., "If the user has answered option 'A' with attribute 'x', Then attribute 'y' is no longer available for option 'B', Else . . . "). This approach, however, is a unidirectional encoding: if the conditional portion (the user has answered option 'A' with attribute 'x') of the statement is true, the resultant portion must also be true (attribute 'y' is no longer available for option 'B'). The converse (if attribute 'y' is no longer available for option 'B', then the user has answered option 'A' with 'x') is not necessarily true, nor in general should it be.

However, a rule-based expert system requires that the inverse rule must be written separately if it is deemed necessary. If the product knowledge being modeled is complex, the required rules and inverse rules can grow into a very large number. In addition, applying this type of knowledge representation to the problem "the user has answered options A, B, C with attributes x, y, z; now what are the legal attributes for this other option D?" involves using an interpreter or compiler that understands the rule syntax so as to apply the rules to the problem.

On the other hand, the frame-based Frame Engine **104** encodes knowledge in an entirely different manner that does not suffer from this "inverse rule" problem. At its most fundamental level, Frame Engine **104** represents knowledge

US 6,810,401 B1

in a hierarchical tree-like structure. The nodes of the tree are generally called "frames" (e.g., corresponding to product categories) and each node contains a collection of "slots" (e.g., corresponding to product features and options). A slot is a one-to-many relationship between an option and a subset of the legal values (e.g., attributes) for that option.

Textually, a slot is represented as follows:

A=x, y, z

where 'A' is an option, and 'x', 'y', and 'z' are attributes for option A.

In general, a frame contains multiple slots, and has child frames as well (because of the tree structure). Conceptually, all the slots in a frame "go together." If at least one of the slots in a frame is found to be invalid (e.g., Slot "A=x, y, z" is in a particular frame, but the user has answered 'A' with attribute 'w'), then the entire frame (along with all of its other slots and all of its child frames) is invalid. Functionally, products and attributes in such a frame are removed from the configuration process. Applying this knowledge representation to the problem "the user has answered options A, B, and C with attributes x, y, and z, now what are the legal attributes for this other option D" involves Frame Engine **104** first marking the appropriate portions of the tree invalid as the user supplies answers to options. Then, to actually provide an answer to the question "what are the legal attributes for some other option D," the engine will look for all the frames which have not been marked invalid and which reference 'D' (i.e., have a slot involving 'D') and then combine all the attributes found in these slots (eliminating any duplicates). At the conclusion of this process, the answer (in many cases, a multi-faceted answer in terms of associated data [a price, an image, a set of drawings, etc.]) is generated and displayed.

In accordance with a preferred embodiment of the invention, a Product Knowledge Builder module may be provided for use in constructing, storing and interrelating data concerning products, components, configurations, etc. to optimize the operation of Frame Engine **104**.

The Product Knowledge Builder allows the entry of product knowledge in an intuitive hierarchical fashion. The knowledge is entered into a tree-like structure very similar to the Windows File Manager or Explorer. Once the product knowledge has been entered, this tool "builds" the knowledge into a single output file. This process both compiles the knowledge into a hierarchical tree structure and then optimizes it. The output file is then ready to be processed by Frame Engine **104**.

The following simple example will illustrate the differences between an If-Then-Else rule based system and one utilizing Frame Engine **104** in accordance with a preferred embodiment of the invention:

There are four people who are identified by a letter, color, and number.

Jim is A, Blue, and 3.

Ted is B, Red, and 2.

Randy is A, Red, and 4.

Roy is B, Blue, and 2.

The first screen in an application would prompt the user for choosing a letter. (As an additional requirement, the questions can be answered in any order, and the user might skip the first screen and come back to it later.) The If-Then-Else rules to handle such option/attribute pairs are as follows:

if Color has no answer and Number has no answer then
Letter is A or B

else if Color has no answer then
if Number is 3 or Number is 4 then
Letter is A
if Number is 2 then
Letter is B
else if Number has no answer then
Letter is A or B
else if Color is Blue and Number is 3 then
Letter is A
else if Color is Red and Number is 2 then
Letter is B
else if Color is Red and Number is 4 then
Letter is A
else if Color is Blue and Number is 2 then
Letter is B

Two more sets of rules will still have to be written for the Color screen and the Number screen. The difficulty of adding a new person to the data or, adding another class of question (e.g., to determine the group's favorite fruit) can easily be seen. It is also useful to remember that this sample data is intended to be a trivial example. In contrast, the Product Knowledge Builder would permit the entry of that same data as follows.

After adding the three questions to the system, add the following compound slot:

| LETTER | COLOR | NUMBER | PERSON |
|--------|-------|--------|--------|
| A | Blue | 3 | Jim |
| B | Red | 2 | Ted |
| A | Red | 4 | Randy |
| B | Blue | 2 | Roy |

To add a new person, a new row is simply inserted, adding the new person's letter, color, number, and name. To add another question such as the group's favorite fruit, a new column is simply added to the slot, and a list of everyone's favorite fruit can be added.

While the actual algorithm for Frame Engine **104** as implemented is likely to be much more complex, the following illustration of the operation of Frame Engine **104** used to implement the above example may be useful:

In the beginning of a configuration session all frames are valid, and the example above has four frames, one for each row. When asked for the list of available answers for any question, the Frame Engine looks down the column for that question. If the row is valid, its answer is added. Accordingly, for the Letter question, Frame Engine **104** sees A, B, A, B. The duplicate answers are combined to arrive at A, B. Now suppose the user answers A. This means unless the frame has Letter=A, it is invalid. The second and fourth rows are thus invalid. Next the user is presented with the Color question. To find the answers, search down the Color column; the result is Blue and Red for the available answers (Blue from the first row and Red from the third). The user picks Blue. This choice makes the second and third rows invalid.

As a result, there is only one valid row left, the first row. The user has effectively finished the selection process by answering only two of the three questions.

Frame Engine **104** is particularly useful when applied to real-world, complex product knowledge challenges. Real-world product knowledge contains relationships between products, knowledge common among similar products,

Case 3:14-cv-02264   Document 50-1   Filed 01/28/15   Page 41 of 49 PageID #: 793

US 6,810,401 B1

**7**

knowledge common among different products, and exceptions to all of the above. The Product Knowledge Builder in accordance with a preferred embodiment contains constructs to handle all of these scenarios.

An important relationship among products can be expressed as: "Product A is a type of Product B" (e.g., a casement is a type of window, a car is a type of vehicle). This relationship is called inheritance. Inheritance is a parent to child relationship, but not in the traditional sense. In human beings, if a parent has a trait, the child may or may not share that trait (e.g., brown hair). In this form of knowledge inheritance, the child must inherit all traits. Inheritance is important, because it allows the software engineer to combine all the identical traits for the children in one logical place: the parent. It is for this reason that the Product Knowledge Builder works in a tree-like fashion. Each frame is a parent with children, which in turn have their own children. For example, if there were a system for selecting groceries, the logical way to organize the data would look something like that shown in FIG. **31**. The Product Knowledge Builder allows the construction of this tree with the result illustrated in FIG. **32**.

As illustrated, when the Bread frame is selected, there is a trait defined as bread. This means that all types on buns and loaves can be made out of White, Wheat, or Rye bread, because both Buns and Loaves inherit from Bread. If any special types of Buns were defined by adding "children" to the Buns frame (i.e., hamburger or hot dog) these new types also inherit White, Wheat, or Rye. Children inherit everything from their parents, grandparents, and great grandparents, all the way up the tree. In the future, if the store added Pumpernickel and carried it for all types of bread, such information could be added to the Bread frame. If the store offered Pumpernickel for Loaves only and not Buns, then Pumpernickel could be added to the Loaves frame. Without the power of inheritance, Pumpernickel would have to be manually added to every type of bread. There are some types of product knowledge that may be shared among different frames in the tree, but which cannot use inheritance. In the groceries example, a trait of this sort would be packaging. Not all groceries come in packages, and sometimes the same kind of product might be available with or without packaging (for example, packaged bread versus bread from the deli). If packaging is available, there will be some product knowledge that applies to all packaging (e.g., servings per container). There is still a need to keep this type of knowledge in a single place for ease of maintenance, and this methodology as incorporated by the Product Knowledge Builder is called frame re-use. A frame can be defined by itself to represent such knowledge, which can then be added into the tree at whatever points are appropriate.

In accordance with a preferred embodiment, although Frame Engine **104** is a frame-based inference engine, it also includes the ability to process data using rules files, making Frame Engine **104** more of a hybrid engine. It is foreseeable that some custom answers are more conveniently handled using rules files rather than building the product knowledge. A rules-based filtering methodology may be used, for example, for filtering output from Frame Engine **104** to comply with certain rules established for a particular product, component, configuration, project, or the like. Similar filtering of unwanted answers, or inapplicable questions may be useful. Rules-based functionality may also be used to add special answers, perform calculations, generate user warnings, or any other special processing required for specific system implementations.

**8**

In accordance with a preferred embodiment, Rules Engine **106** may be added to supplement the operation of Frame Engine **104**. Rules Engine **106** is typically employed to handle special cases, exceptions, and functionality that are specific to a product Line or product series. Rules Engine **106** may also be employed to perform all (or some of) the rules-based functionality (discussed above) as utilized by Frame Engine **104**.

In accordance with a preferred embodiment, any number of additional modules may be added to serve a supportive and optional role (called on an "as-needed" basis). A Pricing Engine, for example, may be added that uses data from Frame Engine **104** and/or Rules Engine **106** to generate prices. Price reports can be graphically generated and prices can be calculated and displayed to the user in multiple currency types. A CAD Engine Module may be added to read CAD drawings and enable multiple CAD drawings to be displayed simultaneously, with separate components to be overlaid upon one another to form a complex illustration. Specifically, the CAD Engine may handle the determination of which components need to be overlaid and may present a list of the files containing the required components to a CADView control (not shown), which may in turn read the AutoCAD files and display the components on the user interface. The CAD Engine may also print, copy or otherwise output the CAD files.

FIG. **2** illustrates a configuration System **200** in accordance with a preferred embodiment of the invention. Specifically, System **200** may include a User Interface Subsystem **202** Data Analysis Subsystem **204** Graphics Formatting Output Subsystem **206**, Configuration Subsystem **208**, and Data Storage Subsystem **210**.

User Interface Subsystem **202** enables the interaction between the user and the system. It may interact with any component of the system. Graphics Formatting and Output Subsystem **206** performs calculations and preparations for the display of graphical and/or textual representations to the User Interface **202**. This subsystem may include a variety of graphical modules such as a Parametric Drawing Module, a Schematic Configurator, a CADControl/CADVU Module, a Bid Quote Generation Module, a Specification Generator Module, etc.

Data Analysis Subsystem **204** accesses and processes data from the Data Storage Subsystem **210** and provides results to the Configurator Subsystem **208** (or other modules as required). The Data Analysis Subsystem **204** may contain a variety of analytical and computational modules such as a Regular Expressions Engine, a Product Code Engine, a Pricing Engine, a Mulling Engine, etc.

Configurator Subsystem **208** (an example of which is shown in more detail in FIG. **1**, as described above) processes questions presented to the user and the answers received from the user. Based on the data in the Data Storage Subsystem **210** and the established data relationships, the Configurator **208** builds the product configuration. The Data Storage Subsystem **210** may serve as the data repository for the collective knowledge of the system. Product knowledge and pricing data may be stored in Data Storage Subsystem **210** to be used by the various modules. The Data Storage Subsystem **210** may include a variety of memory modules such as a Repository Module, a Pacifier Module, a Buffer Module, an Import/Export Module, a Preferences Module, etc. The Data Storage Subsystem **210** may also store the series of questions to be selected (e.g., by Frame Engine **104**, by Rules Engine **106**, etc.) for output to the user interface in response to configuration data input from the user interface.

The Parametric Drawing Engine that may be added to the system takes descriptions of configured products, and pro-

US 6,810,401 B1

**9**

duces an accurate representation of the product. As an example, the parameters used as input data descriptions can include the width or height of a window, or the existence of grilles. From these descriptive parameters, this module will generate a drawing (e.g., an elevation) or other dimensional product aspect for review by the user (such drawings can be converted to CAD format at the user's option).

The Parametric Drawing Engine can also export its drawings for use in other applications (e.g., AutoCAD, in the event that the parametric drawing will be used by an architect). The Parametric Drawing Engine may also tie into other modules such as a Schematic Configurator. The Schematic Configurator is a user interface module and inference tool. Using the Schematic Configurator, the user can view a line drawing representing a configured product (e.g., window) on the user interface, and add other units to the product. Thus, the end user might start out with a single unit and he/she might then add two flanking windows, one on either side of the product. The user can designate which sides to add windows and can even add other product types, such as a round-top window above. The Schematic Configurator can interface with the Frame Engine **104**, seeking matching components to the previously selected configuration. Frame Engine **104** will match appropriate products between the two modules based on any number of product attributes and parameters.

A Preferences Module may also be included in the system. A Preferences Module allows the user to define a set of preferred answers for questions applicable to products in a project. In a preferred embodiment, the set of preferred answers may be based on user selected preferences, regional specification preferences, manufacturer compatibility preferences, etc. As an example, the user can initiate a project and choose "white clad" windows. The user can then set "white clad" as a preference for that entire project. As a result, for every item that the user configures for the project, the system will reference the Preferences Module and will automatically retrieve the preference values by default and override other items. The Preferences Module can also automatically inform a user that the selected preference is unavailable for a given product during the configuration of that product.

EXAMPLES

As an illustration of exemplary commercial embodiments of the invention, the following descriptions of the invention as variously implemented in different iterations of a system for (and method of) configuring window products is provided below.

In this exemplary embodiment, the system can display the entire structure of product knowledge associated with the desired product or product line. In particular, two "lists" are displayed in the primary product selection and configuration screen shown in FIG. **3**: one for questions **10**, and one for answers **12**.

In a typical usage scenario, the user starts at the beginning of a question list, the first of which may present the user with a certain product type, such as a window or a door. As questions **10** are answered by the user, other questions **10** that no longer apply are automatically removed from the list. In some cases, answering questions **10** will actually add new questions **10** to the list or will automatically answer other questions **10**. Because the entire product knowledge structure is always accessible, the user can answer questions **10** in whatever order is desired, although the default order is generally designed to reflect the flow of a typical product configuration. If the user selects "window," the configura-

**10**

tion system directs questions to develop answers pertinent to window configurations only.

Referring to FIG. **4**, preferred answers **14**, or Preferences, are pre-determined questions **10**/answer **12** pairs consisting of any combination of product attributes which will be used repeatedly. Preferences may be useful to save time on large projects or jobs, and a preference set **16** is typically determined for specific product attributes that fit a particular purpose. Once a preference set **16** is defined, it can be used repeatedly thereafter to save time in the product selection process. If the user activates Preferences, the system will automatically select the question **10**/answer **12** pairs in the preference set **16** and apply them to the product being configured at runtime. Any number of question **10**/answer **12** pairs can be set up as preferred values. Libraries of Preferences may be saved to files for use s with repeat customers or recurring product requests.

Referring to FIG. **5**, Standard Answers **18** is a feature providing the ability to display to the user the "standard" answer **12** for a particular product attribute. Standard Answers **18** can also be automatically selected similar to Preferences and are flexible enough to be changed by the user during the configuration process (i.e., Standard Answers can be applied to some products in a project but not to others). If the user activates Standard Answers **18**, the system will automatically answer **12** all questions **10**, which have answers defined as "standard" and apply them to the product being configured at runtime.

Referring now to FIG. **6**, Graphic Selection is a feature which provides a graphic representation **20** of attributes (if applicable), which can represent an answer more clearly **12** than a text description. This feature is particularly useful for the illustration of attributes that would otherwise require either extensive text description or which can be better shown with an image **22**. The Graphic Selection array can accommodate a range of static or "animated" electronic representations, including portable network files, metafiles, bitmaps, or other graphic representations.

The system also provides Custom Answers. Custom Answers is a feature designed to accommodate direct user input for an answer **12** for which there exists one of the following conditions: 1) an acceptable range of incremental values (e.g., dimensional variables); 2) values defined as "other than the values presented" (e.g., custom operation of a twin casement window); or 3) values that are completely undefined. When a particular question **10** permits custom value answers **12**, the Custom Answers box can automatically appear. The system allows the user to enter custom values for dimensional attributes such as unit dimension width, unit dimension height, etc.

Ultimately, the questions **10** and answers **12** guide the user to a desired configured product. From that point, the invention can accurately calculate how much the configured product is going to cost. In addition, the consumer can obtain detailed product information, including specifications that follow standard formats for engineering and architecture.

Referring to FIG. **8**, Standard Parametric Drawings **28** can be generated based on the dimensions of a manufacturer's existing products. Parametric drawings **28** can apply to any product where "views" (e.g., front, top, side) of the product are defined as product attributes. Custom Parametric Drawings **28** can also be generated in accordance with the preferred embodiment of the invention if the value range(s) for the drawings of the applicable products can be defined.

The Schematic Configurator (SC), is used in this example as a tool designed to allow the user to manipulate parametric

US 6,810,401 B1

**11**

drawings **28** of products. Using "Drag and Drop" techniques, the user can design and view a variety of product elevations, manipulate individual components, and graphically edit composite unit designs. The SC module can also be used to select and configure products, as well as manipulate, scale and assemble both pre-defined and custom shapes and sizes into composite units. The SC also allows the elevation designs to be printed, copied and exported for use in other software applications (e.g., CAD). All pricing information driven by the manipulation of product components may be tracked including mulling charges, custom grille pattern designs, grille types, etc. As a unit is configured, the SC gathers the dimensional information and processes it to display an elevation. When a unit configuration is complete, it can be viewed in the SC where any necessary changes can be made (dimensional changes as well as other attribute changes) and other units can be added.

Referring to FIG. **9**, composites of products can be created. Composite unit design, assembly and verification are controlled through the SC. When more than one single unit **30** is placed together in the SC, a Custom Composite Unit **32** is created. This placement can be verified by clicking the Mull button **34**.

Other products can be added to a product already displayed in the SC with three different methods: 1) the Copy function, which creates an exact copy of the selected item; 2) the New Component function, which calls the Selection and Configuration display (FIG. **3**) for the configuration of an entirely new unit to be added to the existing unit; and 3) the Design option **38** described below.

The Design option **38** in the SC allows the user to add component units **30** that can be mulled **34** to the existing components. As an example, if the user wants to add a round top to an existing rectangular unit **30**, the Design option **38** will list all units **30** that are available. The user chooses "Add Round Top" from the list and the system will add the nearest sized round top to the existing unit **30** while simultaneously matching all other relevant attributes. If a new component unit **30** is added which contains attributes not applicable to the base unit **30**, the system will present the user with only those questions **10** specifically applicable to the new component and which require the user's response. The Mull option allows the user to verify that mulling of two or more units **30** can be done. Notification of shop, Field or Invalid mull (depending on the units **30** that have been selected) will be presented to the user with a pop-up or "soft" warning display.

Referring now to FIG. **10**, this exemplary embodiment of the invention can incorporate a Catalog Page feature. The Catalog Page feature displays dimensional attributes whose ranges can be shown in tabular form. Its format is derived from printed product information sources that display such dimensional variables. Catalog Page Drawings **40** provide the user with graphic parametric representations using the widths and heights of the class of products being selected. Unit heights **42** will be displayed down the side of the selection box and the widths **44** will be across the top of the array. This feature clarifies dimensional information presented in text form and provides visual feedback with respect to the scale and size of selected products.

Referring to FIG. **11**, product information can be displayed in a DataGrid. The DataGrid is a tool that allows the user to view a table of answers **10** for a list of questions **12**. Similar in form to catalog pages, DataGrids reflect tabular displays of product attributes found in printed catalogs and price books. In this view the questions **12** are presented

**12**

across the top of the DataGrid instead of down the left hand side of the page. The DataGrid is useful where product questions **10** and answers **12** have a one-to-one correspondence.

Referring to FIG. **12**, a Custom Shapes Editor allows the user to size custom shaped products. The example shown in FIG. **10** directly applies to windows and doors, but may apply to any customizable product. The Editor is automatically opened when a custom shape product is selected as a product category. The Custom Shapes Editor is generally used in conjunction with Catalog Pages to select the general product shape (see FIG. **10**) and permits the user to select and specify any combination of dimensional parameters **48** within the engineering limits set by the manufacturer. The Editor also displays a parametric representation of the custom product for inclusion on quotations. All pricing formulas relating to, for example, glass size, glass area, grille patterns and types, frame side lengths, and other parameters **48**, can be driven with the Custom Shapes Editor.

Referring to FIG. **13**, this exemplary embodiment of the invention utilizes data tables and formulas to look up, calculate and store base prices **50** plus add-on prices **52** of available product options. The total price **53** can include project-based price adjustments if applicable. Pricing of products utilizes a combination of values accessed from a table and enhanced by formulas, which calculate up charges, add-ons and other product options. These methodologies allow the lookup, calculation and storage of unit base prices **50** plus prices **52** for all applicable product features and add-ons. Project-based price adjustments are also available for customer discounts, promotions and competitive bidding situations.

Referring to FIG. **14**, an accessories module may be added containing product accessories **54** supplied by the manufacturer in conjunction with its primary products. The accessories module can include lineal products (e.g., extension jambs, molding, mull covers, etc.) as well as individual or boxed parts and components (handles, hinges, operators, etc.). This module can also be used to add accessories **54** to a quote that are purchased from other sources. Such additional items are added by entering text descriptions in a text box along with the prices for such items. All accessories **54** entered through the module appear on the quote as individual line items. Functionality can also be included to price accessories that are configurable (i.e., items which are defined by attributes displayed and represented in the Selection and Configuration display (FIG. **3**)). These accessories or replacement items require product knowledge description and definition similar to primary products and present the user with relevant questions and answers as already described.

Referring to FIG. **15**, this exemplary embodiment of the invention provides a function to enable line item discounting for products, product lines and related attributes. Line item discounting can be applied to specific configured units; specific attributes (e.g., screens, grilles, etc.) or configured composite units. AU of the line items for which discounting is available are displayed in the Line Item Adjust Box **56** lists. The Line Item Adjust box lists all applicable items, and price adjustment may be applied as follows: 1) none; 2) by multiplier; 3) by a flat fee; or 4) percentage (%). Using the price adjust is function, additional price adjustments can be applied to specific clients, individual units within a project, individual projects, or to groups of projects.

Referring to FIG. **16**, this exemplary embodiment of the invention enables production of a variety of outputs, one of

US 6,810,401 B1

**13**

which can be an order form as shown. The client manufacturer can derive the format, content and design of the order form from an existing form in use. Order forms can contain all codes 26 necessary to build a specified product as well as pricing and dealer/distributor information. The order form is a tabular view of the information needed to build the set of products defined by a particular project. Also included is an "electronic order form" mechanism through which comma or tab delimited ASCII files can be created and exported. These files can be imported by other applications and may be designed to meet the needs of each manufacturer.

Referring to FIG. 17, this exemplary embodiment of the invention enables the production of quotes, which include scaled elevation drawings of the product, reflecting the parametric drawings 28 generated during product selection and the use of the Schematic Configurator module. Also included is a list of all options chosen, the unit base price 50, add-on prices 52 for non-standard choices, total price 53 for each product, and a grand total 60 of all products in the project.

Referring to FIG. 18, this exemplary embodiment of the invention can provide a Schedule Generator. The Schedule Generator can build a product schedule 62, listing all products included in a project, and relevant attributes assigned to each product, plus the system assigned product code 26. The Schedule 62 is constructed as products are selected and constitutes a valuable tool for use by sales people as well as design and construction professionals, providing a full view of the products to be used in a construction project. When an attribute of any unit 30 is changed, the change is reflected on the Schedule 62 as well. The Schedule 62 can be displayed on-screen or printed as hard copy.

Referring to FIG. 19, the exemplary embodiment of the invention enables generation of product specifications 64. After a product has been configured and the user requests a technical specification 64 for that product, the Specification Generator gathers all relevant product information and produces a valid proprietary specification which conforms to the Construction Specifications Institute (CSI) three part section format. The Specification Generator works from content-complete template specifications supplied by the manufacturer. The system can produce unique customized specifications 64 for each product in a project or (as an additional option) a single specification 64 for multiple products.

Referring to FIG. 20, this exemplary embodiment of the invention allows the user to view, print, copy, and export AutoCAD drawing files as DXF files, compatible with a number of CAD systems under the Windows environment. This embodiment of the invention has the ability to do multi-layered component assembly of DWG files. Component assembly is the process of displaying several DWG files at once, which overlay one another to compose an entire detail. The image 66 displayed as a section detail is actually made from three to five separate sub-assembly drawings, and several cross section details can be displayed simultaneously. The drawings included are based on the attributes selected during product selection and configuration. The system can export DWG files to a DXF formatted file. This feature allows the editing of exported drawings using a CAD system that accepts DXF files. The system also will allow the user to print drawing details.

Referring to FIGS. 21a and 21b, this exemplary embodiment can include a project database, which maintains and tracks information that is unique to a particular project. The project database contains the sales or customer service

**14**

representative's name 68, relevant customer information 70 and project information 72 for that particular project. When a new project is created, information from associated databases for sales-representatives and customers is available through drop-down boxes. Fields for Terms of Payment, PO Number, Price Multiplier, and Project name are available, as well as the Line Item Adjust function (FIG. 15). Projects are categorized as Current or Archived and can be moved between these categories as necessary. When a Project is highlighted in the Project window, all units in that project are displayed. Interfaces to contact management systems, sales systems and sales force automation systems can also be engineered on request. The system allows for record additions, changes to existing records, deletion of records, and duplication of records.

Referring to FIGS. 22a and 22b, the system can also include a Sales-Representative database, which controls all information for sales-representatives. These items are ID# 76, Name 78, Territory 80, phone number 82 and fax number 84. The system allows for record additions, changes to existing records, deletion of records, and duplication of records. The Customer list for each sales-representative can be viewed by selecting a specific sales-representative name in the listing.

Referring to FIGS. 23a and 23b, this exemplary embodiment of the invention can also include a Customer database to control all information for customers. These items are ID# 76a, Name 78a, separate billing 80a and shipping Addresses, Contact name 78b, Customer type 86, and miscellaneous defaults. The system allows for record additions, changes to existing records, deletion of records and duplication of records. Customers are displayed in a listing which includes the sales-representative for each customer.

This exemplary embodiment of the invention can also include an Import/Export function set which permits a project to be built on one computer and exported into a file format, which can be imported into the same application on another computer (provided the product knowledge sets are exactly the same). This function set allows a project to be constructed by a customer and then imported by a dealer, distributor or sales representative for quote generation, final order pricing adjustment and negotiation. Similarly, projects can be shared between dealers, sales-people and customer service personnel.

This exemplary embodiment of the invention also includes a System Help File. The System Help File can offer an on-line condensed version of the full user documentation typically supplied with the system. The System Help File can provide easily accessible information to assist in the operation of the system. The System Help File can be configured to be context-sensitive so that the Help topics available are driven by the user's position in the system.

Referring to FIG. 24, this exemplary embodiment of the invention can include a Product Line Review function. The Product Line Review offers manufacturer and product line information 88, as well as general industry information 88, as it relates to the manufacturer's product line. Product Line Review is typically derived from each manufacturer's sales and marketing catalog(s), promotional brochures and other printed materials. Product Line Review can include full color or black & white scanned images 90, product features and benefits (as text descriptions), line drawings, technical illustrations and other appropriate product information.

Referring to FIG. 25, this exemplary embodiment of the invention can incorporate an Interactive Tutor. The Interactive Tutor is a series of help screens 92 referenced to specific

US 6,810,401 B1

**15**

system features and functions. When the Show Messages (or Tutor) option is checked, the system will present messages on the screen to assist the user with the next step. This option is turned on or off by either selecting the Tutor button or by opening the Tutor Menu and clicking Show Messages so that the check is removed.

Audio/Visual Presentations can also be included as an integral part of the exemplary system. Sound, video or both media combined can be utilized to present, promote or enhance the client company and its products. Examples of this kind of information include videos of manufacturing processes, product installation procedures, or sales and marketing presentations. Audio information can include theme music or sound tracks, which complement video information.

This exemplary embodiment of the invention can also include a Product Information Module. The Product Information module allows the user to view various catalogs as a product is specified. Combining the expert system with the Adobe Acrobat Reader, for example, allows users access to a range of supporting product information. The printed catalogs from which this information is derived are more graphically oriented than CAD drawings and specifications. Generally, the format of this kind of material is PDF files.

Referring now to FIG. **26**, flow chart **300** illustrates how another exemplary implementation of a preferred embodiment of the invention can be employed by a sales-representative/user in ordering sales for customers/users in the field. After the program is started at step **302**, the sales-representative will call on new or existing customers to investigate prospective business. The sales representative can then run the system and start a project. At step **304**, the representative would initiate the project and a list of all projects would be displayed. The representative can then initiate a new project at step **308**. Alternatively, the system could remain in a "wait" mode until the project button is initiated. Once the project button is initiated, the sales-representative can then type in the client's name and address, and other pertinent information at step **310**. Once the client information is entered then the user is presented with a configuration screen (step **312**) that can be used to begin adding product information.

The manner in which a product is entered consists of the user inputting into the system a request for a new "mark." A "mark" refers to a configured unit or product such as a window, door, or other assembly. The user can then select a product type, such as a window, at step **314**. The user can then begin to configure a new mark and at that point is prompted to answer some questions about the product at step **315** such as the type, size, or style of window desired. The sales-representative/user can input the specific product information, for example, color options, glass type, etc. At step **318**, the sales-representative can select a quantity of product for the project. As a result, the system will repeat the same configuration for the number of windows entered in the Quantity data field.

At step **322**, the user can create custom composite units. At this point, the user would enter the Schematic Configurator and choose the composite elements for the configurator to construct at step **324**. Once the custom configuration is complete, or if the custom composite step is bypassed, the user can initiate a quote button at step **326**, which enables the calculation of a price quote for the products currently defined by the project. The quote can contain individual descriptions of each product selected in preceding steps with all associated pricing, along with a drawing of each product

**16**

with any custom composite units. Moreover, the information can be displayed, printed, presented or otherwise output together or separately at step **328**. At step **330**, the system would provide a price total and a total quote for the project.

FIG. **27** illustrates another exemplary implementation of a preferred embodiment, in which a dealer distributor adds individual sales representatives to the database at step **402**. Customer names will then be added at step **404**. The system will then check whether all customers have been added at step **406**. If not, then it will loop back to add more names. Once all customers have been added to the database, the system will query whether the same thing has been done for sales representatives at step **412**. Once this data has been added, then the system will generate the customer database sales report. Once completed, this program will end.

Another exemplary implementation of a preferred embodiment is shown in FIG. **28**. Upon initiating a product customization, the user can create a project (step **450**). A product can be selected (step **452**) to be configured for that project. The product can be configured by accessing the Schematic Configurator (step **454**) to create a custom composite product. This step **454** can be repeated until all the products for a specific project have been configured at step **456**. Upon completion of configuration of all products for the project, additional projects may be created by returning to step **450**. Once all projects have been created and all products for these projects have been selected and configured (step **462**), the user moves on in the system by accessing the Generator for Output Reports (step **468**), whereby schedules, CAD drawings, Technical Specification Sheets, etc. can be created as hard copies (step **470**). After the generation of output reports, the user can export CAD Details to CAD software (step **472**). Before exiting the system, the user can transmit the project and all related information regarding the project to a dealer for a price quote (step **474**), which can also be printed as a hard copy.

Another exemplary implementation of a preferred embodiment is shown in FIG. **29**. In this exemplary embodiment, a user/sales-representative can initiate configuration of products in at least three ways: by taking a Telephone Sales and Order Entry (step **480**), by Receiving a printed order form (step **482**), and by Importing electronic project CIP (or other text format) (step **484**). If a Printed order form is received (step **482**), or Telephone Sales and Order Entry is taken (step **480**), the sales-representative proceeds to create or select the customer from the Customer Database (step **486**). Next the sales-representative can Create or Append a project for that customer (step **488**). A desired product can be configured for that project (step **489**). This step can be repeated until all the desired products for that customer or customer's project have been configured. Once all the products have been configured, the sales-representative can decide whether or not all the projects have been added for that as customer (step **496**). If they have not (step **498**), the sales-representative can return to step **488** and create or access additional projects. If all the projects have been attended to, the sales-representative can determine if all customers have been added. If additional customers need to be added to the system or accessed within the system, the sales-representative can return to step **486** to create new files or select customers from the database, and then repeat the aforementioned steps. After all customers have been attended to, the user can transmit a product code (e.g., End Item Code) to back-end manufacturing and/or ERP systems before exiting the system.

If, as shown in FIG. **29**, the user imports electronic Project CIP (or other text format), the user can access Integrated

US 6,810,401 B1

**17**

Manufacturing Software and move on to determine if the Version Control (VC) Number is correct in step **506**. If not, the user can verify by telephone at step **480**, and progress therefrom throughout the system as discussed above. If the VC Number is correct, the user can then add the order to any of the Sales Representative, Customer, Project, or Mark Databases (step **512**). Next the user/sales-representative can Transmit the End Item Code to the back-end manufacturing and/or ERP systems (step **514**).

In accordance with a preferred embodiment, the functions, features and architectures described above can be part of a network available to enable business-to-business commerce over the Internet. In accordance with a preferred embodiment of the invention, an Internet portal (and a corresponding method) is provided to be the center of a selected vertical market in a particular industry or collection of industries (e.g., fenestration, or windows and doors as exemplified above). The portal can be an Internet focal point for the participants in the vertical market. The portal can not only incorporate the configuration system described above for use by participants in the portal, but also can be a virtual space for industry news and information as well as a means for facilitating commerce by and between the participating manufacturers, dealers, distributors, and retail customers making up the vertical market, as shown in FIG. **30**. In a preferred embodiment, Web server software such as Bondware by Bondware, Inc., which is a partially-owned subsidiary of EdgeNet, Inc., the details of which are incorporated herein by reference, may be used to implement the Internet portal.

The portal provides the central services for its participating members, providing news, advertisements, means for communication between members. The portal also provides a member-to-member commerce channel providing product offerings, configuration tools, ordering and purchasing mechanisms. Fees can be charged for membership to the portal, advertisements viewed or displayed on the portal, or as part of any member-to-member commerce transactions.

The portal can be an authoritative point of information about a given product market or focused to a specific group within the vertical market. The software package creating the portal can be a suite of Web applications enabling the creation of e-commerce communities for business customers. Virtual communities can be created through this portal where customers within the vertical market can shop, learn, play and explore common interests. This portal can incorporate the configuration-related system described heretofore. The portal can be accessible to those with market-specific expertise, and in return for membership in the portal, the participants can provide much of the content themselves in the form of advertising, news, discussions, sales, etc. as shown in FIG. **30**.

In accordance with a preferred embodiment of the invention, one or more processor-based systems are used to implement the modules described or apparent from the description herein and to perform the functionality described (or inherent) herein. For each such system, one or more processors (e.g., central processing unit (CPU)) are provided for execution of one or more computer programs stored on any (one or more) known recording mediums. The processor(s) perform, control, or at least inform the various processing steps performed by the system in sending and retrieving data to and from at least one user interface and/or network. A user interface may be connected directly to a bus or remotely connected through a network (e.g., Internet). The network represents (wired or wireless) connection of two or more devices, whether directly or indirectly connected (e.g.,

**18**

directly coupling through cable, indirect coupling through one or more hubs or servers, whether the network is local to the processor-based system, geographically remote from the system, or a distributed combination of local/remote network components).

Preferably, one or more of the modules are coupled (directly or indirectly) to one or more database structures for use in supplying storage functionality for the modules in accordance with the operations described (or inherent) herein. The database structures can take any form from an individual floppy disk drive, hard disk drive, CD-ROM, redundant array of independent devices (RAID) system, to a network of the same or other storage devices. As is well known in the art, the database structures may be physically connected within the same location, or have one or more structures remotely located in different locations. Each module may have dedicated or shared access to one or more database structures locally or remotely located from the module.

While preferred embodiments of the invention have been described and illustrated, it should be apparent that many modifications to the embodiments and implementations of the invention can be made without departing from the spirit or scope of the invention. Although the configuration system (and corresponding method) has been specifically described in connection with the configuration of a window/door product, it should be apparent that the system (and method) can be applied to any product, service, or component that is to be designed or configured such as cabinets, rooms, houses, cars, landscape designs, clothing, etc.

While the illustrated embodiments have been described utilizing Internet communications, it should be readily apparent that other communication systems or (wired/wireless) networks (e.g., intranets, private bulletin boards, individual local or wide area networks, proprietary chat rooms, ICQ, IRC channels, instant messaging systems, etc.) using real-time or non-real-time systems in lieu of or in addition to the disclosed Internet resources may also be utilized.

A Pricing Engine module could be added to the configuration system to generate pricing and cost information for individual products, components, projects, etc. both on a real-time, on-going basis, as the user interacts with the system, and also to provide total (or sub-total) pricing data for the configured product or project. The Pricing Engine may include bid and quote generation functionality to facilitate the production and transmission of bid/quotes by users to their ultimate customers. A Product Code Engine (see FIG. **7**) may be added to generate (and receive as inputs) codes (e.g., UPC, EIC, etc.) assigned by manufacturers, retailers, or other users, as well as by the system itself for use in processing data associated with a particular product, component, project, etc. The product codes may be used by other modules of the system (e.g., the Pricing Engine) to associate data (e.g., prices) directly with the product codes.

A Communications module can be added to streamline the sales, order entry and manufacturing process: from transaction sites through the plant and to the job site. Thus, for example, the user, sales representative, or other individual can place an order of the configured product/service directly with the provider (e.g., manufacturer). The communication can be accomplished through any known means of communication (e.g., telephone, fax, e-mail, Internet, etc.). The Communications module would provide the system with capability to transmit (e.g., fax) quotes to remote ordering locations.

US 6,810,401 B1

19

A Specification Generator module may also be added to generate detailed specifications in textual and/or graphical format for the configured products/services, etc. The specifications may be displayed, output, exported, or transmitted as desired by the user.

The modules described herein, particularly those illustrated or inherent in the instant disclosure, may be one or more hardware, software, or hybrid components residing in (or distributed among) one or more local or remote computer systems. Although the modules are shown or described as physically separated components, it should be readily apparent that the modules may be combined or further separated into a variety of different components, sharing different resources (including processing units, memory, clock devices, software routines, etc.) as required for the particular implementation of the embodiments disclosed herein. Indeed, even a single general purpose computer executing a computer program stored on an article of manufacture (e.g., recording medium) to produce the functionality and any other memory devices referred to herein may be utilized to implement the illustrated embodiments. User interface devices may be any device used to input and/or output information. The user interface device may be implemented as a graphical user interface (GUI) containing a display or the like, or may be a link to other user input/output devices known in the art. Discrete functionality of the system may be separated (logically or physically) to more efficiently operate the system. Many of the fundamental data coordinating functions (e.g., functionality performed by Core **102**) may be separated into a Foundation-Level Tools Subsystem. This Subsystem may include a BB Assist Module to create BB structures and the like.

In addition, memory units described herein may be any one or more known storage devices (e.g., Random Access Memory (RAM), Read Only Memory (ROM), hard disk drive (HDD), floppy drive, zip drive, compact disk-ROM, DVD, bubble memory, etc.), and may also be one or more memory devices embedded within a processor, or shared with one or more of the other components. The computer programs or algorithms described herein may easily be configured as one or more hardware modules, and the hardware modules shown may easily be configured as one or more software modules without departing from the invention. Accordingly, the invention is not limited by the foregoing description, drawings, or specific examples enumerated herein.

What is claimed as new and desired to be protected by Letters Patent of the United States is as follows:

1. A method of configuring a product from a plurality of product components, the method comprising the steps of:

representing product component knowledge of a plurality of product components in a hierarchical structure, wherein said representing step includes storing product component category information in frames in the form of nodes of the hierarchical structure and storing product component features, options, and attributes in slots for respective nodes of the structure;

outputting a set of product-specific questions related to desired attributes of desired product components;

receiving individual answers to respective ones of the set of product-specific questions, including desired attributes of at least one product component;

removing at least one product-specific question from the output set of product-specific questions, prior to receiving an answer to the at least one product-specific question, in response to answers received in said receiving step;

20

performing frame-based inferences of the product component knowledge stored in the hierarchical structure based on answers received in said receiving step; and

configuring a product with features and options based on the desired attributes of the at least one product component and based on inferences made in said performing step.

2. The method of configuring as recited in claim **1**, wherein said representing step comprises the step of representing the hierarchical structure in the form of a tree, wherein frames of the tree maintain parent-child relationships in which a child frame inherits all of the features and options of a parent frame.

3. The method of configuring as recited in claim **2**, wherein said configuring step further comprises the step of filtering inferences made in said performing step by executing a set of rules on the inferences made so as to produce a product configuration, wherein the product configuration is in the form of a window product.

4. The method of configuring as recited in claim **1**, wherein said removing step comprises the step of removing a given product-specific question in response to invalidation of a slot in a frame corresponding to the given product-specific question.

5. A machine-readable recording medium for use in configuring a product assembly from a plurality of product components, the recording medium having stored therein a series of machine-executable program instructions executed by a machine to perform the steps of:

requesting a product type:

prompting a set of product-specific questions selected based on product type requested related to desired attributes of product components:

providing answers to product-specific questions as prompted, including desired attributes of at least one product component;

configuring the assembly using frame-based inferences of a product component knowledge base in response to answers provided;

displaying line drawings of the assembly as configured, wherein the line drawing graphically depicts a type, size and style of the assembly as configured, wherein said displaying step further comprises displaying composite units of the assembly as configured; and allowing custom configuration of the assembly as configured by allowing addition and modification of composite units to the assembly as configured: and

quoting a price for the assembly as configured and displayed,

wherein the series of machine-executable program instructions further comprises the step of building a product component knowledge base by storing product component information related to window and door products in a hierarchical tree, wherein the hierarchical tree is composed of frames corresponding to different product components and slots within each frame corresponding to attributes of the different product components.

6. A product configuration system for configuring products from a plurality of product components based on user interaction, the system comprising:

a user interface, wherein said user interface receives answers from the user corresponding to questions output to the user in the form of a display of graphical and textual representations;

a graphics formatting and output subsystem, wherein said graphics formatting and output subsystem performs

US 6,810,401 B1

**21**

calculations and preparations for the display of graphical and textual representations to said user interface;

a data storage subsystem, wherein said data storage subsystem is a repository of product information representing knowledge of product components including type, style, size, and attributes;

a configurator subsystem, wherein said configurator subsystem builds product configurations based on data from said data storage subsystem and established data relationships, wherein said configurator indudes a core module for facilitating input and output data in the system, and a frame engine for computing available configuration answers for any configuration questions posed to the user at any time, wherein the frame engine is a frame-based expert system, the frame engine receiving values of answers, including answers related to desired product component attributes, as received by said user interface and performing frame-based inferences of the values of answers to other questions automatically, and generating configuration data representing configuration of a desired product based on the inferences made; and

**22**

a data analysis subsystem, wherein said data analysis subsystem accesses and processes data from said data storage subsystem, and wherein said data analysis subsystem includes a pricing engine that uses the configuration data generated by the frame engine to generate pricing for the desired product.

7. The product configuration system of claim **6**, the system further comprising a schematic configurator that displays on said user interface drawings representing the desired product as configured by said configurator subsystem, and allows manipulation and graphical editing of the desired product configuration, wherein the desired product configured is a door assembly.

8. The product configuration system of claim **6**, the system further comprising a product code engine for both generating and receiving as inputs codes associated with component parts included in the product information stored in said data storage subsystem, wherein said product code engine facilitates input to and output of the system utilizing such codes.

\*   \*   \*   \*   \*

# EXHIBIT B
## TO FIRST AMENDED COMPLAINT

US007461049B2

## (12) United States Patent
### Thompson et al.

(10) Patent No.: **US 7,461,049 B2**
(45) Date of Patent: **Dec. 2, 2008**

(54) **AUTOMATED CONFIGURATION SYSTEM AND METHOD**

(75) Inventors: **Joseph H. Thompson**, Nashville, TN (US); **Randy J. Weems**, Lavergne, TN (US); **Edward A. Lessman**, Nashville, TN (US)

(73) Assignee: **Edgenet, Inc.**, Brentwood, TN (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 608 days.

(21) Appl. No.: **10/669,465**

(22) Filed: **Sep. 25, 2003**

(65) **Prior Publication Data**

US 2004/0068485 A1      Apr. 8, 2004

**Related U.S. Application Data**

(63) Continuation of application No. 09/684,907, filed on Oct. 10, 2000, now Pat. No. 6,810,401.

(60) Provisional application No. 60/158,250, filed on Oct. 8, 1999, provisional application No. 60/158,316, filed on Oct. 8, 1999.

(51) **Int. Cl.**
**G06F 7/00** (2006.01)
**G06F 17/30** (2006.01)
**G06F 17/00** (2006.01)

(52) **U.S. Cl.** .......................................... **707/2**; 707/100

(58) **Field of Classification Search** ..................... 707/2, 707/10, 100, 101, 5; 706/10, 50, 60; 705/26, 705/33; 709/246, 226
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,175,795 A * 12/1992 Tsuda et al. ................... 706/10
5,293,479 A * 3/1994 Quintero et al. .............. 715/841
5,311,424 A 5/1994 Mukherjee et al.

5,745,765 A 4/1998 Paseman
5,784,286 A 7/1998 Hirose et al.
5,877,966 A 3/1999 Morris et al.
5,963,953 A 10/1999 Cram et al.
5,966,310 A 10/1999 Maeda et al.
6,064,982 A 5/2000 Puri
6,260,068 B1 * 7/2001 Zalewski et al. ............ 709/226
6,272,494 B1 * 8/2001 Inoue ......................... 707/100
6,351,734 B1 2/2002 Lautzenheiser et al.
6,412,012 B1 6/2002 Bieganski et al.
6,727,925 B1 4/2004 Bourdelais
6,865,524 B1 3/2005 Shah et al.
7,269,664 B2 * 9/2007 Hutsch et al. ............... 709/246

OTHER PUBLICATIONS

EPIC Electronic Product Information Corp, Product Brochures, Apr. 1997.
EPIC Product Information Corp., Technology; Software Brochure, May 1992.
EPIC Electronic Product Information Corp., Quick Reference Technology Demo, Mar. 1995.
Edgenet Media, Made 2 Order, Brochure, Rev. Jul. 28, 1998.

* cited by examiner

*Primary Examiner*—Wilson Lee
*Assistant Examiner*—Merilyn P Nguyen
(74) *Attorney, Agent, or Firm*—Dewitt Ross & Stevens S.C.

(57) **ABSTRACT**

An automated configuration system (and method) is provided for facilitating the configuration of desired products, services, or other assemblages that require users to gather and assimilate disparate knowledge of makes, models, types, features, codes, and prices of the desired product/service to be configured. In accordance with a preferred embodiment, configuration is facilitated through interaction of a user with a frame engine that performs frame-based inferences to discern stored knowledge of a product (or the like), as supplemented by a rules-based inference system.

**20 Claims, 36 Drawing Sheets**



Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 86 of 166



*FIG. 1*

Case 3:14-cv-02264    Document 50-2    Filed 01/28/15    Page 3 of 49 PageID #: 804

U.S. Patent

Dec. 2, 2008

Sheet 2 of 36

US 7,461,049 B2



FIG. 2

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 88 of 166



FIG. 3

Case 3:14-cv-02264    Document 50-2    Filed 01/28/15    Page 5 of 49 PageID #: 806

U.S. Patent

Dec. 2, 2008

Sheet 4 of 36

US 7,461,049 B2



FIG. 4

**U.S. Patent**    Dec. 2, 2008    Sheet 5 of 36    US 7,461,049 B2



*FIG. 5*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 91 of 166



*FIG. 6*

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 8 of 49 PageID #: 809

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 92 of 166



*FIG. 7*

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 9 of 49 PageID #: 810



*FIG. 8*

U.S. Patent

Dec. 2, 2008

Sheet 9 of 36

US 7,461,049 B2



FIG. 9

U.S. Patent

Dec. 2, 2008

Sheet 10 of 36

US 7,461,049 B2

FIG. 10

U.S. Patent    Dec. 2, 2008    Sheet 11 of 36    US 7,461,049 B2

[Quick Spec]

File  Edit  Option  Window  Tutor  Help

| Exit | Quick Spec | Projects | Product Line Review | Tutor | |

| Close | Save | Prefs | Back | Forward | Clear | Guide Form Spec's | Appl & Perf Spec's | |

SELECT MODEL/CAT NUM    Custom:                                    —10

| Lamp | J1364 | | Cat Number | Freq. | Ballast Type | Lamp Starting | Lamp Config. | Family | |
|------|-------|---|------------|-------|--------------|---------------|--------------|--------|
| Lamp Qty. | 1 | | CJ60MPT | 60 Hz | Magnetic | Preheat | N/A | UNIVERSAL | |
| Voltage | 120V | | | | | | | | |
| Cat. Number | | | CJ40MPT | 40 Hz | Magnetic | Preheat | N/A | UNIVERSAL | —46 |
| All Attributes | | | CJ45MPT | 40 Hz | Magnetic | Preheat | N/A | UNIVERSAL | |

Qualify   1

Prefs: On

Hint:

## FIG. 11



*FIG. 12*

U.S. Patent    Dec. 2, 2008    Sheet 13 of 36    US 7,461,049 B2

FIG. 13

U.S. Patent

Dec. 2, 2008

Sheet 14 of 36

US 7,461,049 B2

54 →

☐ Edit Mark–Accessories        ▭ ▢ ☒

| Close | Debug | Undo |

**Questions/Selections**

| Application | Casement |
| Category | Mulling |
| Length | Custom (cut by the foot) |
| Number | 15" Bow Mullion WHITE |
| Length | 3" |

**Answers**       Enter Length in Inches

# edgenet

| Quantity | Manufacturer |

| Custom Answer | 3" |     | 1 | M2o ▽ |

| Shopping Cart | Quantity | Price |
| Item #778 15" Bow Mullion – WHITE, 3" inches | 1 | 5.10 |

| New |
| Del |

| Edit Status: | |

*FIG. 14*

**U.S. Patent**     **Dec. 2, 2008**     **Sheet 15 of 36**     **US 7,461,049 B2**



## FIG. 15

U.S. Patent

Dec. 2, 2008

Sheet 16 of 36

US 7,461,049 B2

☐ Order Form Viewer  ☐☐☒

EdgeNet, Inc    Customer  Ray Hill    Purchaser  Ray Hill    Page _____ of _____
Unit Order Form    Location  461 Ocean Blvd    Job Name  Pillsbury Residence    Ship Date _____
    Integrity GA 30556    S# _____
Quote # _____    P.O # _____    Date  Wed Oct 04 2000    _____ %Discount

| QTY. | Product Code RO Width X Height (1) | Ext. Finish (2) | Hinge (3) | Glass (4) | PAS/ RDG (5) | Grille/Divided Light(6) | | | | | | Jamb Width(7) | Int. Prime (8) | Screen(9) | | | Hard- Ware (10) | Balance/Track (11) | | | Ext. Trim(12) | Arched Casing (13) | | | ELEV Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Type | Style | Pattern | Bar | LS | IN | | | Color | Type | Mesh | | W W | TP | Style | | Type | Size | Style | |
| | STANDARD UNITS | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | C2-CAS-1-8x3-0W | WH | LR | OPD | | | | | 1 3/8" | | | 4 9/16" | | WH | AM | | | | | | | | | | |
| 1 | C12-AWN-2-4x1-8W | WH | S/V | OPD | | | | | | | | 4 9/16" | | WH | AM | | | | | | | | | | |
| 1 | C2-DH-2-0x3-2W | WH | | OPD | | | | | 1 3/8" | | | 4 9/16" | | WH | AM | | | | K | PWR | | | | | |
| | Prep For Stool | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | C2-CAS-1-8x3-0W | WH | LR | OPD | | | | | 1 3/8" | | | 4 9/16" | | WH | AM | | | | | | | | | | |

26

Previous Page

Next Page

Print

Close

*FIG. 16*



FIG. 17

U.S. Patent    Dec. 2, 2008    Sheet 18 of 36    US 7,461,049 B2



| Order Form Viewer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Project Schedule—Pillsbury Residence | | | | | | | | |
| Item | Product Code | Quantity | Finish | Product Type | Configuration | RO Width | RO Height | Jamb |
| 0005 | C2-CAS-1-8x3-0W | 1 | White | Casement Windows. | Twin Unit (2-Wide) | 3' 4 3/4" | 3' 0 1/2" | |
| 0003 | C2-DH-2-0x3-2W | 1 | White | Double Hung Windows | Twin Unit | 4' 4 7/8" | 3' 0 1/2" | |
| 0002 | C12-AWN-2-4x1-8W | 1 | White | Awning Windows | One-Wide/Two-High Unit | 2' 4 1/2" | 3' 4 1/2" | |
| 0001 | C2-CAS-1-8x3-0W | 1 | White | Casement Windows | Twin Unit (2-Wide) | 3' 4 3/4" | 3' 0 1/2" | |

62

26

Previous Page

Next Page

Print

Close

*FIG. 18*

U.S. Patent    Dec. 2, 2008    Sheet 19 of 36    US 7,461,049 B2



FIG. 19



FIG. 20a

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 106 of 166



## FIG. 20b

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 23 of 49 PageID #: 824



FIG. 20c

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 24 of 49 PageID #: 825

U.S. Patent

Dec. 2, 2008

Sheet 23 of 36

US 7,461,049 B2



*FIG. 21a*

U.S. Patent

Dec. 2, 2008

Sheet 24 of 36

US 7,461,049 B2

◻ Edit Project                                                          [?]◻◻

Quote # [000006]     Sales Rep [Jack Spradigan ▽]

Name [Pillsbury Reside]  Price Mult [1.0]                    Status     Date
                                                                        [Wed Oct 04 16:44:04 2000]

**Project Information**          [Copy from Customer]        Customer Information

[Shipping Address] [Billing Address]          Customer   [Ray Hill ▽]

Name       [Ray Hill]                         Tax        [6.0000]

Phone      [(770) 876-3425]                   PO #       [            ]

Fax        [(770) 876-3420]                   Terms      [Net 30 Days ▽]

Address1   [461 Ocean Blvd]                   Comments

Address2   [            ]

City       [Integrity]                        [                                    ] —72

State/Province [GA]    Zip Code [30556]

Country    [            ]

                    [Copy from Billing Address]    ⊙ Delivery      ○ Pickup

[Line Item Adjust]                               [Ok]    [Cancel]

## FIG. 21b



FIG. 22a

U.S. Patent

Dec. 2, 2008

Sheet 26 of 36

US 7,461,049 B2



FIG. 22b



*FIG. 23a*

U.S. Patent

Dec. 2, 2008

Sheet 28 of 36

US 7,461,049 B2



FIG. 23b

U.S. Patent

Dec. 2, 2008

Sheet 29 of 36

US 7,461,049 B2



FIG. 24

U.S. Patent

Dec. 2, 2008

Sheet 30 of 36

US 7,461,049 B2



FIG. 25

Case: 3:15-cv-00330-wmc   Document #: 1   Filed: 05/29/15   Page 116 of 166



*FIG. 26*

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 33 of 49 PageID #: 834



*FIG. 27*

Case 3:14-cv-02264    Document 50-2    Filed 01/28/15    Page 34 of 49 PageID #: 835

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 118 of 166



*FIG. 28*

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 35 of 49 PageID #: 836



*FIG. 29*

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 120 of 166



## FIG. 30

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 37 of 49 PageID #: 838

Case: 3:15-cv-00330-wmc    Document #: 1    Filed: 05/29/15    Page 121 of 166



*FIG. 31*



*FIG. 32*

Case 3:14-cv-02264   Document 50-2   Filed 01/28/15   Page 38 of 49 PageID #: 839

US 7,461,049 B2

**1**

## AUTOMATED CONFIGURATION SYSTEM AND METHOD

This application claims priority to U.S. Provisional Patent Application No. 60/158,250, filed Oct. 8, 1999, and U.S. Provisional Patent Application No. 60/158,316, filed Oct. 8, 1999, which are both hereby incorporated by reference in their entirety. This application is a continuation of application Ser. No. 09/684,907, filed Oct. 10, 2000 now U.S. Pat. No. 6,810,401, the subject matter of which is incorporated by reference herein.

### BACKGROUND

In the building and construction industry, job estimation is a time-consuming and costly process. In order to appropriately estimate the cost of any job an individual must assemble both the correct product to satisfy the engineering criteria of a given project and then assemble prices from a variety of data sources. Complex estimates compound the work and cost of this process. In a complex project, estimates are often assembled from a combination of pricing sources. These estimates require both a structured and intimate understanding of the product, its technical specifications, and costs.

### SUMMARY

An automated configuration system (and method) is provided for facilitating the configuration of desired products, services, or other assemblages that require users to gather and assimilate disparate knowledge of makes, models, types, features, options, limitations, codes, and prices of the desired product/service (or group of the same) to be configured. In accordance with a preferred embodiment, configuration is facilitated through interaction of a user with a frame engine that performs frame-based inferences to discern stored knowledge of a product (or the like), as supplemented by a rules-based inference system.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating a configuration device in accordance with a preferred embodiment of the invention;

FIG. **2** is a block diagram illustrating a configuration system in accordance with a preferred embodiment of the invention;

FIG. **3** is an exemplary illustration of a product Selection and Configuration display in accordance with a preferred embodiment of the invention;

FIG. **4** is an exemplary illustration of a Preferred Answer display in accordance with a preferred embodiment of the invention;

FIG. **5** is an exemplary illustration of a Standard Answer display in accordance with a preferred embodiment of the invention;

FIG. **6** is an exemplary illustration of a Graphic Selection display in accordance with a preferred embodiment of the invention;

FIG. **7** is an exemplary illustration of multiple Product Code displays in accordance with a preferred embodiment of the invention;

FIG. **8** is an exemplary illustration of a Standard Parametric Drawings display in accordance with a preferred embodiment of the invention;

**2**

FIG. **9** is an exemplary illustration of a Composite Unit Design display in accordance with a preferred embodiment of the invention;

FIG. **10** is an exemplary illustration of a Catalog Page display in accordance with a preferred embodiment of the invention;

FIG. **11** is an exemplary illustration of a DataGrid display in accordance with a preferred embodiment of the invention;

FIG. **12** is an exemplary illustration of a Custom Shapes Editor display in accordance with a preferred embodiment of the invention;

FIG. **13** is an exemplary illustration of a Pricing display in accordance with a preferred embodiment of the invention;

FIG. **14** is an exemplary illustration of an Accessories Module in accordance with a preferred embodiment of the invention;

FIG. **15** is an exemplary illustration of a Line Item Adjust Module in accordance with a preferred embodiment of the invention;

FIG. **16** is an exemplary illustration of an Order Form display in accordance with a preferred embodiment of the invention;

FIG. **17** is an exemplary illustration of a Quotes display in accordance with a preferred embodiment of the invention;

FIG. **18** is an exemplary illustration of a Schedule Generator display in accordance with a preferred embodiment of the invention;

FIG. **19** is an exemplary illustration of a Product Specifications display in accordance with a preferred embodiment of the invention;

FIG. **20** is an exemplary illustration of an AutoCAD display in accordance with a preferred embodiment of the invention;

FIG. **21***a* and **21***b* are exemplary illustrations of a Project Information Management display in accordance with a preferred embodiment of the invention;

FIG. **22***a* and **22***b* are exemplary illustration of a Sales-Representative Information Management display in accordance with a preferred embodiment of the invention;

FIG. **23***a* and **23***b* are exemplary illustration of a Client/Customer Information Management display in accordance with a preferred embodiment of the invention;

FIG. **24** is an exemplary illustration of a Product Line Review display in accordance with a preferred embodiment of the invention;

FIG. **25** is an exemplary illustration of an Interactive Tutor display in accordance with a preferred embodiment of the invention;

FIG. **26** is a flow diagram illustrating the sales/personnel process flow steps in accordance with a preferred embodiment of the invention;

FIG. **27** is a flow diagram illustrating the dealer/distributor use steps in accordance with a preferred embodiment of the invention;

FIG. **28** is a flow diagram showing the architectural process for a millwork system in accordance with a preferred embodiment of the invention;

FIG. **29** is flow diagram illustrating the manufacturer use process in accordance with a preferred embodiment of the invention;

FIG. **30** is a diagram illustrating a configuration network, in accordance with a preferred embodiment of the invention; and

FIGS. **31** and **32** are illustrations of the hierarchical structures used in accordance with a preferred embodiment of the invention.

US 7,461,049 B2

**3**

DETAILED DESCRIPTION

Preferred embodiments and applications of the invention will be described herein. Other embodiments may be realized and structural or logical changes may be made to the embodiments without departing from the spirit or scope of the invention. Although the preferred embodiments disclosed herein have been particularly described as applied to a configuration system and method for configuration of specific exemplary products (e.g., windows and doors), it should be readily apparent that the invention may be embodied to provide configuration and estimation functionality for any number of products, services or the like where configured, customized or assembled-to-order products/services are evaluated, selected, purchased, sold, supported, or otherwise considered.

In accordance with a preferred embodiment of the invention, a configuration system (and corresponding method) is embodied in a single (or multiple) processor-based system that may be supported in a stand-alone, networked, mainframe, or client-server architecture. A single (or multiple) program memory module is provided for storing one or more computer programs used to perform the functionality described herein.

In accordance with a preferred embodiment, one or more user interfaces are provided as part of (or in conjunction with) the configuration system to-permit users to interact with the system. Individual ones of a plurality of client devices (e.g., network/stand-alone computers, personal digital assistants (PDAs), WebTV (or other Internet-only) terminals, set-top boxes, cellular/PCS phones, screenphones, pagers, kiosks, or other known (wired or wireless) communication devices, etc.) may similarly be used to execute one or more computer programs (e.g., universal Internet browser programs, dedicated interface programs, etc.) to allow users to interface with the configuration system.

In accordance with a preferred embodiment, a user (e.g., consumer, sales-representative, buyer, seller, contractor, builder, architect, consultant, organizer, project coordinator, etc.) of the configuration system interacts with the system to configure and/or estimate the cost of a desired product, component, or project. The interaction with the system is preferably through a series of questions provided by the system with input answers provided by the user. The interactive nature of the system aides the user in arriving at the desired product, component, or project selection and the production of any corresponding information (e.g., layouts, pricing, schematics, specifications, etc.).

FIG. **1** illustrates in block diagram form a configuration device in accordance with a preferred embodiment of the invention containing the Core **102**, the Frame Engine **104**, and the Rules Engine **106** subsystems or modules (described in detail below).

Core **102** is a processing module that can contain a variety of miscellaneous functions for the system. Core **102**, for example, may be used to take a user's input and standardize that input. For example, if the user inputs "2 feet, 3 inches," Core **102** can include functionality that converts that input solely to inches (or another unitized number, e.g., metric units). Another function that may be incorporated in Core **102** is a messaging system that contains all the codes for dynamically loading the other modules. Generally, any functions that may facilitate the processing of input/output data in the system may be incorporated in Core **102**.

Preferably, Frame Engine **104** is a frame-based inference engine used to process product knowledge, which may be supplemented by an interpreted rules system, based on input

**4**

data from Core **102** (or other modules) and from users of the system. In accordance with a preferred embodiment, user data is input through user input of answers to a series of questions regarding configuration of a desired product or project posed by the system (as will be discussed in detail below). In accordance with a preferred embodiment, Frame Engine **104** computes available configuration answers for any configuration questions posed to a user at any time (e.g., in any order), and processes the user's answer to such question. When given the value of one or more answers, Frame Engine **104** infers the values of answers to other questions automatically, and thus, eliminates the need for excessive rule constructs, as typically required in a rules-based engine. Through inference, Frame Engine **104** may also remove or insert questions (and their associated answers) based on the user's previous response(s).

In accordance with a preferred embodiment of the invention, Frame Engine **104** is primarily constructed using a frame-based design concept of knowledge organization, representation, and product classification. Frame-based and rule-based expert systems encode knowledge using fundamentally different models.

In the context of product configuration, the problem an expert system is supposed to solve is as follows: given a set of options ("questions" to be presented to the user), each of which has a set of legal attributes ("values" with which the user may answer the questions), how are the options/attributes themselves related to each other (which options/attributes remove [or 'constrain away'] other options/attributes, which options/attributes are 'interdependent', etc.).

As an example, if the user has answered options A, B, and C with attributes x, y, and z, the expert system must then determine what are now the legal attributes for some other option D. In order to do this, an expert system first has to encode the relationship between the options in some manner (i.e., represent the knowledge). Then, as the expert system is provided current choices as inputs in real time (i.e., "the user has answered options A, B, and C with attributes x, y, and z"), the system must now apply its encoded knowledge to the problem "what are the legal attributes for D" in order to supply the solution(s).

A rule-based expert system generally represents knowledge using a large collection of If-Then-Else constructs (i.e., "If the user has answered option 'A' with attribute 'x', Then attribute 'y' is no longer available for option 'B', Else . . . "). This approach, however, is a unidirectional encoding: if the conditional portion (the user has answered option 'A' with attribute 'x') of the statement is true, the resultant portion must also be true (attribute 'y' is no longer available for option 'B'). The converse (if attribute 'y' is no longer available for option 'B', then the user has answered option 'A' with 'x') is not necessarily true, nor in general should it be.

However, a rule-based expert system requires that the inverse rule must be written separately if it is deemed necessary. If the product knowledge being modeled is complex, the required rules and inverse rules can grow into a very large number. In addition, applying this type of knowledge representation to the problem "the user has answered options A, B, C with attributes x, y, z; now what are the legal attributes for this other option D?" involves using an interpreter or compiler that understands the rule syntax so as to apply the rules to the problem.

On the other hand, the frame-based Frame Engine **104** encodes knowledge in an entirely different manner that does not suffer from this "inverse rule" problem. At its most fundamental level, Frame Engine **104** represents knowledge in a hierarchical tree-like structure. The nodes of the tree are

US 7,461,049 B2

**5**

generally called "frames" (e.g., corresponding to product categories) and each node contains a collection of "slots" (e.g., corresponding to product features and options). A slot is a one-to-many relationship between an option and a subset of the legal values (e.g., attributes) for that option.

Textually, a slot is represented as follows:

A=x, y, z

where 'A' is an option, and 'x', 'y', and 'z' are attributes for option A.

In general, a frame contains multiple slots, and has child frames as well (because of the tree structure). Conceptually, all the slots in a frame "go together." If at least one of the slots in a frame is found to be invalid (e.g., Slot "A=x, y, z" is in a particular frame, but the user has answered 'A' with attribute 'w'), then the entire frame (along with all of its other slots and all of its child frames) is invalid. Functionally, products and attributes in such a frame are removed from the configuration process. Applying this knowledge representation to the problem "the user has answered options A, B, and C with attributes x, y, and z, now what are the legal attributes for this other option D" involves Frame Engine **104** first marking the appropriate portions of the tree invalid as the user supplies answers to options. Then, to actually provide an answer to the question "what are the legal attributes for some other option D," the engine will look for all the frames which have not been marked invalid and which reference 'D' (i.e., have a slot involving 'D') and then combine all the attributes found in these slots (eliminating any duplicates). At the conclusion of this process, the answer (in many cases, a multi-faceted answer in terms of associated data [a price, an image, a set of drawings, etc.]) is generated and displayed.

In accordance with a preferred embodiment of the invention, a Product Knowledge Builder module may be provided for use in constructing, storing and interrelating data concerning products, components, configurations, etc. to optimize the operation of Frame Engine **104**.

The Product Knowledge Builder allows the entry of product knowledge in an intuitive hierarchical fashion. The knowledge is entered into a tree-like structure very similar to the Windows File Manager or Explorer. Once the product knowledge has been entered, this tool "builds" the knowledge into a single output file. This process both compiles the knowledge into a hierarchical tree structure and then optimizes it. The output file is then ready to be processed by Frame Engine **104**.

The following simple example will illustrate the differences between an If-Then-Else rule based system and one utilizing Frame Engine **104** in accordance with a preferred embodiment of the invention:

There are four people who are identified by a letter, color, and number.

Jim is A, Blue, and 3.
Ted is B, Red, and 2.
Randy is A, Red, and 4.
Roy is B, Blue, and 2.

The first screen in an application would prompt the user for choosing a letter. (As an additional requirement, the questions can be answered in any order, and the user might skip the first screen and come back to it later.) The If-Then-Else rules to handle such option/attribute pairs are as follows:

if Color has no answer and Number has no answer then
    Letter is A or B

**6**

-continued

else if Color has no answer then
        if Number is 3 or Number is 4 then
            Letter is A
    if Number is 2 then
            Letter is B
    else if Number has no answer then
            Letter is A or B
    else if Color is Blue and Number is 3 then
            Letter is A
    else if Color is Red and Number is 2 then
            Letter is B
    else if Color is Red and Number is 4 then
            Letter is A
    else if Color is Blue and Number is 2 then
            Letter is B

Two more sets of rules will still have to be written for the Color screen and the Number screen. The difficulty of adding a new person to the data or, adding another class of question (e.g.. to determine the group's favorite fruit) can easily be seen. It is also useful to remember that this sample data is intended to be a trivial example. In contrast, the Product Knowledge Builder would permit the entry of that same data as follows.

After adding the three questions to the system, add the following compound slot:

| LETTER | COLOR | NUMBER | PERSON |
|--------|-------|--------|--------|
| A | Blue | 3 | Jim |
| B | Red | 2 | Ted |
| A | Red | 4 | Randy |
| B | Blue | 2 | Roy |

To add a new person, a new row is simply inserted, adding the new person's letter, color, number, and name. To add another question such as the group's favorite fruit, a new column is simply added to the slot, and a list of everyone's favorite fruit can be added.

While the actual algorithm for Frame Engine **104** as implemented is likely to be much more complex, the following illustration of the operation of Frame Engine **104** used to implement the above example may be useful:

In the beginning of a configuration session all frames are valid, and the example above has four frames, one for each row. When asked for the list of available answers for any question, the Frame Engine looks down the column for that question. If the row is valid, its answer is added. Accordingly, for the Letter question, Frame Engine **104** sees A, B, A, B. The duplicate answers are combined to arrive at A, B. Now suppose the user answers A. This means unless the frame has Letter=A, it is invalid. The second and fourth rows are thus invalid. Next the user is presented with the Color question. To find the answers, search down the Color column; the result is Blue and Red for the available answers (Blue from the first row and Red from the third). The user picks Blue. This choice makes the second and third rows invalid.

As a result, there is only one valid row left, the first row. The user has effectively finished the selection process by answering only two of the three questions.

Frame Engine **104** is particularly useful when applied to real-world, complex product knowledge challenges. Real-world product knowledge contains relationships between

US 7,461,049 B2

7

products, knowledge common among similar products, knowledge common among different products, and exceptions to all of the above. The Product Knowledge Builder in accordance with a preferred embodiment contains constructs to handle all of these scenarios.

An important relationship among products can be expressed as: "Product A is a type of Product B" (e.g., a casement is a type of window, a car is a type of vehicle). This relationship is called inheritance. Inheritance is a parent to child relationship, but not in the traditional sense. In human beings, if a parent has a trait, the child may or may not share that trait (e.g., brown hair). In this form of knowledge inheritance, the child must inherit all traits. Inheritance is important, because it allows the software engineer to combine all the identical traits for the children in one logical place: the parent. It is for this reason that the Product Knowledge Builder works in a tree-like fashion. Each frame is a parent with children, which in turn have their own children. For example, if there were a system for selecting groceries, the logical way to organize the data would look something like that shown in FIG. **31**. The Product Knowledge Builder allows the construction of this tree with the result illustrated in FIG. **32**.

As illustrated, when the Bread frame is selected, there is a trait defined as bread. This means that all types of buns and loaves can be made out of White, Wheat, or Rye bread, because both Buns and Loaves inherit from Bread. If any special types of Buns were defined by adding "children" to the Buns frame (i.e., hamburger or hot dog) these new types also inherit White, Wheat, or Rye. Children inherit everything from their parents, grandparents, and great grandparents, all the way up the tree. In the future, if the store added Pumpernickel and carried it for all types of bread, such information could be added to the Bread frame. If the store offered Pumpernickel for Loaves only and not Buns, then Pumpernickel could be added to the Loaves frame. Without the power of inheritance, Pumpernickel would have to be manually added to every type of bread. There are some types of product knowledge that may be shared among different frames in the tree, but which cannot use inheritance. In the groceries example, a trait of this sort would be packaging. Not all groceries come in packages, and sometimes the same kind of product might be available with or without packaging (for example, packaged bread versus bread from the deli). If packaging is available, there will be some product knowledge that applies to all packaging (e.g., servings per container). There is still a need to keep this type of knowledge in a single place for ease of maintenance, and this methodology as incorporated by the Product Knowledge Builder is called frame re-use. A frame can be defined by itself to represent such knowledge, which can then be added into the tree at whatever points are appropriate.

In accordance with a preferred embodiment, although Frame Engine **104** is a frame-based inference engine, it also includes the ability to process data using rules files, making Frame Engine **104** more of a hybrid engine. It is foreseeable that some custom answers are more conveniently handled using rules files rather than building the product knowledge. A rules-based filtering methodology may be used, for example, for filtering output from Frame Engine **104** to comply with certain rules established for a particular product, component, configuration, project, or the like. Similar filtering of unwanted answers, or inapplicable questions may be useful. Rules-based functionality may also be used to add special answers, perform calculations, generate user warnings, or any other special processing required for specific system implementations.

8

In accordance with a preferred embodiment, Rules Engine **106** may be added to supplement the operation of Frame Engine **104**. Rules Engine **106** is typically employed to handle special cases, exceptions, and functionality that are specific to a product line or product series. Rules Engine **106** may also be employed to perform all (or some of) the rules-based functionality (discussed above) as utilized by Frame Engine **104**.

In accordance with a preferred embodiment, any number of additional modules may be added to serve a supportive and optional role (called on an "as-needed" basis). A Pricing Engine, for example, may be added that uses data from Frame Engine **104** and/or Rules Engine **106** to generate prices. Price reports can be graphically generated and prices can be calculated and displayed to the user in multiple currency types. A CAD Engine Module may be added to read CAD drawings and enable multiple CAD drawings to be displayed simultaneously, with separate components to be overlaid upon one another to form a complex illustration. Specifically, the CAD Engine may handle the determination of which components need to be overlaid and may present a list of the files containing the required components to a CADView control (not shown), which may in turn read the AutoCAD files and display the components on the user interface. The CAD Engine may also print, copy or otherwise output the CAD files.

FIG. **2** illustrates a configuration System **200** in accordance with a preferred embodiment of the invention. Specifically, System **200** may include a User Interface Subsystem **202**, Data Analysis Subsystem **204**, Graphics Formatting Output Subsystem **206**, Configuration Subsystem **208**, and Data Storage Subsystem **210**.

User Interface Subsystem **202** enables the interaction between the user and the system. It may interact with any component of the system. Graphics Formatting and Output Subsystem **206** performs calculations and preparations for the display of graphical and/or textual representations to the User Interface **202**. This subsystem may include a variety of graphical modules such as a Parametric Drawing Module, a Schematic Configurator, a CADControl/CADVU Module, a Bid Quote Generation Module, a Specification Generator Module, etc.

Data Analysis Subsystem **204** accesses and processes data from the Data Storage Subsystem **210** and provides results to the Configurator Subsystem **208** (or other modules as required). The Data Analysis Subsystem **204** may contain a variety of analytical and computational modules such as a Regular Expressions Engine, a Product Code Engine, a Pricing Engine, a Mulling Engine, etc.

Configurator Subsystem **208** (an example of which is shown in more detail in FIG. **1**, as described above) processes questions presented to the user and the answers received from the user. Based on the data in the Data Storage Subsystem **210** and the established data relationships, the Configurator **208** builds the product configuration. The Data Storage Subsystem **210** may serve as the data repository for the collective knowledge of the system. Product knowledge and pricing data may be stored in Data Storage Subsystem **210** to be used by the various modules. The Data Storage Subsystem **210** may include a variety of memory modules such as a Repository Module, a Pacifier Module, a Buffer Module, an Import/Export Module, a Preferences Module, etc. The Data Storage Subsystem **210** may also store the series of questions to be selected (e.g., by Frame Engine **104**, by Rules Engine **106**, etc.) for output to the user interface in response to configuration data input from the user interface.

The Parametric Drawing Engine that may be added to the system takes descriptions of configured products, and pro-

US 7,461,049 B2

9

duces an accurate representation of the product. As an example, the parameters used as input data descriptions can include the width or height of a window, or the existence of grilles. From these descriptive parameters, this module will generate a drawing (e.g., an elevation) or other dimensional product aspect for review by the user (such drawings can be converted to CAD format at the user's option).

The Parametric Drawing Engine can also export its drawings for use in other applications (e.g., AutoCAD, in the event that the parametric drawing will be used by an architect). The Parametric Drawing Engine may also tie into other modules such as a Schematic Configurator. The Schematic Configurator is a user interface module and inference tool. Using the Schematic Configurator, the user can view a line drawing representing a configured product (e.g., window) on the user interface, and add other units to the product. Thus, the end user might start out with a single unit and he/she might then add two flanking windows, one on either side of the product. The user can designate which sides to add windows and can even add other product types, such as a round-top window above. The Schematic Configurator can interface with the Frame Engine 104, seeking matching components to the previously selected configuration. Frame Engine 104 will match appropriate products between the two modules based on any number of product attributes and parameters.

A Preferences Module may also be included in the system. A Preferences Module allows the user to define a set of preferred answers for questions applicable to products in a project. In a preferred embodiment, the set of preferred answers may be based on user selected preferences, regional specification preferences, manufacturer compatibility preferences, etc. As an example, the user can initiate a project and choose "white clad" windows. The user can then set "white clad" as a preference for that entire project. As a result, for every item that the user configures for the project, the system will reference the Preferences Module and will automatically retrieve the preference values by default and override other items. The Preferences Module can also automatically inform a user that the selected preference is unavailable for a given product during the configuration of that product.

EXAMPLES

As an illustration of exemplary commercial embodiments of the invention, the following descriptions of the invention as variously implemented in different iterations of a system for (and method of) configuring window products is provided below.

In this exemplary embodiment, the system can display the entire structure of product knowledge associated with the desired product or product line. In particular, two "lists" are displayed in the primary product selection and configuration screen shown in FIG. 3: one for questions 10, and one for answers 12.

In a typical usage scenario, the user starts at the beginning of a question list, the first of which may present the user with a certain product type, such as a window or a door. As questions 10 are answered by the user, other questions 10 that no longer apply are automatically removed from the list. In some cases, answering questions 10 will actually add new questions 10 to the list or will automatically answer other questions 10. Because the entire product knowledge structure is always accessible, the user can answer questions 10 in whatever order is desired, although the default order is generally designed to reflect the flow of a typical product configuration.

10

If the user selects "window," the configuration system directs questions to develop answers pertinent to window configurations only.

Referring to FIG. 4, preferred answers 14, or Preferences, are pre-determined questions 10/answer 12 pairs consisting of any combination of product attributes which will be used repeatedly. Preferences may be useful to save time on large projects or jobs, and a preference set 16 is typically determined for specific product attributes that fit a particular purpose. Once a preference set 16 is defined, it can be used repeatedly thereafter to save time in the product selection process. If the user activates Preferences, the system will automatically select the question 10/answer 12 pairs in the preference set 16 and apply them to the product being configured at runtime. Any number of question 10/answer 12 pairs can be set up as preferred values. Libraries of Preferences may be saved to files for use with repeat customers or recurring product requests.

Referring to FIG. 5, Standard Answers 18 is a feature providing the ability to display to the user the "standard" answer 12 for a particular product attribute. Standard Answers 18 can also be automatically selected similar to Preferences and are flexible enough to be changed by the user during the configuration process (i.e., Standard Answers can be applied to some products in a project but not to others). If the user activates Standard Answers 18, the system will automatically answer 12 all questions 10, which have answers defined as "standard" and apply them to the product being configured at runtime.

Referring now to FIG. 6, Graphic Selection is a feature which provides a graphic representation 20 of attributes (if applicable), which can represent an answer more clearly 12 than a text description. This feature is particularly useful for the illustration of attributes that would otherwise require either extensive text description or which can be better shown with an image 22. The Graphic Selection array can accommodate a range of static or "animated" electronic representations, including portable network files, metafiles, bitmaps, or other graphic representations.

The system also provides Custom Answers. Custom Answers is a feature designed to accommodate direct user input for an answer 12 for which there exists one of the following conditions: 1) an acceptable range of incremental values (e.g., dimensional variables); 2) values defined as "other than the values presented" (e.g., custom operation of a twin casement window); or 3) values that are completely undefined. When a particular question 10 permits custom value answers 12, the Custom Answers box can automatically appear. The system allows the user to enter custom values for dimensional attributes such as unit dimension width, unit dimension height, etc.

Ultimately, the questions 10 and answers 12 guide the user to a desired configured product. From that point, the invention can accurately calculate how much the configured product is going to cost. In addition, the consumer can obtain detailed product information, including specifications that follow standard formats for engineering and architecture.

Referring to FIG. 8, Standard Parametric Drawings 28 can be generated based on the dimensions of a manufacturer's existing products. Parametric drawings 28 can apply to any product where "views" (e.g., front, top, side) of the product are defined as product attributes. Custom Parametric Drawings 28 can also be generated in accordance with the preferred embodiment of the invention if the value range(s) for the drawings of the applicable products can be defined.

The Schematic Configurator (SC), is used in this example as a tool designed to allow the user to manipulate parametric

US 7,461,049 B2

11

drawings **28** of products. Using "Drag and Drop" techniques, the user can design and view a variety of product elevations, manipulate individual components, and graphically edit composite unit designs. The SC module can also be used to select and configure products, as well as manipulate, scale and assemble both pre-defined and custom shapes and sizes into composite units. The SC also allows the elevation designs to be printed, copied and exported for use in other software applications (e.g., CAD). All pricing information driven by the manipulation of product components may be tracked including mulling charges, custom grille pattern designs, grille types, etc. As a unit is configured, the SC gathers the dimensional information and processes it to display an elevation. When a unit configuration is complete, it can be viewed in the SC where any necessary changes can be made (dimensional changes as well as other attribute changes) and other units can be added.

Referring to FIG. **9**, composites of products can be created. Composite unit design, assembly and verification are controlled through the SC. When more than one single unit **30** is placed together in the SC, a Custom Composite Unit **32** is created. This placement can be verified by clicking the Mull button **34**.

Other products can be added to a product already displayed in the SC with three different methods: 1) the Copy function, which creates an exact copy of the selected item; 2) the New Component function, which calls the Selection and Configuration display (FIG. **3**) for the configuration of an entirely new unit to be added to the existing unit; and 3) the Design option **38** described below.

The Design option **38** in the SC allows the user to add component units **30** that can be mulled **34** to the existing components. As an example, if the user wants to add a round top to an existing rectangular unit **30**, the Design option **38** will list all units **30** that are available. The user chooses "Add Round Top" from the list and the system will add the nearest sized round top to the existing unit **30** while simultaneously matching all other relevant attributes. If a new component unit **30** is added which contains attributes not applicable to the base unit **30**, the system will present the user with only those questions **10** specifically applicable to the new component and which require the user's response. The Mull option allows the user to verify that mulling of two or more units **30** can be done. Notification of shop, Field or Invalid mull (depending on the units **30** that have been selected) will be presented to the user with a pop-up or "soft" warning display.

Referring now to FIG. **10**, this exemplary embodiment of the invention can incorporate a Catalog Page feature. The Catalog Page feature displays dimensional attributes whose ranges can be shown in tabular form. Its format is derived from printed product information sources that display such dimensional variables. Catalog Page Drawings **40** provide the user with graphic parametric representations using the widths and heights of the class of products being selected. Unit heights **42** will be displayed down the side of the selection box and the widths **44** will be across the top of the array. This feature clarifies dimensional information presented in text form and provides visual feedback with respect to the scale and size of selected products.

Referring to FIG. **11**, product information can be displayed in a DataGrid. The DataGrid is a tool that allows the user to view a table of answers **10** for a list of questions **12**. Similar in form to catalog pages, DataGrids reflect tabular displays of product attributes found in printed catalogs and price books. In this view the questions **12** are presented across the top of the DataGrid instead of down the left hand side of the page.

12

The DataGrid is useful where product questions **10** and answers **12** have a one-to-one correspondence.

Referring to FIG. **12**, a Custom Shapes Editor allows the user to size custom shaped products. The example shown in FIG. **10** directly applies to windows and doors, but may apply to any customizable product. The Editor is automatically opened when a custom shape product is selected as a product category. The Custom Shapes Editor is generally used in conjunction with Catalog Pages to select the general product shape (see FIG. **10**) and permits the user to select and specify any combination of dimensional parameters **48** within the engineering limits set by the manufacturer. The Editor also displays a parametric representation of the custom product for inclusion on quotations. All pricing formulas relating to, for example, glass size, glass area, grille patterns and types, frame side lengths, and other parameters **48**, can be driven with the Custom Shapes Editor.

Referring to FIG. **13**, this exemplary embodiment of the invention utilizes data tables and formulas to look up, calculate and store base prices **50** plus add-on prices **52** of available product options. The total price **53** can include project-based price adjustments if applicable. Pricing of products utilizes a combination of values accessed from a table and enhanced by formulas, which calculate up charges, add-ons and other product options. These methodologies allow the lookup, calculation and storage of unit base prices **50** plus prices **52** for all applicable product features and add-ons. Project-based price adjustments are also available for customer discounts, promotions and competitive bidding situations.

Referring to FIG. **14**, an accessories module may be added containing product accessories **54** supplied by the manufacturer in conjunction with its primary products. The accessories module can include lineal products (e.g., extension jambs, molding, mull covers, etc.) as well as individual or boxed parts and components (handles, hinges, operators, etc.). This module can also be used to add accessories **54** to a quote that are purchased from other sources. Such additional items are added by entering text descriptions in a text box along with the prices for such items. All accessories **54** entered through the module appear on the quote as individual line items. Functionality can also be included to price accessories that are configurable (i.e., items which are defined by attributes displayed and represented in the Selection and Configuration display (FIG. **3**). These accessories or replacement items require product knowledge description and definition similar to primary products and present the user with relevant questions and answers as already described.

Referring to FIG. **15**, this exemplary embodiment of the invention provides a function to enable line item discounting for products, product lines and related attributes. Line item discounting can be applied to specific configured units; specific attributes (e.g., screens, grilles, etc.) or configured composite units. All of the line items for which discounting is available are displayed in the Line Item Adjust Box **56** lists. The Line Item Adjust box lists all applicable items, and price adjustment may be applied as follows: 1) none; 2) by multiplier; 3) by a flat fee; or 4) percentage (%). Using the price adjust function, additional price adjustments can be applied to specific clients, individual units within a project, individual projects, or to groups of projects.

Referring to FIG. **16**, this exemplary embodiment of the invention enables production of a variety of outputs, one of which can be an order form as shown. The client manufacturer can derive the format, content and design of the order form from an existing form in use. Order forms can contain all codes **26** necessary to build a specified product as well as pricing and dealer/distributor information. The order form is

US 7,461,049 B2

13

a tabular view of the information needed to build the set of products defined by a particular project. Also included is an "electronic order form" mechanism through which comma or tab delimited ASCII files can be created and exported. These files can be imported by other applications and may be designed to meet the needs of each manufacturer.

Referring to FIG. **17**, this exemplary embodiment of the invention enables the production of quotes, which include scaled elevation drawings of the product, reflecting the parametric drawings **28** generated during product selection and the use of the Schematic Configurator module. Also included is a list of all options chosen, the unit base price **50**, add-on prices **52** for non-standard choices, total price **53** for each product, and a grand total **60** of all products in the project.

Referring to FIG. **18**, this exemplary embodiment of the invention can provide a Schedule Generator. The Schedule Generator can build a product schedule **62**, listing all products included in a project, and relevant attributes assigned to each product, plus the system assigned product code **26**. The Schedule **62** is constructed as products are selected and constitutes a valuable tool for use by sales people as well as design and construction professionals, providing a full view of the products to be used in a construction project. When an attribute of any unit **30** is changed, the change is reflected on the Schedule **62** as well. The Schedule **62** can be displayed on-screen or printed as hard copy.

Referring to FIG. **19**, the exemplary embodiment of the invention enables generation of product specifications **64**. After a product has been configured and the user requests a technical specification **64** for that product, the Specification Generator gathers all relevant product information and produces a valid proprietary specification which conforms to the Construction Specifications Institute (CSI) three part section format. The Specification Generator works from content-complete template specifications supplied by the manufacturer. The system can produce unique customized specifications **64** for each product in a project or (as an additional option) a single specification **64** for multiple products.

Referring to FIG. **20**, this exemplary embodiment of the invention allows the user to view, print, copy, and export AutoCAD drawing files as DXF files, compatible with a number of CAD systems under the Windows environment. This embodiment of the invention has the ability to do multi-layered component assembly of DWG files. Component assembly is the process of displaying several DWG files at once, which overlay one another to compose an entire detail. The image **66** displayed as a section detail is actually made from three to five separate sub-assembly drawings, and several cross section details can be displayed simultaneously. The drawings included are based on the attributes selected during product selection and configuration. The system can export DWG files to a DXF formatted file. This feature allows the editing of exported drawings using a CAD system that accepts DXF files. The system also will allow the user to print drawing details.

Referring to FIGS. **21**a and **21**b, this exemplary embodiment can include a project database, which maintains and tracks information that is unique to a particular project. The project database contains the sales or customer service representative's name **68**, relevant customer information **70** and project information **72** for that particular project. When a new project is created, information from associated databases for sales-representatives and customers is available through drop-down boxes. Fields for Terms of Payment, PO Number, Price Multiplier, and Project name are available, as well as the Line Item Adjust function (FIG. **15**). Projects are categorized as Current or Archived and can be moved between these

14

categories as necessary. When a Project is highlighted in the Project window, all units in that project are displayed. Interfaces to contact management systems, sales systems and sales force automation systems can also be engineered on request. The system allows for record additions, changes to existing records, deletion of records, and duplication of records.

Referring to FIGS. **22**a and **22**b, the system can also include a Sales-Representative database, which controls all information for sales-representatives. These items are ID# **76**, Name **78**, Territory **80**, phone number **82** and fax number **84**. The system allows for record additions, changes to existing records, deletion of records, and duplication of records. The Customer list for each sales-representative can be viewed by selecting a specific sales-representative name in the listing.

Referring to F*igs*. **23**a and **23**b, this exemplary embodiment of the invention can also include a Customer database to control all information for customers. These items are ID# **76**a, Name **78**a, separate billing **80**a and shipping Addresses, Contact name **78**b, Customer type **86**, and miscellaneous defaults. The system allows for record additions, changes to existing records, deletion of records and duplication of records. Customers are displayed in a listing which includes the sales-representative for each customer.

This exemplary embodiment of the invention can also include an Import/Export function set which permits a project to be built on one computer and exported into a file format, which can be imported into the same application on another computer (provided the product knowledge sets are exactly the same). This function set allows a project to be constructed by a customer and then imported by a dealer, distributor or sales representative for quote generation, final order pricing adjustment and negotiation. Similarly, projects can be shared between dealers, sales-people and customer service personnel.

This exemplary embodiment of the invention also includes a System Help File. The System Help File can offer an on-line condensed version of the full user documentation typically supplied with the system. The System Help File can provide easily accessible information to assist in the operation of the system. The System Help File can be configured to be context-sensitive so that the Help topics available are driven by the user's position in the system.

Referring to FIG. **24**, this exemplary embodiment of the invention can include a Product Line Review function. The Product Line Review offers manufacturer and product line information **88**, as well as general industry information **88**, as it relates to the manufacturer's product line. Product Line Review is typically derived from each manufacturer's sales and marketing catalog(s), promotional brochures and other printed materials. Product Line Review can include fall color or black & white scanned images **90**, product features and benefits (as text descriptions), line drawings, technical illustrations and other appropriate product information.

Referring to FIG. **25**, this exemplary embodiment of the invention can incorporate an Interactive Tutor. The Interactive Tutor is a series of help screens **92** referenced to specific system features and functions. When the Show Messages (or Tutor) option is checked, the system will present messages on the screen to assist the user with the next step. This option is turned on or off by either selecting the Tutor button or by opening the Tutor Menu and clicking Show Messages so that the check is removed.

Audio/Visual Presentations can also be included as an integral part of the exemplary system. Sound, video or both media combined can be utilized to present, promote or enhance the client company and its products. Examples of this kind of information include videos of manufacturing processes,

US 7,461,049 B2

15
16

product installation procedures, or sales and marketing presentations. Audio information can include theme music or sound tracks, which complement video information.

This exemplary embodiment of the invention can also include a Product Information Module. The Product Information module allows the user to view various catalogs as a product is specified. Combining the expert system with the Adobe Acrobat Reader, for example, allows users access to a range of supporting product information. The printed catalogs from which this information is derived are more graphically oriented than CAD drawings and specifications. Generally, the format of this kind of material is PDF files.

Referring now to FIG. 26, flow chart 300 illustrates how another exemplary implementation of a preferred embodiment of the invention can be employed by a sales-representative/user in ordering sales for customers/users in the field. After the program is started at step 302, the sales-representative will call on new or existing customers to investigate prospective business. The sales representative can then run the system and start a project. At step 304, the representative would initiate the project and a list of all projects would be displayed. The representative can then initiate a new project at step 308. Alternatively, the system could remain in a "wait" mode until the project button is initiated. Once the project button is initiated, the sales-representative can then type in the client's name and address, and other pertinent information at step 310. Once the client information is entered then the user is presented with a configuration screen (step 312) that can be used to begin adding product information.

The manner in which a product is entered consists of the user inputting into the system a request for a new "mark." A "mark" refers to a configured unit or product such as a window, door, or other assembly. The user can then select a product type, such as a window, at step 314. The user can then begin to configure a new mark and at that point is prompted to answer some questions about the product at step 315 such as the type, size, or style of window desired. The sales-representative/user can input the specific product information, for example, color options, glass type, etc. At step 318, the sales-representative can select a quantity of product for the project. As a result, the system will repeat the same configuration for the number of windows entered in the Quantity data field.

At step 322, the user can create custom composite units. At this point, the user would enter the Schematic Configurator and choose the composite elements for the configurator to construct at step 324. Once the custom configuration is complete, or if the custom composite step is bypassed, the user can initiate a quote button at step 326, which enables the calculation of a price quote for the products currently defined by the project. The quote can contain individual descriptions of each product selected in preceding steps with all associated pricing, along with a drawing of each product with any custom composite units. Moreover, the information can be displayed, printed, presented or otherwise output together or separately at step 328. At step 330, the system would provide a price total and a total quote for the project.

FIG. 27 illustrates another exemplary implementation of a preferred embodiment, in which a dealer distributor adds individual sales representatives to the database at step 402. Customer names will then be added at step 404. The system will then check whether all customers have been added at step 406. If not, then it will loop back to add more names. Once all customers have been added to the database, the system will query whether the same thing has been done for sales representatives at steps 412. Once this data has been added, then the system will generate the customer database sales report. Once completed, this program will end.

Another exemplary implementation of a preferred embodiment is shown in FIG. 28. Upon initiating a product customization, the user can create a project (step 450). A product can be selected (step 452) to be configured for that project. The product can be configured by accessing the Schematic Configurator (step 454) to create a custom composite product. This step 454 can be repeated until all the products for a specific project have been configured at step 456. Upon completion of configuration of all products for the project, additional projects may be created by returning to step 450. Once all projects have been created and all products for these projects have been selected and configured (step 462), the user moves on in the system by accessing the Generator for Output Reports (step 468), whereby schedules, CAD drawings, Technical Specification Sheets, etc. can be created as hard copies (step 470). After the generation of output reports, the user can export CAD Details to CAD software (step 472). Before exiting the system, the user can transmit the project and all related information regarding the project to a dealer for a price quote (step 474), which can also be printed as a hard copy.

Another exemplary implementation of a preferred embodiment is shown in FIG. 29. In this exemplary embodiment, a user/sales-representative can initiate configuration of products in at least three ways: by taking a Telephone Sales and Order Entry (step 480), by Receiving a printed order form (step 482), and by Importing electronic project CIP (or other text format) (step 484). If a Printed order form is received (step 482), or Telephone Sales and Order Entry is taken (step 480), the sales-representative proceeds to create or select the customer from the Customer Database (step 486). Next the sales-representative can Create or Append a project for that customer (step 488). A desired product can be configured for that project (step 489). This step can be repeated until all the desired products for that customer or customer's project have been configured. Once all the products have been configured, the sales-representative can decide whether or not all the projects have been added for that customer (step 496). If they have not (step 498), the sales-representative can return to step 488 and create or access additional projects. If all the projects have been attended to, the sales-representative can determine if all customers have been added. If additional customers need to be added to the system or accessed within the system, the sales-representative can return to step 486 to create new files or select customers from the database, and then repeat the aforementioned steps. After all customers have been attended to, the user can transmit a product code (e.g., End Item Code) to back-end manufacturing and/or ERP systems before exiting the system.

If, as shown in FIG. 29, the user imports electronic Project CIP (or other text format), the user can access Integrated Manufacturing Software and move on to determine if the Version Control (VC) Number is correct in step 506. If not, the user can verify by telephone at step 480, and progress therefrom throughout the system as discussed above. If the VC Number is correct, the user can then add the order to any of the Sales Representative, Customer, Project, or Mark Databases (step 512). Next the user/sales-representative can Transmit the End Item Code to the back-end manufacturing and/or ERP systems (step 514).

In accordance with a preferred embodiment, the functions, features and architectures described above can be part of a network available to enable business-to-business commerce over the Internet. In accordance with a preferred embodiment

US 7,461,049 B2

17

of the invention, an Internet portal (and a corresponding method) is provided to be the center of a selected vertical market in a particular industry or collection of industries (e.g., fenestration, or windows and doors as exemplified above). The portal can be an Internet focal point for the participants in the vertical market. The portal can not only incorporate the configuration system described above for use by participants in the portal, but also can be a virtual space for industry news and information as well as a means for facilitating commerce by and between the participating manufacturers, dealers, distributors, and retail customers making up the vertical market, as shown in FIG. 30. In a preferred embodiment, Web server software such as Bondware by Bondware, Inc., which is a partially-owned subsidiary of EdgeNet. Inc., the details of which are incorporated herein by reference, may be used to implement the Internet portal.

The portal provides the central services for its participating members, providing news, advertisements, means for communication between members. The portal also provides a member-to-member commerce channel providing product offerings, configuration tools, ordering and purchasing mechanisms. Fees can be charged for membership to the portal, advertisements viewed or displayed on the portal, or as part of any member-to-member commerce transactions.

The portal can be an authoritative point of information about a given product market or focused to a specific group within the vertical market. The software package creating the portal can be a suite of Web applications enabling the creation of e-commerce communities for business customers. Virtual communities can be created through this portal where customers within the vertical market can shop, learn, play and explore common interests. This portal can incorporate the configuration-related system described heretofore. The portal can be accessible to those with market-specific expertise, and in return for membership in the portal, the participants can provide much of the content themselves in the form of advertising, news, discussions, sales, etc. as shown in FIG. 30.

In accordance with a preferred embodiment of the invention, one or more processor-based systems are used to implement the modules described or apparent from the description herein and to perform the functionality described (or inherent) herein. For each such system, one or more processors (e.g., central processing unit (CPU)) are provided for execution of one or more computer programs stored on any (one or more) known recording mediums. The processor(s) perform, control, or at least inform the various processing steps performed by the system in sending and retrieving data to and from at least one user interface and/or network. A user interface may be connected directly to a bus or remotely connected through a network (e.g., Internet). The network represents (wired or wireless) connection of two or more devices, whether directly or indirectly connected (e.g., directly coupling through cable, indirect coupling through one or more hubs or servers, whether the network is local to the processor-based system, geographically remote from the system, or a distributed combination of local/remote network components).

Preferably, one or more of the modules are coupled (directly or indirectly) to one or more database structures for use in supplying storage functionality for the modules in accordance with the operations described (or inherent) herein. The database structures can take any form from an individual floppy disk drive, hard disk drive, CD-ROM, redundant array of independent devices (RAID) system, to a network of the same or other storage devices. As is well known in the art, the database structures may be physically connected within the same location, or have one or more structures remotely

18

located in different locations. Each module may have dedicated or shared access to one or more database structures locally or remotely located from the module.

While preferred embodiments of the invention have been described and illustrated, it should be apparent that many modifications to the embodiments and implementations of the invention can be made without departing from the spirit or scope of the invention. Although the configuration system (and corresponding method) has been specifically described in connection with the configuration of a window/door product, it should be apparent that the system (and method) can be applied to any product, service, or component that is to be designed or configured such as cabinets, rooms, houses, cars, landscape designs, clothing, etc.

While the illustrated embodiments have been described utilizing Internet communications, it should be readily apparent that other communication systems or (wired/wireless) networks (e.g., intranets, private bulletin boards, individual local or wide area networks, proprietary chat rooms, ICQ, IRC channels, instant messaging systems, etc.) using real-time or non-real-time systems in lieu of or in addition to the disclosed Internet resources may also be utilized.

A Pricing Engine module could be added to the configuration system to generate pricing and cost information for individual products, components, projects, etc. both on a real-time, on-going basis, as the user interacts with the system, and also to provide total (or sub-total) pricing data for the configured product or project. The Pricing Engine may include bid and quote generation functionality to facilitate the production and transmission of bid/quotes by users to their ultimate customers. A Product Code Engine (see FIG. 7) may be added to generate (and receive as inputs) codes (e.g., UPC, EIC, etc.) assigned by manufacturers, retailers, or other users, as well as by the system itself for use in processing data associated with a particular product, component, project, etc. The product codes may be used by other modules of the system (e.g., the Pricing Engine) to associate data (e.g., prices) directly with the product codes.

A Communications module can be added to streamline the sales, order entry and manufacturing process: from transaction sites through the plant and to the job site. Thus, for example, the user, sales representative, or other individual can place an order of the configured product/service directly with the provider (e.g., manufacturer). The communication can be accomplished through any known means of communication (e.g., telephone, fax, e-mail, Internet, etc.). The Communications module would provide the system with capability to transmit (e.g., fax) quotes to remote ordering locations.

A Specification Generator module may also be added to generate detailed specifications in textual and/or graphical format for the configured products/services, etc. The specifications may be displayed, output, exported, or transmitted as desired by the user.

The modules described herein, particularly those illustrated or inherent in the instant disclosure, may be one or more hardware, software, or hybrid components residing in (or distributed among) one or more local or remote computer systems. Although the modules are shown or described as physically separated components, it should be readily apparent that the modules may be combined or further separated into a variety of different components, sharing different resources (including processing units, memory, clock devices, software routines, etc.) as required for the particular implementation of the embodiments disclosed herein. Indeed, even a single general purpose computer executing a computer program stored on an article of manufacture (e.g., recording medium) to produce the functionality and any other

US 7,461,049 B2

**19**

memory devices referred to herein may be utilized to implement the illustrated embodiments. User interface devices may be any device used to input and/or output information. The user interface device may be implemented as a graphical user interface (GUI) containing a display or the like, or may be a link to other user input/output devices known in the art. Discrete functionality of the system may be separated (logically or physically) to more efficiently operate the system. Many of the fundamental data coordinating functions (e.g., functionality performed by Core 102) may be separated into a Foundation-Level Tools Subsystem. This Subsystem may include a BB Assist Module to create BB structures and the like.

In addition, memory units described herein may be any one or more known storage devices (e.g., Random Access Memory (RAM), Read Only Memory (ROM), hard disk drive (HDD), floppy drive, zip drive, compact disk-ROM, DVD, bubble memory, etc.), and may also be one or more memory devices embedded within a processor, or shared with one or more of the other components. The computer programs or algorithms described herein may easily be configured as one or more hardware modules, and the hardware modules shown may easily be configured as one or more software modules without departing from the invention. Accordingly, the invention is not limited by the foregoing description, drawings, or specific examples enumerated herein.

The invention claimed is:

1. A configuration system comprising:

a processor;

a user interface, wherein said user interface receives input data for a desired configuration; and a frame engine, receiving data input from said user interface, wherein said frame engine outputs configuration data to said user interface in response to a frame-based inference of the input data by examination of a hierarchical data tree structure having nodes whose components contain data relevant to various configurations and by removing appropriate portions of the data tree structure from consideration as input data is received for a desired configuration.

2. The system of claim 1, further comprising a database, coupled to said frame engine, storing configuration data selectively retrieved for output in response to inferences made by said frame engine.

3. The system of claim 2, wherein said frame engine subjects configuration data to be output to said user interface to pertinent rules-based inferences before being output to said user interface.

4. The system of claim 3, further comprising a rules engine, coupled to said frame engine, wherein said rules engine subjects selected configuration data to be output to said user interface to pertinent rules-based inferences before being output to said user interface.

5. The system of claim 2, wherein said frame engine represents data concerning configuration in a hierarchical structure, with frames corresponding to configuration categories, wherein the frames act as nodes of the hierarchical structure containing a collection of slots corresponding to configuration features and options.

6. The system of claim 5, wherein said database stores data representative of product knowledge pertaining to products that may be configured by the system.

7. The system of claim 2, wherein said database stores a plurality of questions for selective output to said user interface based on frame-based inferences made by said frame engine in response to answers input through said user interface.

**20**

8. The system of claim 7, further comprising: a data analysis subsystem performing analysis of configuration data to be output to said user interface; and a graphics formatting output subsystem providing graphical representations of configuration data output to said user interface.

9. The system of claim 8, wherein said data analysis subsystem comprises a pricing engine providing pricing data corresponding to configuration data output to said user interface.

10. The system of claim 8, wherein said graphics formatting output subsystem comprises a parametric drawing engine providing illustrations of configuration data to said user interface.

11. A method of configuring a project, the method comprising the steps of:

accessing a user interface;

initiating a project for configuration;

configuring the project by entering project selections;

performing a frame-based inference by examination of a hierarchical data tree structure having nodes whose components contain data relevant to various configurations and by removing appropriate portions of the data tree structure from consideration as project selections are entered, thereby to obtain inferences in response to project selections made in said configuring step; and

outputting project configuration data to the user interface based on the inferences made in said performing step.

12. The method of claim 11, wherein said configuring step involves answering a plurality of questions presented, wherein the questions to be presented during said configuring step are stored in a database and selected for presentation based on inferences made in said performing step.

13. The method of claim 12, wherein said configuring step further comprises the substep of presenting preferred answers to select questions presented on the user interface.

14. The method of claim 12, wherein said performing step further comprises the substep of performing a rules-based inference in response to project selections made in said configuring step.

15. The method of claim 11, wherein said configuring step further comprises the substeps of:

graphically selecting parameters to configure the project based upon graphic representations of variations of characteristics of components to be selected for the project; and

manipulating schematically configured illustrations of components to be selected for the project.

16. The method of claim 15, wherein the project to be configured includes a custom product, the method further comprising the steps of:

accessing a catalog page to display graphical and textual information pertinent to the product to be configured;

accessing a custom shapes editor to size a product upon configuration and to select a customized combination of dimensional parameters for said product;

accessing an accessories module containing product accessory information; and

producing technical specifications containing technical information regarding the project as configured.

17. An article of manufacture comprising a machine-readable storage medium having stored therein indicia of a plurality of machine-executable control program steps, the control program comprising the steps of:

accessing a user interface;

initiating a project for configuration;

configuring the project by entering project selections;

US 7,461,049 B2

21

performing a frame-based inference by examination of a hierarchical data tree structure having nodes whose components contain data relevant to various configurations and by removing appropriate portions of the data tree structure from consideration as project selections are entered, thereby to obtain inferences in response to project selections made in said configuring step; and

outputting project configuration data to the user interface based on the inferences made in said performing step.

18. The article of manufacture as recited in claim 17, wherein said performing step comprises the substep of representing data concerning configuration of the project in a hierarchical structure, with frames corresponding to configuration categories, wherein the frames act as nodes of the

22

hierarchical structure containing a collection of slots corresponding to configuration features and options.

19. The article of manufacture as recited in claim 18, wherein said performing step comprises the substep of subjecting selected configuration data of the project to pertinent rules-based inferences.

20. The article of manufacture as recited in claim 18, wherein the substep of representing data concerning configuration of the project in a hierarchical structure comprises organizing nodes in a parent node and child node relationship, wherein each child node inherits attributes of a respectively associated parent node.

*  *  *  *  *

# EXHIBIT C
## TO FIRST AMENDED COMPLAINT

# edgenet

## NONDISCLOSURE, NONCOMPETITION, AND INTELLECTUAL PROPERTY PROTECTION AGREEMENT

This Agreement (the "Agreement") is made as of May 10 2005 (the "Effective Date"), by and between Edgenet, Inc., a Delaware corporation with its principal place of business at 6 Cadillac Drive, Suite 260, Brentwood, Tennessee 37027 ("Edgenet") and the undersigned prospective employee of Edgenet ("Employee"). Edgenet and Employee are each sometimes referred to herein as a "Party" and collectively as the "Parties."

### RECITALS:

A.    Edgenet desires to employ Employee, and Employee desires to accept employment by Edgenet.

B.    Employee acknowledges that, in the course of Employee's employment with Edgenet, Employee will receive certain confidential information of Edgenet and may create certain intellectual property that should be owned by Edgenet.

C.    Employee and Edgenet recognize that there is a need for Edgenet to protect such confidential information from unauthorized use and disclosure and to secure and protect its intellectual property rights.

NOW, THEREFORE, in consideration of Edgenet's employment of Employee and the covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.    "Confidential Information" means any and all tangible and intangible information (whether written or otherwise recorded or oral) of Edgenet that (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; or (b) that Edgenet designates as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential.  Confidential Information includes, without limitation (i) nonpublic information relating to Edgenet's technology, customers, business plans, promotional and marketing activities, finances and other business affairs, and (ii) third-party information that Edgenet is obligated to keep confidential. Confidential Information also includes any of the above mentioned items that are developed or created by Employee during his/her employment with Edgenet.

2.    Notwithstanding the above, the term "Confidential Information" shall not include any information that is either:

(a)    readily discernible from publicly-available products or literature; or

(b)    approved for disclosure by prior written permission of a corporate officer of Edgenet.

3.      All Confidential Information furnished to Employee will be used solely in connection with performing Employee's duties to Edgenet, will not be discussed with other persons without Edgenet's express written authorization, will not be used in any way directly or indirectly except in furtherance of Edgenet's business, and will be kept confidential by Employee.

4.      Employee may disclose Confidential Information as required to comply with binding orders of governmental entities that have jurisdiction over it or as otherwise required by law, provided that Employee (i) gives Edgenet reasonable written notice to allow Edgenet to seek a protective order or other appropriate remedy (except to the extent Employee's compliance with the foregoing would cause it to violate a court order or other legal requirement), (ii) discloses only such information as is required by the governmental entity or otherwise required by law, and (iii) and uses commercially reasonable efforts to obtain confidential treatment for any Confidential Information so disclosed.

5.      If Edgenet so requests at any time, Employee will return promptly to Edgenet all copies, extracts, or other reproductions in whole or in part of the Confidential Information in the possession of Employee. All Documents (defined to include not only paper documents but also data stored in computer memory, or on microfilm, microfiche, magnetic tape, disk or other medium, e-mails and any soft documents) that Employee prepares in connection with his/her duties as an employee of Edgenet, and all Confidential Information that may be given to him/her in the course of his/her employment, are and shall remain the sole property of Edgenet. Except as necessary in the performance of Employee's duties, all Documents (including copies of Documents) containing Confidential Information shall be and remain in Edgenet's sole possession on Edgenet's premises and shall not be copied or removed from Edgenet's premises. Upon termination of his/her employment with Edgenet, Employee shall return to Edgenet all Documents, including all copies thereof, in Employee's possession or control.

6.      Employee understands and acknowledges that Edgenet is not and will not be making any representation or warranty, express or implied, as to the accuracy or completeness of any furnished Confidential Information, and Edgenet does not and will not have any liability to Employee or any other person resulting from any reliance upon or use of, or otherwise with respect to, any furnished Confidential Information.

7.      Employee shall notify Edgenet immediately upon discovery of any unauthorized disclosure of Confidential Information, use of Confidential Information other than as permitted hereunder, or any other breach of this Agreement. Employee will cooperate with Edgenet in every reasonable way to help Edgenet regain possession of its Confidential Information and prevent further unauthorized use.

8.      All Confidential Information shall remain the exclusive property of Edgenet. Edgenet retains all rights and remedies afforded it under patent, copyright, trade secret, trademark, and any other applicable laws of the United States and the states thereof, or any applicable foreign countries, including, without limitation, any laws designed to protect proprietary or confidential information. This Agreement does not grant to Employee any express or implied right to any of Edgenet's Intellectual Property.

9.      Intellectual Property.

(a)      "Intellectual Property" means any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, design, technique, · know-how, trade secret, idea or other

intellectual property right whatsoever or any interest therein, whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection.

(b)    Employee agrees to promptly disclose and describe to Edgenet all Intellectual Property that Employee may solely or jointly conceive, create, discover, develop, or reduce to practice during the period of undersigned's employment with Edgenet (i) that relate at the time of conception, development or reduction to practice to Edgenet's business or actual or demonstrably anticipated research or development, (ii) that were developed, in whole or in part, on Edgenet's time or with the use of any of Edgenet's equipment, supplies, facilities or Confidential Information, or (iii) that result from any work Employee performed for Edgenet ("Edgenet Intellectual Property"). All Edgenet Intellectual Property and the benefits thereof are the exclusive property of Edgenet and its assigns, as works made for hire or otherwise. Employee hereby assigns to Edgenet all rights Employee may have or may acquire in Edgenet Intellectual Property without further compensation and shall communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to Edgenet.

(c)    Employee recognizes that Intellectual Property relating to his/her activities while working for Edgenet and conceived or made by him/her, alone or with others, within one year after termination of his/her employment, may have been conceived or made in significant part while employed by Edgenet. Accordingly, Employee agrees that such Intellectual Property Rights shall be presumed to have been conceived during his/her employment with Edgenet and are to be assigned to Edgenet as Edgenet Intellectual Property unless and until Employee has established the contrary. Employee agrees to disclose promptly in writing to Edgenet all Intellectual Property made or conceived by him/her for one (1) year after his/her employment terminates, whether or not he/she believes such Intellectual Property is subject to this Agreement, to permit a determination by Edgenet as to whether or not the Intellectual Property should be the property of Edgenet. Any such information will be received in confidence by Edgenet.

(d)    Employee agrees to perform, during and after his/her employment, all acts deemed necessary or desirable by Edgenet to permit and assist it, at its expense, in perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in Edgenet Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in the registration and enforcement of applicable patents and copyrights or other legal proceedings.

(e)    In the event that Edgenet is unable for any reason whatsoever to secure Employee's signature to any lawful and necessary document required to apply for or execute any patent, copyright or other applications with respect to any Edgenet Intellectual Property (including improvements, renewals, extensions, continuations, divisions or continuations in part thereof), Employee hereby irrevocably appoints Edgenet and its duly authorized officers and agents as his/her agents and attorneys-in-fact to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights or other rights thereon with the same legal force and effect as if executed by Employee.

10.    Restrictive Covenants.

(a)    During his/her employment with Edgenet, and for one (1) year thereafter,

~~provided employee has voluntarily resigned his/her employment, and/or is terminated for unlawful acts,~~ Employee will not participate, directly ~~or indirectly~~ as a partner, officer, director, stockholder, consultant, employee, agent, independent contractor or otherwise, in any business that is directly or ~~indirectly~~ competitive with the business of Edgenet. This restriction includes, without limitation, a prohibition against Employee soliciting or attempting to solicit, directly or indirectly,

905708 v1
100847-000  4/8/2005                                            - 3 -

any person or entity who is a customer or prospect of Edgenet or provides goods or services to Edgenet for the purpose of inducing the person or entity to cancel, reduce, or replace services with Edgenet or otherwise restrict their business with Edgenet. Notwithstanding the foregoing, Employee may hold up to five percent (5%) of the issued and outstanding publicly traded securities of any company without being deemed in violation of this restriction.

*Notwithstanding the above, in the event that employee is terminated due to a position elimination, general overhead cost reductions or other business reasons the aforementioned restrictive covenants will reduce to 6 month period or a time frame commensurate with the severance package.*

(b)    Employee further covenants and agrees that, for three (3) years after the termination of his/her employment with Edgenet, by either party and regardless of reason, Employee will not solicit or attempt to solicit, directly or indirectly, any person or entity who, during Employee's employment with Edgenet, was a customer or prospect of Edgenet or provided goods or services to Edgenet, if such solicitation or attempted solicitation is for the purpose of inducing the person or entity to cancel, reduce, or replace services obtained through Edgenet or otherwise restrict their business with Edgenet.

(c)    During his/her employment with Edgenet, Employee shall devote his/her full time and best efforts to the business of Edgenet and shall not take any position with any organization other than Edgenet that may interfere with Employee's responsibilities to Edgenet without the approval of Edgenet's Chief Executive Officer.

11.    Employee shall not make, use or permit to be used any Edgenet Property otherwise than for the benefit of Edgenet. The term "Edgenet Property" shall include all notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular telephones, pagers, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of Edgenet's business or concerning any of its dealings or affairs and any other Edgenet property in his/her possession, custody or control. Employee acknowledges and agrees that all Edgenet Property shall be and remain the sole and exclusive property of Edgenet. Immediately upon the termination of Employee's employment with Edgenet, or at such earlier time as Edgenet may request, Employee shall deliver all Edgenet Property in Employee's possession or control, and all copies thereof, to Edgenet.

12.    Employee represents and warrants to Edgenet that Employee's employment by Edgenet is not prohibited or restricted in any way by any noncompetition, nondisclosure or other agreement. To the extent that Employee possesses any non-public information relating to any previous employer, Employee covenants that Employee will not (i) disclose any such information to Edgenet or any of its employees or affiliates, or (ii) use any such information in any way in the course of Employee's employment with Edgenet.

13.    Employee further acknowledges that:

(a)    irreparable injury and damage will result from unauthorized disclosure of Confidential Information and from uses of Confidential Information other than in pursuance of the Business Purpose;

(b)    monetary damages may not be sufficient remedy for unauthorized disclosure of Confidential Information; and

(c)    Edgenet shall be entitled, without waiving any additional rights or remedies available to it at law, in equity, or by statute, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

14.    Employee agrees to indemnify, defend, and hold harmless Edgenet from and against any claim, loss, liability, damage or expense, including but not limited to Edgenet's reasonable attorneys' fees, arising out of or connected with any third party claim that, if true, would be a breach by Employee of any of the terms of this Agreement.

15.    Nothing herein contained shall be construed as a guarantee of continued employment of Employee.  Nothing in this Agreement is intended to abrogate, nor should this Agreement be construed in any way to abrogate, the at-will nature of the employment relationship between the Parties.

16.    This Agreement shall be construed in accordance with and controlled by the laws of the State of Tennessee, without regard to its or any other jurisdiction's laws governing conflicts of law.  The Parties agree that the United States Federal District Court for the Middle District of Tennessee and the courts of the State of Tennessee, County of Davidson shall have exclusive subject matter and personal jurisdiction to determine all disputes surrounding this Agreement and disclosure of Confidential Information hereunder.

17.    All agreements and covenants contained herein are severable, and if any of them shall be held to be invalid by a competent court, this Agreement shall be interpreted as if such invalid agreement or covenant were not contained herein.  Subject to the foregoing, all terms and conditions of this Agreement will be deemed enforceable to the fullest extent permissible under applicable law, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect.

18.    All obligations created by this Agreement shall survive any change or termination of the Parties' employment relationship, if one exists or arises.

19.    This Agreement may be assigned by Edgenet in the event of any sale of its business as a going concern. This Agreement will inure to the benefit of and be binding upon the Parties and their successors and assigns.

20.    The provisions of this Agreement constitute the entire Agreement between Employee and Edgenet regarding the subject matter hereof, which Agreement cannot be varied except by writing signed by both parties.  Notwithstanding the foregoing, in the event that Edgenet and Employee have entered into a written employment agreement containing terms materially different from the terms hereof, the terms most favorable to Edgenet shall control unless the parties expressly refer to this section and specify their intent to override it.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day first written above.

EDGENET INC.                                    EMPLOYEE

By: _____

Name: _____          Signature: _____

Title: _____          Name: _STEVE  Corcle._



## Non-Disclosure Agreement

Edgenet, Inc. ("Edgenet" or the "Company"), an affiliate of Liberty Capital Partners, Inc. ("Liberty"), is interested into entering into discussions with,

_Steve Cork_

(please print your full name)

concerning a possible position (the "Opportunity") within our organization. In connection with your consideration of the Opportunity, you may be made aware of certain non-public information, including confidential and proprietary information concerning the business, assets, financial condition, operations and prospects of the Company and its subsidiaries.

As a condition to our furnishing on behalf of the Company such information to you, you agree to treat confidentially such information and any other information relating to the Company and its subsidiaries which, Edgenet or any of the Company's representatives or agents furnish to you at any time (before or after the date of this letter agreement) and in any medium (including written, orally, visually, electronically or by other means, whether designated confidential or not) (collectively, the "Evaluation Material").

The term "Evaluation Material" also shall be deemed to include all notes, analyses, compilations, studies, interpretations or other documents prepared by you which contain, reflect or are based upon or derived from, in whole or in part, directly or indirectly, the information furnished to you pursuant hereto. The term "Evaluation Material" does not include information which (a) was already in your possession prior to the time of disclosure to you by or on behalf of the Company pursuant hereto, provided that the source of each such information was not known to you to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information, (b) is or becomes generally available to the public other than as a result of a disclosure by you, or (c) is or becomes available to you on a non-confidential basis from a source other than the Company, Edgenet or any of the Company's representatives or agents, provided that the source of such information was not known to you to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information.

The Evaluation Material will be used solely for the purpose of evaluating the Opportunity between the Company and you, and will be kept confidential to you, expect to the extent that disclosure (a) has been consented to in writing by the Company, or (b) is required by law or other applicable judicial or government order.

All right, title and interest in and to the Evaluation Material shall remain the exclusive property of the Company and the Evaluation Material shall be held in trust and confidence by you. No interest, license or any right respecting the Evaluation Materials, other than expressly set out herein, is granted to you under this letter agreement by implication or otherwise, and no license or right is granted either expressly or by implication, estoppel or otherwise, to publish, reproduce, prepare derivative works based upon, distribute copies of, publicly display, or perform, any of the items, either during the term of this letter agreement or thereafter.

In addition, without the prior written consent of the Company, you will not disclose to any person (a) that the Evaluation Material has been made available to you, (b) that the Company is contemplating the Opportunity, that discussion or negotiations are taking place concerning the possible Opportunity between you and the Company, or (c) any terms or other facts, conditions or other information with respect to any such possible Opportunity including the status thereof.

In the event that you are requested by judicial, legislative or regulatory process to disclose any Evaluation Material, you shall provide the Company with prompt notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this agreement. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the terms hereof, you may disclose only that portion of the Evaluation Material that you are advised by counsel is legally required, you will give the Company written notice of the information to be disclosed as far in advance as practicable, and you will exercise reasonable efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded the portion of the Evaluation Material so disclosed.

It is understood and agreed that money damages would not be a sufficient remedy for any breach of this letter agreement, and that the Company is entitled to seek specific performance and injunctive or other equitable relief for such breach. Such remedy shall not be deemed to be the exclusive remedy for breach of this agreement, but shall be in addition to all other remedies available at law or equity to the Company.

None of the Company, Liberty or any of their affiliates, or any of the directors, officers, employees, shareholders, agents or representatives of any of the foregoing makes any representation or warranty, either express or implied, as to the accuracy or completeness of the Evaluation Material. You agree that none of the Company, Liberty, nor any of their affiliates, or any directors, officers, employees, shareholders, agents or representatives of any of the foregoing shall have any liability to you resulting from the use of the Evaluation Material or any errors therein or omissions there from. It is further understood that unless and until a formal employment offer is extended and has been executed and delivered, neither you, Liberty, the Company or its shareholders shall be under any legal or other obligation of any kind except for matters specifically agreed in this letter agreement.

Within 10 days after being so requested by the Company in writing, except to the extent you are advised by legal counsel that complying with such request would be prohibited by law, you will return or destroy all Evaluation Material. Any destruction of materials shall be confirmed by you in writing. Any Evaluation Material that cannot be returned or destroyed (such as oral Evaluation Material) shall remain confidential, subject to the terms of this agreement.

This agreement binds the parties only with respect to the matters expressly set forth herein.  As such, unless and until final employment agreements regarding the Opportunity between the Company and you have been executed and delivered, (a) neither the Company nor you will be under any legal obligation of any kind whatsoever to negotiate or consummate the Opportunity, and (b) you shall have no claim whatsoever against the Company or Edgenet or any of their respective directors, officers, owners, affiliates or representatives arising out of or relating to the Opportunity.

Additionally, you agree not to solicit for employment any Company employees to whom you may be introduced or otherwise had contact with as a result of your consideration of the Opportunity for a period of five years after the date of this agreement, provided that you shall not be restricted in any general solicitation for employees (including though the use of employment agencies) not specifically directed at any such persons, and provided further that you shall not be restricted in hiring any such person who responds to any such general solicitation.

This agreement shall be governed by the internal laws of the State of New York, without regard to conflict of laws provisions.  This agreement may be amended only in writing.  No failure or delay by the Company or Liberty in exercising any right hereunder or any partial exercise thereof shall operate as a waiver thereof or preclude any other or further exercise of any right hereunder.  In case any provision of this letter agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.  This letter agreement may be assigned by the Company but not by you without the Company's prior consent.

As to any individual item of information disclosed to you and governed by this letter agreement, the obligations set forth herein shall expire five (5) years from the effective date of this letter agreement, except for trade secrets (as defined by applicable law), the confidentiality of which shall be maintained for as long as the specific trade secret involved remains a trade secret.

The Liberty is a third party beneficiary of this letter agreement.

Please confirm that the foregoing is in accordance with your understanding by signing and returning this letter to the designated Edgenet Inc. representative.

**Edgenet, Inc.**                                    **Participant:**

By: _____          By: _____

Name: _Brett Gavdr_____          Name: _STEPHEN    CORK____

Title: _Director  HR_____          Title: _____

Date: _8/26/05_____          Date: _Apr 26/05_____



# EXHIBIT D
## TO FIRST AMENDED COMPLAINT

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("Agreement") is made for valuable consideration the receipt and sufficiency of which is acknowledged the latest date set forth below, between WTS Paradigm, LLC a Wisconsin limited liability company ("WTS") and the undersigned third party executing this Agreement on the signature page ("Vendor").

Section 1. Purpose. WTS and Vendor desire to explore a business opportunity of mutual interest and in connection with this opportunity agree to execute this Agreement.

Section 2. Definitions.

"Confidential Information" means any business contact, potential business affiliation, information, technical data, or know-how, including, but not limited to, that which is related to research, products, services, customers, markets, software, developments, inventions, processes, designs, drawings, engineering, marketing or finances by example and not limitation provided by one party. Confidential Information does not include information, technical data or know-how which (i) is in possession of the receiving party at the time of disclosure as shown by the receiving party's files and records immediately prior to the time of disclosure; (ii) prior to or after the time of disclosure becomes part of the public knowledge or literature, not as a result of any inaction or action of the receiving party; (iii) is approved for release in writing by the disclosing party; or (iv) information that qualifies as a Trade Secret.

"Trade Secret" means any and all documents or information relating to the Disclosing Party which meet the definition of a Trade Secret under Section 134.90, Wis. Stats. Examples of such Trade Secrets may include, but are not limited to: software architecture, formulas, patterns, compilations, programs, devices, methods, techniques or processes, customer lists, customer contact information, product costing and mark-up information, service costing and mark-up information.

The party disclosing the Confidential Information or Trade Secrets shall sometimes be referred to as "Disclosing Party" in the Agreement and the party receiving the Confidential Information or Trades Secrets shall sometimes be referred to as "Receiving Party" in the Agreement.

Section 3. Nonuse and Nondisclosure of Confidential Information and Trade Secrets. The Receiving Party agrees not to use any Confidential Information or Trade Secrets for any purpose except to evaluate and engage in discussions concerning the potential business relationship between the parties. The Receiving Party shall not reverse engineer, disassemble or decompile any prototypes, software or other tangible objects which embody the Disclosing Party's Confidential Information or Trade Secrets and which are provided to the Receiving Party hereunder. The Receiving Party shall not disclose any Confidential Information or Trade Secrets to anyone except to those employees, agents and consultants who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship and who have previously agreed to be bound by confidentially obligations no less stringent than those in this Agreement. The recipient's obligations under this Section with

090180 mutual nondisclosure agreement vendor

respect to any Confidential Information shall remain in effect for two (2) years from the date it first received such Confidential Information hereunder. The term of this covenant not to disclose Trade Secrets is unlimited.

Section 4. Maintenance of Confidentiality Information and Trades Secrets. The Receiving Party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information and Trades Secrets. Without limiting the foregoing, Receiving Party shall take at least those measures that Receiving Party takes to protect its own most highly confidential information and at a minimum the measures taken by WTS to protect its Confidential Information and Trades Secrets. Each party agrees to immediately notify the other in writing of any misuse or misappropriation of such Confidential Information or Trade Secrets. The Receiving Party shall not make any copies of Confidential Information or Trade Secrets unless the same are previously approved in writing by the Disclosing Party. The Receiving Party shall reproduce Disclosing Party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. The Receiving Party shall immediately notify the Disclosing Party in the event of any unauthorized use or disclosure of the Confidential Information or Trades Secrets.

Section 5. No Warranty. ALL CONFIDENTIAL INFORMATION AND TRADE SECRETS ARE PROVIDED "AS IS". NEITHER PARTY MAKES ANY WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

Section 6. Return of Materials. Upon the written request of the disclosing party or upon completion of the purpose contemplated for the release of the Confidential Information and/or Trade Secrets, whichever occurs first, the receiving party shall immediately return to disclosing party all Confidential Information and Trade Secrets received pursuant to this Agreement, or, at the request of the disclosing party, shall immediately destroy all Confidential Information and Trade Secrets, and shall certify such destruction to the disclosing party.

Section 7. Patent, Trademark or Copyright Infringement. Nothing in this Agreement is intended to grant any rights under any patent(s), trademark(s), or copyright(s) of either party, nor shall this Agreement grant either party any rights in or to the other party's Confidential Information or Trade Secrets, except the limited right to review such patent, trademark(s), copyright(s), Confidential Information or Trade Secrets solely for the purpose of the business relationship established or to be established by the parties.

Section 8. Third Party Requests. In the event that a party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information or Trade Secrets supplied by the other party, the receiving party agrees to provide the other party with prompt notice of such request(s), and if disclosure of such information is required, the party will: (i) furnish only that portion of the Confidential Information or Trade Secrets which the receiving party in the written opinion of its legal counsel is legally compelled to disclose, and (ii) use its best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to the Confidential Information or Trade Secrets.

090180 mutual nondisclosure agreement vendor

Section 9.  Assignment, Successors.  Neither party may assign its rights under this Agreement except with the prior written consent of the other party.  This Agreement shall be binding upon, inure to the benefit of, and be specifically enforceable by the parties and their respective legal representatives, successors and assigns.

Section 10.  Survival.  The commitments in this Agreement shall survive the expiration, termination or cancellation of this Agreement.

Section 11.  Remedies.  Each party agrees that its obligations hereunder are necessary and reasonable in order to protect the other party and the other party's business, and that monetary damages will not be an adequate remedy for a breach or non-compliance with the terms of this Agreement.   Accordingly, each party agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to the other party, and that, in addition to any other remedies that may be available in law, in equity or otherwise, the party shall be entitled to obtain ex parte temporary or permanent injunctive relief against the actual or threatened breach of this Agreement or the continuation of any such breach.

Section 12.  Modification, Amendment, Waiver.  No modification, amendment or waiver of any provision of this Agreement shall be effective unless approved in writing by the party against whom enforcement is sought.  The failure of a party at any time to enforce any of the provisions of this Agreement shall not be construed as a waiver of such provisions and shall not affect the party's right thereafter to enforce each and every provision of this Agreement.

Section 13.  Governing Law and Jurisdiction.  This Agreement shall be governed by and construed under the laws of the State of Wisconsin.  The Federal and State courts within the State of Wisconsin shall have the exclusive jurisdiction to adjudicate any dispute arising out of this Agreement.

Section 14.  Fees and Costs.  The prevailing party in any lawsuit for enforcement of this Agreement shall be entitled to reimbursement from the other party for all costs and expenses (including reasonable attorney's fees) incurred by its enforcing the obligations of this Agreement.

Section 15.  Use of Copies and Facsimile.  It is agreed that an executed facsimile or copy of this document is a legal and binding contract with the same force as the original.

Section 16.  Authority.  The signature of each of the undersigned represents their agreement to be bound by the terms of this Agreement and their warranty of authority to bind their respective entity to the terms of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement effective as of the date first above written in Wisconsin.

WTS PARADIGM, LLC                         VENDOR:

By: _____            By: _____

Title: _____ Date: _____      Title: Founder   Date: 2/18/2010

090180 mutual nondisclosure agreement vendor

# VMH SOFTWARE

## 6. Confidentiality

**VMH Software** will maintain as confidential all information obtained under or in connection with this Agreement and will not divulge such information to any person without **WTS Paradigm** prior written consent. This clause does not extend to information which was rightfully in the possession of **VMH Software** prior to the commencement of the negotiations that led to this Agreement, or that which was already in the public domain or becomes so at a future date.

## 7. Materials and Reports

**VMH Software** will provide reports and documents to WTS Paradigm during the course of this agreement and these materials will be strictly confidential to WTS Paradigm and for their sole use. These Documents will be property of **WTS Paradigm** and **VMH Software** will not redistribute these documents or reports without prior written consent from WTS Paradigm.

## 8. Independence

**VMH Software** is an independent contractor and nothing in this Agreement will render them an agent or partner of **WTS Paradigm. VMH Software** is retained or engaged by **WTS Paradigm** only for the purposes and to the extent set forth in this Agreement. **VMH Software's** relation to **WTS Paradigm** will, during the period or periods of this Agreement, be that of an independent contractor and as such **VMH Software** will be free to dispose of such portion of its time, energy and skill when **VMH Software** is not obligated under this Agreement in such a manner as **VMH Software** sees fit. This Agreement will not establish a joint venture, agency or partnership between **WTS Paradigm** and **VMH Software.**

Effective _2-23-2010_

IN WITNESS WHEREOF the parties have signed this Agreement as of the date above written.

Per: WTS Paradigm

_Joel Fields - VP Operations_

Per VMH Software

_____

Confidential – VMH Software - 2010



**EXHIBIT E**
**TO FIRST AMENDED COMPLAINT**

# VMH Software & Consulting

## VMH SOFTWARE

WHEREAS **VMH Software** has agreed to provide services set out in Appendix 1 hereof to **WTS Paradigm** AND the parties have agreed and do hereby agree that the terms of such agreement be put into writing NOW THEREFORE the parties agree to be bound by the following terms and conditions:

### 1. The Term
This agreement will commence and terminate on the dates specified in Appendix 1

### 2. VMH Software & Consulting
will ensure that it will perform the services as described in Appendix 1 ("the Service"). Nothing contained in this contract will be construed as or have the effect of constituting a relationship of employer and employee between the parties to this agreement.

- The relationship is strictly business to business
- **WTS Paradigm** will not deduct and withhold tax from fees paid to **VMH Software**; **VMH Software** is responsible for their own tax affairs.
- **VMH Software** will have no rights to the benefits and protections in law that are normally available to an Employee of **WTS Paradigm**

### 3. Fees
The fee payable by **WTS Paradigm** to **VMH Software** will be the fee as is specified in Appendix 1. The fee will be payable at conclusion of the "Service". All fees quoted are exclusive of sales tax. **VMH Software** will submit invoices to WTS Paradigm, 1600 Aspen Commons, Suite 500 Middleton, WI 53562 at the conclusion of the project and deliverables

### 4. Meetings
**VMH Software** and **WTS Paradigm** will attend meetings as required from time to time in order to discuss aspects of this agreement and the Services. The primary reason for this is to ensure that any issues, risks or problems are identified and fixed as early as possible in the assignment.

### 5. Expenses
Reasonable expenses when properly and necessarily incurred will be paid by **WTS Paradigm**. **VMH Software** will explicitly detail and obtain **WTS Paradigm** approval before the expense is incurred.

JF

## VMH SOFTWARE

### 6. Confidentiality

**VMH Software** will maintain as confidential all information obtained under or in connection with this Agreement and will not divulge such information to any person without **WTS Paradigm** prior written consent. This clause does not extend to information which was rightfully in the possession of **VMH Software** prior to the commencement of the negotiations that led to this Agreement, or that which was already in the public domain or becomes so at a future date.

### 7. Materials and Reports

**VMH Software** will provide reports and documents to WTS Paradigm during the course of this agreement and these materials will be strictly confidential to WTS Paradigm and for their sole use.  These Documents will be property of **WTS Paradigm** and **VMH Software** will not redistribute these documents or reports without prior written consent from WTS Paradigm.

### 8. Independence

**VMH Software** is an independent contractor and nothing in this Agreement will render them an agent or partner of **WTS Paradigm. VMH Software** is retained or engaged by **WTS Paradigm** only for the purposes and to the extent set forth in this Agreement. **VMH Software's** relation to **WTS Paradigm** will, during the period or periods of this Agreement, be that of an independent contractor and as such **VMH Software** will be free to dispose of such portion of its time, energy and skill when **VMH Software** is not obligated under this Agreement in such a manner as **VMH Software** sees fit.  This Agreement will not establish a joint venture, agency or partnership between **WTS Paradigm** and **VMH Software.**

Effective _2-23-2010_

IN WITNESS WHEREOF the parties have signed this Agreement as of the date above written.

Per: WTS Paradigm

_Joel Fields - VP, Operations_

Per VMH Software

Confidential – VMH Software - 2010

# VMH SOFTWARE

## APPENDIX 1

Term: This agreement will commence on February 22, 2010 and terminate on or before March 15, 2010

**Services Scope:**

Overview:
WTS Paradigm has interest in developing a strategy for gaining further penetration of their software to the retail and dealer channels. Specific retailers include, but not limited to Lowe's and The Home Depot. Dealer channel(s) include ProBuild, 84Lumber and regional players such as Bradco supply etc.

VMH Software founder Stephen Cork, based on his unique experience, is in a position to provide a range of guidance and insight to WTS Paradigm particularly as it relates to Retail and Dealer channels. The specific engagement/deliverables will be based on the following areas:

- Product Strategy Review
- Marketing Strategy Review
- Sales Strategy Review

Process:
1. Contract
2. Inquiry/Data Collection
3. Interpretation
4. Feedback
5. Alternatives
6. Decision
7. Action
8. Measurement

Timetable:

| ITEM | HOURS | START | END | BILLABLE |
|---|---|---|---|---|
| Contact | | 2/17/2010 | 2/22/2010 | x |
| Inquiry* – 1 1/2 days on site – WI | 12 | <2/28/2010 | | $2,150.00 |
| Interpretation | 8 | 3/3/2010 | 3/3/2010 | $1,080.00 |
| Feedback | 4 | 3/4/2010 | 3/4/2010 | $ 540.00 |
| Alternatives/Decision | 8 | 3/8/2010 | 3/9/2010 | $1,080.00 |
| Action Plan & Report | 14 | 3/10/2010 | 3/12/2010 | $1,900.00 |
| Measurement | | | | x |
| | | | | $6,750.00 |

JF

## VMH SOFTWARE

INQUIRY

Interview of management, sales, product support and customer service to gain an understanding of:
- Culture, people, history, strengths and weaknesses.
- Product offerings, technology, product roadmap and demonstration (s)
- Current pricing, market strategies and sales/marketing team structure

INTERPRETATION

What does the inquiry data say, and, what does it mean?  Penetrating Retailers and Dealers is dependant on many factors including:
- People  - skill set, attitude, credibility etc
- Approach – Consultative/Hard Sell/Technical etc
- Product gaps

FEEDBACK

Confirmation of data and clarify important issues.  Phone meeting with senior management.  Discussion to include agreement on current status and general business as it applies to Retail/Dealer channels

ALTERNATIVES/DECISIONS

Identify alternative approaches to Retailer and Dealer markets
- Price strategies
- Product offerings
- Business support
- People
- WTS ideas/alternatives

ACTION AND REPORT

- Recommendations on pricing strategies, options and alternatives
- Specific pricing values and ranges
- Potential overall value from retailers and dealer channel
- Partnership suggestions and strategies for aiding in market penetration
- Indentify specific needs of retailers and dealers with recommendations how WTS and/or additions to WTS offering provides solutions

MEASUREMENT

Follow up in 3 & 6 months to determine WTS success in the indentified markets.

Confidential – VMH Software - 2010

# VMH SOFTWARE

SPECIFIC DELIVERABLES
(In conjunction with the overall report and recommendations)

1. PRICE MODELS FOR RETAIL & DEALERS
   1.1. Industry samples
   1.2. Recommendations
       1.2.1.  Window recommendations
       1.2.2.  Door recommendations
       1.2.3.  Other categories

2. TOTAL VALUE OF RETAIL/DEALER OPPORTUNITIES

3. MAINTENANCE AND VERSIONING
   3.1. Typical maintenance costs
   3.2. Release updates major vs inclusive

4. PARTNERSHIP RECOMMENDATIONS (DEALER FOCUS)
   4.1. How partnership can work
   4.2. Recommended partners and contacts

5. SALES APPROACH AND HOT POINTS (big box)
   5.1. Service level requirements
   5.2. Geography – rep locations

6. PRODUCT
   6.1. (GUI) Recommendations/observations
   6.2. Architecture/system logic – needs

7. MARKETING
   7.1. ROI models
   7.2. Trade shows

8. GENERAL RECOMMENDATIONS

Confidential – VMH Software - 2010

## VMH SOFTWARE

### PRICING MODELS:

Per location
(Industry Standard)

| Store locations | Annual Fee | Initial Fee | Catalog Main | Service Fee |
|---|---|---|---|---|
| 1-500 | $125 | | | |
| 501-750 | $175 | $50,000 | $15,000/seat | $71,000 |
| 751-1250 | $250 | | | |
| 1251- 1750 | $200 | | | |
| Over 1750 | $360,000 cap | | | |

Consolidated Approach:
(Industry Standard)

| ILF | ALF | Services | |
|---|---|---|---|
| $750 ,000 | $1,000,000 | $1,240,000 | |

Recommended Approach:

| ILF | ALF | Services | |
|---|---|---|---|
| $xxx,xxx | $ xxx,xxx | $ xxx,xxx | |

### TOTAL VALUE:



- LOW
- THD
- DEALER

Confidential – VMH Software - 2010

# VMH SOFTWARE

## PARTNERSHIP – DEALER FOCUS



Lorem ipsum dolor sit amet, consectetur adipiscing elit. Aliquam consequat euismod felis at varius. Sed tincidunt ante et velit tincidunt id egestas leo iaculis. Curabitur id arcu vitae ante sagittis dictum. In ullamcorper, turpis ut eleifend sodales, enim risus condimentum risus, nec varius diam ante sit amet arcu. Integer a tortor enim. In imperdiet diam

Confidential – VMH Software - 2010

# EXHIBIT F
## TO FIRST AMENDED COMPLAINT

# DECLARATION OF STEPHEN CORK

STEPHEN CORK certifies under oath and declares under penalty of perjury that the following statements are true and correct and based on personal knowledge:

1. I am a resident of Tennessee. I am over the age of majority and am competent to testify as to the facts set forth in this Declaration.

2. I was hired by Edgenet, Inc. ("Edgenet") in 2005 as Vice President of Building Products. When I was hired by Edgenet I signed a Nondisclosure, Noncompetition, and Intellectual Protection Agreement dated May 10, 2005 with Edgenet, a true and correct copy of which is attached as Exhibit A to this Declaration (hereinafter the "Edgenet Agreement").

3. Paragraph 1 of the Edgenet Agreement provides:

"Confidential Information" means any and all tangible and intangible information (whether written or otherwise recorded or oral) of Edgenet that (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; or (b) that Edgenet designates as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered as confidential. Confidential Information includes, without limitation (i) nonpublic information relating to Edgenet's technology, customers, business plans, promotional and marketing activities, finances and other business affairs, and (ii) third-party information that Edgenet is obligated to keep confidential. Confidential Information also includes any of the above mentioned items that are developed or created by Employee during his/her employment with Edgenet.

4. Paragraph 3 of the Edgenet Agreement provides:

All Confidential Information furnished to Employee will be used solely in connection with performing Employee's duties to Edgenet, will not be discussed with other persons without Edgenet's express written authorization, will not be used in any way directly or indirectly except in furtherance of Edgenet's business, and will be kept confidential by Employee.

1

5.    Paragraph 5 of the Edgenet Agreement provides:

If Edgenet so requests at any time, Employee will return promptly to Edgenet all copies, extracts, or other reproductions in whole or in part of the Confidential Information in the possession of Employee.  All Documents (defined to include not only paper documents but also data stored in computer memory, or on microfilm, microfiche, magnetic tape, disk or other medium, e-mails and any soft documents) that Employee prepares in connection with his/her duties as an Employee of Edgenet, and all Confidential Information that may be given to him/her in the course of his/her employment are and shall remain the sole property of Edgenet. Except as necessary in the performance of Employee's duties, all Documents (including copies of Documents) containing Confidential Information shall be and remain in Edgenet's sole possession on Edgenet's premises and shall not be copied or removed from Edgenet's premises. Upon termination of his/her employment with Edgenet, Employee shall return to Edgenet all Documents, including all copies thereof in Employee's possession or control.

6.    Paragraph 7 of the Edgenet Agreement provides:

Employee shall notify Edgenet immediately upon discovery of any unauthorized disclosure of Confidenial Information, use of Confidential Information other than as permitted hereunder, or any other breach of this Agreement.  Employee will cooperate with Edgenet in every reasonable way to help Edgenet regain possession of its Confidential Information and prevent further unauthorized use.

7.    Paragraph 8 of the Edgenet Agreement provides:

All Confidential Information shall remain the exclusive property of Edgenet.  Edgenet retains all rights and remedies affored it under patent, copyright, trade secret, trademark, and any othe applicable laws of the United States and the states thereof, or any applicable foreign countries, including, without limitation, any laws designed to protect proprietary or confidential information.  This Agreement does not grant to Employee any express or implied right to any of Edgenet's Intellectual Proprety.

8.    Paragraph 9 of the Edgenet Agreement provides:

Intellectual Property.

(a)    "Intellectual Property" means any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, design, technique, know-how, trade secret, idea or other intellectual



property right whatsoever or any interest therein, whether or not patentable or registrable under copyright, trademark or similar statutes or subject to analogous protection.

...

(d)     Employee agrees to perform during and after his/her employment, all acts deemed necessary or desirable by Edgenet to permit and assist it, at its expense, in perfecting and enforcing the full benefits, enjoyment, rights and title throughout the world in Edgenet Intellectual Property. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in the registration and enforcement of applicable patents, copyrights or other legal proceedings.

9.    Paragraph 11 of the Edgenet Agreement provides:

Employee shall not make, use or permit to be used any Edgenet Property otherwise than for the benefit of Edgenet. The term "Edgenet Property" shall include all notes, memoranda, reports, lists, records, drawings, sketches, specifications, software programs, software code, data, computers, cellular phones, pages, credit and/or calling cards, keys, access cards, documentation or other materials of any nature and in any form, whether written, printed, electronic or in digital format or otherwise, relating to any matter within the scope of Edgenet's business or concerning any of its dealings or affairs and any other Edgenet property in his/her possession, custody or control. Employee acknowledges and agrees that all Edgenet Property shall be and remain the sole and exclusive property of Edgenet. Immediately upon termination of Employee's employment with Edgenet, or at such early time as Edgenet may request, Employee shall deliver all Edgenet Property in Employee's possession or control, and all copies thereof, to Edgenet.

10.    Paragraph 18 of the Agreement provides:

All obligations created by this Agreement shall survive any change or termination of the Parties employment relationship, if one exists or arises.

11.    During my employment with Edgenet I was responsible for sales of Edgenet, Inc.'s m2o product configuration software product (hereinafter "m2o software product") to dealers and window manufacturers. In the course of my employment I became familiar with Edgenet's m2o software product in connection with my sales efforts.

12.    In the course of my employment with Edgenet, I was provided technical and non-technical and financial data to assist me in my efforts to sell Edgenet's m2o software product to customers. Much of this data was non-public information that was not generally known or readily ascertainable outside of Edgenet. Much of this data was marked confidential by Edgenet and Edgenet took steps to ensure that the data remained confidential and non-accessible by parties outside of Edgenet.

13.    I left my employment with Edgenet in approximately June of 2007.

14.    After I left my employment with Edgenet I started consulting in the construction visualization space. I performed consulting services for various companies through my company VMH Software.

15.    I have known Nate Herbst, President of WTS Paradigm, LLC since approximately 2006 from various trade shows and industry events. After I left Edgenet, Mr. Herbst and I had conversations from time to time regarding the possibilities of WTS Paradigm, LLC doing business with one of the clients for which I consulted.

16.    In 2009, Mr. Herbst and I also discussed WTS engaging me to do consulting work for WTS in connection with their product configuration software product. At the time, WTS was interested in aggressively pursuing The Home Depot, Lowe's and the dealer market. The Home Depot was WTS' main target.

17.    In December 2009, while Mr. Herbst and I were discussing my providing consulting service to WTS, Mr. Herbst emailed me and asked me for information concerning Edgenet's licensing fees for "big box" retailers, specifically, what license fees Edgenet charged its big box customers for Edgenet's m2o software. While I did not respond with the requested information at that time, later and during the course providing services to WTS, I provided Mr.

Herbst with specific information concerning Edgenet's m2o software license fees that it charged its customers.

18.    From my experience working at Edgenet, the specific license fees that Edgenet charges customers for its m2o software is considered by Edgenet to be confidential information and Edgenet does not publish this information and takes steps to keep third parties from discovering the license fees it charges to customers.

19.    Mr. Herbst was aware that I was a former Edgenet employee and was aware that I had signed an agreement with post-employment restrictions; however, Mr. Herbst was interested in hiring me as a consultant because of the knowledge I had regarding Edgenet and my knowledge of Edgenet's confidential information.

20.    On February 18, 2010, WTS and my company VMH Software entered into a Non-Disclosure Agreement.  The Non-Disclosure Agreement between WTS and VMH Software is attached as Exhibit B to this Declaration.

21.    On February 23, 2010, WTS and VMH Software entered into a consulting agreement.  The Consulting Agreement between WTS and VMH Software is attached as Exhibit C to this Declaration.

22.    The purpose of the consulting agreement was for me to provide assistance in structuring WTS's sales strategy for future sales targets for WTS' product configuration software product.  The WTS sales targets for which I provided assistance and advice included The Home Depot, Lowe's 84, ProBuild (UBC) and Bradco. In performing my consulting duties pursuant to the Consulting Agreement with WTS, I assisted and advised WTS regarding (i) defining the future functionality of their product configuration software, (ii) developing a pricing model for The Home Depot and other customers, (iii) setting out a product strategy review for WTS' product

5

configuration software, (iv) developing a marketing strategy review for WTS' product configuration software, and (v) developing a sales strategy review for WTS' product configuration software. In connection with each of these efforts, I provided WTS with information relating to Edgenet's m2o product that is confidential to Edgenet and which Edgenet takes steps to keep from becoming known to third parties outside of Edgenet. For example, I provided WTS with access to Edgenet's sales power point presentation to UBC (now called ProBuild) that Edgenet used during the sales process in successfully winning UBC's business in 2006-7. WTS subsequently won the UBC business from Edgenet.

23. In assisting WTS with defining the future functionality of their product configuration software, WTS solicited from me, and I provided information relating to the functionality of Edgenet's m2o software and provided WTS with suggested functionality and additions to their product's current functionality that was based on Edgenet's m2o software. In doing so, I provided WTS with Edgenet confidential information and other Edgenet property. For example, I provided WTS with images of Edgenet's graphical user interface used at The Home Depot and at by customers. I also strongly suggested that WTS use the Edgenet graphical user interface images. Mr. Herbst was aware that the information I was providing him on product functionality was Edgenet confidential information and that the graphical user interface images I provided were Edgenet's property.

24. Mr. Herbst specifically solicited Edgenet confidential information relating to Edgenet pricing to customers. In assisting WTS in developing a pricing model for The Home Depot and other customers which WTS was targeting as potential sales, I made recommendations and provided advice on pricing strategies, pricing options and pricing alternatives and provided specific pricing values and ranges based on Edgenet's pricing strategies, options and actual prices

6



using Edgenet's pricing model for its m2o software as a model for my recommendations. I also showed Nate Herbst Edgenet's iCat (a catalog management solution) pricing which is confidential to Edgenet and provided Mr. Herbst and WTS with information on Edgenet's m2o annual license fees and how Edgenet calculated such fees for vendors of The Home Depot. Mr. Herbst was aware that the information I was providing him on pricing strategies, options, values and ranges was Edgenet confidential information.

25.    In developing a marketing and sales strategy review for WTS, I advised WTS on the potential overall value from retailers and dealer channels and made partnership suggestions and strategies for aiding in market penetration. The information I provided to WTS with respect to retailer and dealer channels was obtained during my employment at Edgenet and much of it was confidential to Edgenet. Mr. Herbst and his WTS team was well aware that the source of this information was Edgenet.

26.    On April 13-14, 2010 I traveled to WTS' office in Madison, Wisconsin and attended meetings with Nate Herbst, President of WTS, Joel Fields, VP of Operations for WTS, and Jess Williamson, Product Lead for WTS. The main subjects of the meetings were defining WTS' sales strategy for future targets including The Home Depot, Lowe's, 84, Bradco.

27.    I viewed a demonstration of WTS' product configuration software in the spring or summer of 2010. My impression, based on the demonstration, was that WTS' product configuration software was a very technically based system and not user friendly. I advised WTS that WTS' system as currently designed was not likely to get WTS The Home Depot's business. My recommendation to WTS with respect to WTS' desire to win The Home Depot business was for WTS to copy certain parts of Edgenet's m2o software. For example, I recommended that WTS copy Edgenet's graphical user interface and the question and answer trees employed by Edgenet.

7

28.    WTS questioned me about Edgenet's system architecture and system logic and requested my recommendations as to how WTS could be more competitive with their product configuration product and I explained to WTS about how Edgenet used frames and slots architecture in their m2o product and how the frames and slots architecture permitted the Edgenet m2o product to be very fast.  At the time of the demonstration, it was my impression from viewing the demonstration that WTS' product configuration product worked by asking the user a transcending series of questions in order. If the user answered all the questions and wanted to change an answer to an earlier question, the user could not simply change the earlier answer without re-answering all the questions again.  The WTS system had a prescribed path, rather than an optional path as to how to choose the product the user wanted.  The WTS system was unable to truncate the process and thereby remove or eliminate products by answering a question out of turn.  Based on a subsequent review of WTS' system as it is now installed at The Home Depot, it is my belief that the current version of the WTS product configuration software is now able to truncate the question process.

29.    My impression of WTS' product configuration software was that it was too slow.  I advised WTS that if they wished to compete for The Home Depot's business they needed to increase the speed of their product configuration software.  Both Nate Herbst and Jess Williamson of WTS responded that WTS' product configuration software had sufficient speed to compete for The Home Depot's business.  In response, I advised Jess Williamson that he should go to a The Home Depot store and view the manner and speed at which Edgenet's m2o product worked.  Mr. Williamson took my advice and viewed Edgenet's m2o product at a The Home Depot store.  When he returned, Mr. Williamson acknowledged that WTS' product configuration software was not as

8

fast as Edgenet's m2o software and WTS' product needed to be faster if WTS hoped to replace the Edgenet product configuration software product at The Home Depot.

30. At WTS request, I provided WTS with Edgenet confidential information on price models for retails and dealers, including real world Edgenet industry samples. I also provided recommendations with respect to pricing for window products, door products, and other product categories based on Edgenet price models. The Edgenet industry samples and price models were not publically available information and were considered as confidential information by Edgenet. Mr. Herbst was aware that the information I was providing him relating to price models was Edgenet confidential information.

31. I qualified available retailer and dealer opportunities for WTS based on my knowledge of Edgenet's business and I provided WTS with Edgenet historical maintenance costs for its m2o software product and provided Edgenet's methods and timing for providing new releases and new versions of its m2o software product. Mr. Herbst was aware that the information I was providing him with respect to Edgenet's maintenance costs and versioning was Edgenet confidential information.

32. I provided WTS with Edgenet's sales approach to prospective customers. Mr. Herbst was aware that the information I was providing him with respect to Edgenet's sales approach was Edgenet confidential information.

33. I provided WTS with Edgenet's Service Level Agreement metrics that Edgenet offered its customers. Mr. Herbst was aware that the information I was providing him with respect to Edgenet's SLAs was Edgenet confidential information.

Case 3:14-cv-02264   Document 50-6   Filed 01/28/15   Page 10 of 11 PageID #: 883

34.    I recommended that WTS standardize their catalog in the same manner that Edgenet used a standardized catalog and advised WTS as to how Lowe's and The Home Depot's process of creating catalogs differed based on my experience selling the m2o software.

35.    I provided WTS with a copy of Edgenet's ROI model for Edgenet's m2o product that Edgenet had prepared for a customer.  This was an Edgenet confidential document.  Mr. Herbst was aware that the document I gave him was a confidential Edgenet document.

36.    WTS paid me $6,750 for my consulting services.

37.    I have been retained as a consultant by EdgeAQ, LLC's legal counsel in accordance with my contractual obligation to cooperate in assisting EdgeAQ, LLC to regain possession of its Confidential Information and prevent further unauthorized use of EdgeAQ, LLC's Confidential Information and my further obligation to cooperate in legal proceedings with respect to Intellectual Property under my Nondisclosure, Noncompetition, and Intellectual Protection Agreement, dated May 10, 2005.  I have further agreed to cooperate and provide assistance in connection with the lawsuit between EdgeAQ, LLC and WTS Paradigm, LLC.

38.    Pursuant to the agreement, I will be reimbursed for my time actually expended in providing testimony or in preparing to testify at my standard consulting rate of $110 per hour.

39.    Pending compliance with my obligations to cooperate as detailed above, EdgeAQ, LLC has covenanted not to sue me for past actions and has agreed to indemnify and hold me harmless from and against claims to which I may be subject arising out of my consulting services.

FURTHER AFFIANT SAYETH NOT

Stephen Cork hereby certifies under oath and declares upon penalty of perjury that the foregoing statements in my declaration are true and correct and based on my personal knowledge.

EXECUTED on January 20, 2015.

_____
                                                   Stephen Cork

10